IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DAVID BENNETT, :
:
Plaintiff, :
: CIVIL ACTION
v. :
: NO. 04-CV-40014-FDS
SAINT-GOBAIN CORPORATION, JOHN R. :
MESHER, AND TIMOTHY L. FEAGANS, :
:
Defendants. :

**STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF MOTION OF DEFENDANTS SAINT-GOBAIN CORPORATION, JOHN MESHER AND TIMOTHY FEAGANS FOR SUMMARY JUDGMENT**

Defendants Saint-Gobain Corporation ("Saint-Gobain" or "Company"), John Mesher ("Mesher") and Timothy Feagans ("Feagans") (collectively "Defendants"), by their undersigned counsel, submit this statement of undisputed material facts[1] pursuant to Local Rule 56.1 in support of their Motion for Summary Judgment against plaintiff David Bennett ("Bennett" or "Plaintiff") on both his federal and state law claims.

**General Background**

1. Saint-Gobain Corporation is a heavy manufacturing corporation, with five or six major business units, including building products, abrasive products and glass, ceramic

---

[1] For purposes of this motion only, the facts set forth herein are assumed to be true. Defendants reserve the right to challenge some or all of these facts should this matter proceed to trial.

and high-performance plastic products. (Deposition of John Mesher ("Mesher Dep."), at 54 (describing management committee), 185.)[2]

2. Defendant Saint-Gobain Corporation is the holding company for employees and the corporate staff which provide service to the business units, such as tax, insurance, benefit, IT and legal services. (Mesher Dep., at 185.)

3. Saint-Gobain's headquarters is located in Valley Forge, Pennsylvania. (Mesher Dep., at 34.) Most of the members of Saint-Gobain's Law Department are located at its headquarters' office in Valley Forge. All but one of the Company's intellectual property attorneys are located at the Worcester facility. (Mesher Dep., at 13-14, 125.)

4. At all times material to this matter, Saint-Gobain employed plaintiff David Bennett ("Plaintiff" or "Bennett") as a Senior Patent Attorney at Saint-Gobain's administrative office in Worcester. (Complaint, at ¶¶ 2, 5; Answer, at ¶¶ 2, 5.)[3] Bennett originally was hired by Norton Company in 1989. (Deposition of David Bennett ("Bennett Dep."), at 24, 26.)[4] Norton was acquired by Saint-Gobain in 1990 or 1991. (Bennett Dep., at 28; Mesher Dep., at 13.)

5. In his position as Senior Patent Attorney, Bennett originally reported to Steven Borst. (Id.) Sometime in 1999, Bennett's reporting relationship was changed. At that time, Bennett and others in the intellectual property group began to report directly to defendant Feagans, Deputy General Counsel of Saint-Gobain, who also worked in Worcester. (Complaint,

---

[2] On this date, Defendants also have filed with the Court the Declaration of Jill Brenner Meixel, Esq. ("Meixel Declaration"). The pertinent portions of the deposition of John Mesher and supporting exhibits are attached to the Meixel Declaration as Exhibit A.

[3] Despite filing a Motion to Amend the Complaint, which Motion was granted in part, Plaintiff never filed an Amended Complaint. All references therefore are to the Complaint.

[4] The pertinent portions of the deposition of David Bennett and supporting exhibits are attached to the Meixel Declaration as Exhibit B.

at ¶¶ 3, 7; Answer, at ¶¶ 3, 7; Bennett Dep., at 31.) Feagans reported directly to Mesher, Saint-Gobain's Vice President and General Counsel. (Complaint, at ¶¶ 3, 4; Answer, at ¶¶ 3, 4.) As General Counsel, Mesher worked in Saint-Gobain's headquarters' office in Valley Forge, Pennsylvania. (Complaint, at ¶¶ 4, 10; Answer, at ¶¶ 4, 10.)

6. Since he became General Counsel in 1997, Mesher has hired the following individuals in his department who were over the age of 40 at the time they were hired: Frank Anthony (51 years old at the time he was hired); Elaine Sherman (59 years old at the time she was hired); Teresa Ciccotelli (49 years old at the time she was hired); Charles Blakinger (52 years old at the time he was hired); Kathleen MacMurray (47 years old at the time she was hired); Debra Kohn (45 years old at the time she was hired); Dorean Meacham (57 years old at the time she was hired); and Michael Starczewski (40 years old at the time he was hired). During the time that he has been General Counsel at Saint-Gobain, Mesher also has promoted Carol Gray (46 years old at the time she was promoted), Sherry Carr (57 years old at the time she was promoted) and Lauren Alterman 42 years old at the time she was promoted). (Mesher Dep., at 166-68; Ferrante Affidavit, ¶¶ 10, 11.)[5]

7. The average age of the staff working in Worcester in 1999 was well over the age of 40, with just two individuals below that age:

> David Bennett (61)  Senior Intellectual Property Counsel
> Stephen Borst (56)  Chief Patent Counsel & Assistant Secretary
> Thomas DiMauro (38)  Patent Attorney
> Otto Lies (62)  Trademark Manager (paralegal)
> Mary Porter (45)  Patent Attorney
> Volker Ulbrich (58)  Senior Patent Attorney
> Cheryl Comer (54)  General Assistant
> Sue Gendreau (54)  General Assistant – Patent Counsel
> Donna Neylon (54)  General Assistant – Corporate Patents

---

[5] On this date, Defendants also have filed with the Court the Affidavit of Cathy Ferrante.

>Ruth Swan (54)  General Assistant – Patent Counsel
>Timothy Feagans (39)  Associate General Counsel
>Frank Anthony (53)  Divisional Counsel
>Joan Frank (53)  Paralegal
>Toula Koulisis (46)  General Assistant

(Ferrante Affidavit, ¶¶ 4-5.)

**June 2001 Complaint**

8. On or about June 6, 2001, Bennett made an internal written grievance regarding Feagans' management of the intellectual property law group in Worcester. (Bennett Dep., at 203-04; Bennett Dep. Ex. 34.) As he described it, "[t]he concern we have met to discuss relates exclusively to the way in which Tim Feagans is managing the Law Department in Worcester." (Bennett Dep. Ex. 34, at 1.)

9. Bennett's grievance had four components. Three components had nothing to do with age:

- He contested the circumstances surrounding the hiring of a suitable candidate (Mike Crosby) to fill a vacancy in the group (Bennett Dep. Ex. 34, at 2-3);

- He contested the criticism by Feagans of the performance of a colleague, Otto Lies (Bennett Dep. Ex. 34, at 3-4); and

- He disagreed with certain comments made by Feagans on his review (Bennett Dep. Ex. 34, at 4).

10. Bennett's last complaint was that Feagans created a hostile work environment by praising certain department members, such as Ruth Swan (age 56), while criticizing others, such as Otto Lies (age 64) or Donna Neylon (age 56). (Bennett Dep. Ex. 34, at 5.) From that observation, Bennett concluded that the "older" members of the Group have been marked out for "abusive and disrespectful mis-management." (Bennett Dep. Ex. 34, at 6.) He supported this conclusion by reference to a statement made by another colleague, Mary Porter, of a comment supposedly made by Feagans to "get rid of the older members of the IP group, and

-4-

specifically indicat[ing] by name, Otto [Lies], Volker [Ulbrich] and myself [Bennett] . . . ." (Bennett Dep. Ex. 34, at 4.)[6] Feagans denies ever making any such comments. (Deposition of Timothy Feagans ("Feagans Dep."), at 78-79.)[7]

11. The 2001 grievance was made against Feagans alone. Bennett, Ulbrich and Lies all testified at their deposition that they could not recall ever hearing Mesher make any age related comment. (Bennett Dep., at 75; Deposition of Otto Lies ("Lies Dep."), at 108; Deposition of Volker Ulbrich ("Ulbrich Dep."), at 38.)[8]

12. A preliminary investigation of that claim was undertaken by the Vice President of Human Resource for Saint-Gobain Corporation, Dennis Baker. (Bennett Dep., at 130; Mesher Dep., at 42.) Baker was the top human resources professional within the Company, with twenty-five years of human resources experience. (Mesher Dep., at 48.) Baker and Mesher met with Bennett, and others, in June 2001 and again in July 2001. (Bennett Dep., at 245-46; Mesher Dep., at 42, 45.)

13. In a Confidential Memorandum dated August 3, 2001, Baker concluded that, "the allegations are unfounded that Mr. Feagans made harassing remarks because of age of the Complainants or that he discriminated against them because of their age." (Mesher Dep. Ex. 23, at 6.) Bennett and others were advised of Baker's findings. (Bennett Dep., at 77.)

---

[6] Plaintiff does not allege and in fact did not file a charge or institute suit in connection with the matters which were the subject of the June 2001 internal grievance. The cornerstone of the case before this Court is Plaintiff's claim that his termination in October 2002 was discriminatory. (Complaint, at ¶¶ 18, 21.)

[7] The pertinent portions of the deposition of Timothy Feagans and supporting exhibits are attached to the Meixel Declaration as Exhibit C.

[8] The pertinent portions of the deposition of Otto Lies and the supporting exhibits are attached to the Meixel Declaration as Exhibit D. The pertinent portions of the deposition of Volker Ulbrich are attached to the Meixel Declaration as Exhibit E.

## Positive Performance Review and Feedback for Bennett in 2002

14.     Thereafter, Bennett continued in his position in the IP group. The performance evaluation he received in February 2002, signed by Feagans as his immediate supervisor and by Mesher as the supervisor's manager, was *higher* than the 2001 performance evaluation. (Compare, 2001 Performance Evaluation and Law Department Evaluation Worksheet (Bennett Dep. Ex. 23) with 2002 Performance Evaluation and Law Department Evaluation Worksheet (Bennett Dep. Ex. 24); Feagans Dep., at 60-64; Mesher Dep., at 157, 164.) He was rated as a 4, between effective and outstanding, with an overall rating on the Law Department Evaluation Worksheet of 4.25 (as compared to 3.75 for 2001). (Bennett Dep. Ex. 24; Feagans Dep. Ex. 10; Feagans Dep., at 61-64.) This change resulted in a salary increase of 2.9%, as contrasted with a raise of 2.7% for 2001. (Ferrante Affidavit, ¶¶ 8-9, attached Salary Confirmation, effective date 4/1/2001 and attached Salary Confirmation, effective date 4/1/2002.)

15.     The comments in the February 2002 evaluation are balanced:

> The ratings and comments from this review are intended to place emphasis on David's performance as a lawyer for Saint-Gobain. On this level, David is one of the most respected and valued members of the Department. He brings tremendous energy and enthusiasm to his work and get[s] excellent results for his clients. His work in developing an appropriate legal strategy for responding to various actions by 3M has been outstanding. Although there were several instances last year when David's communications on Department matters were not constructive or professional, I have seen some improvement in recent months . . . .

(2002 Performance Evaluation (Bennett Dep. Ex. 24) Overall Rating, Manager's Comments, at 4.)

16.     Other comments later in 2002 established that Feagans judged Bennett on his work performance and provided positive feedback. (Feagans Dep., at 73-77; Feagans Dep.

-6-

Exs. 13-19.) Feagans even worked with Bennett to create objectives for the 2002 bonus program which were easier to achieve than the objectives Bennett, himself, had suggested. (Feagans Dep., at 74-76; Feagans Dep. Exs. 16-17.)

17. This positive performance also was noted by Mesher. On August 28, 2002, he made recommendations for November 2002 stock option grants for those in his department. (Mesher Dep., at 158-60; Mesher Dep. Ex. 68.) Included with those who were recommended was Bennett, recommended for an exceptional stock option grant. (Id.)

18. There were three major criteria considered for the award of stock options: 2001 performance (shown in the 2002 Performance Evaluation) and bonus ratings, years of service and retention risk. (Mesher Dep. Ex. 70; Mesher Dep., at 161-62.)

19. Those attorneys in Worcester who were recommended for the award of stock options in addition to Bennett were Frank Anthony (age 56), Michael Crosby (age 33), Mary Porter (age 48) and Volker Ulbrich (age 60). (Mesher Dep., at 160; Mesher Dep. Ex. 68.)

20. Mesher did not receive approval for his initial proposal regarding the awarding of stock options and, on September 27, 2002, he was required by senior management to reduce the number of individuals for whom he recommended exceptional stock option grants. (Mesher Dep., at 160-61; Mesher Dep. Ex. 69.) Only two attorneys from Worcester were recommended – Bennett (age 64) and Anthony (age 56). (Mesher Dep. Ex. 69.)[9]

**Outsourcing of the Trademark Work**

21. Difficult business conditions and budgetary pressures required Mesher to look at the Law Department's fixed costs periodically. (Mesher Dep., at 162-64; Mesher Dep.

---

[9] After he was terminated, Bennett's name was removed from those being considered for exceptional stock option grants. (Mesher Dep., at 161-62; Mesher Dep. Ex. 70.)

Exs. 64, 65.) In November 2001, Mesher determined that it would be more cost-effective to have an outside law firm perform the trademark administration and prosecution work that was being performed in-house by a non-lawyer (Otto Lies) in Worcester. (Id.; Mesher Dep., at 37-38) Outsourcing the trademark function would reduce fixed costs and headcount. (Mesher Dep., at 162-64; Mesher Dep. Exs. 64, 65.) An outside law firm also would be better able to provide a broader range of trademark legal services at lower fixed costs. (Id.) On November 29, 2001, the outsourcing proposal of the Philadelphia law firm of Duane Morris was submitted and then accepted. (Mesher Dep., at 29; Mesher Dep. Ex. 64.)

22. That decision resulted in the elimination of two positions: (1) the position of trademark manager, held by a paralegal – Otto Lies; and (2) the trademark administrative support position held by Donna Neylon. (Mesher Dep., at 37; Mesher Dep. Ex. 65.) Both Lies and Neylon were advised on or about December 12, 2001 that this decision had been made, that the transition would take about two months and that the transition would be completed by February 15, 2002. (Mesher Dep., at 162-63; Mesher Dep. Ex. 65.) They each were offered a severance arrangement, which included outplacement and salary continuation. For Neylon, the salary continuation period ended on July 26, 2002. (Mesher Dep. Ex. 28.) For Lies, the proposed salary continuation period was through December 27, 2002. (Lies Dep., at 110-12; Lies Dep. Ex. 9.)

23. Once Mesher advised Lies and Neylon, he went to the intellectual property section of the Worcester Law Department to explain the decision. (Mesher Dep. Ex. 65, at 2.) He then advised those who worked in the general law section in Worcester. (Id.)

24. Mesher made this decision to outsource the trademark function without consulting with Feagans. (Feagans Dep., at 26-27, 79-80.)

25.  The trademark work continues to be outsourced to Duane Morris. (Mesher Dep., at 38.)

**Move of Worcester Personnel to Valley Forge**

26.  On September 23, 2002, by hand delivered letters and a face-to-face meeting, Mesher informed each of the Worcester-based members of the Law Department, including Bennett and Feagans, that he had decided to close the Worcester office of Saint-Gobain's Law Department and to consolidate it with the rest of the Department in Valley Forge, Pennsylvania. (Mesher Dep., at 56; Bennett Dep., at 110-112; Bennett Dep. Ex. 26.) Mesher further advised the employees that they could relocate to Valley Forge. (Id.) If they chose not to relocate, their employment would terminate on February 28, 2003, and they would be eligible to receive the normal severance package. (Id.) Or, if they signed a Separation Agreement and General Release, they would receive an enhanced severance package. (Id.) The decision to relocate the Worcester-based members of the Law Department to Valley Forge was made by Mesher alone. (Mesher Dep, at 51.)

27.  Feagans was affected by the decision and was given the same choice as the other members of the Law Department working in Worcester, including the same choice of the standard and enhanced severance packages. (Feagans Dep., at 27, 29-30; Bennett Dep., at 110-112.) He had no involvement in the decision. (Feagans Dep., at 79.) At the time he learned about the move, Feagans had decided that he was not going to relocate to Pennsylvania. (Feagans Dep., at 29-30.) Mesher knew of Feagans' position regarding the relocation before he made the general announcement to the rest of the Law Department. (Feagans Dep., at 30.)

28.  Bennett, by contrast, considered the proposal. Indeed, he went on a trip to Valley Forge to examine the facilities and the housing. (Bennett Dep., at 79.) His colleague, Volker Ulbrich, also considered the proposal. (Ulbrich Dep., at 68.)

29.     The proposal to move the lawyers from Worcester to Valley Forge was not well-received by a number of the business units. (Mesher Dep., at 56.) A number of the business leaders and research and development managers of the Worcester-based operations advised Mesher that they would prefer that the lawyers remain in Worcester in order to serve their legal needs more effectively. (Mesher Dep., at 128-130; Mesher Dep. Exs. 31, 33.) The business clients were concerned that the geographic distance would make their lawyers less accessible. (Mesher Dep. Ex. 33.)

30.     Although Mesher did not agree with this assessment, upon further consideration, he conceded to the wishes of the business clients and decided not to proceed with the relocation. (Mesher Dep., at 56-57, 129; Mesher Dep. Exs. 32, 34.) On October 4, 2002, Mesher withdrew the offer. (Bennett Dep., at 113; Bennett Dep. Ex. 27; Mesher Dep., at 57; Mesher Dep. Ex. 34.) The group remains in Worcester. (Feagans Dep., at 15.)

**Termination of Bennett's Employment**

31.     On October 31, 2002, Saint-Gobain terminated Bennett's employment for: gross misconduct, including (i) a pattern of harassment of a female employee through anonymous, unwanted written communications, using interoffice mail and other means of delivery, which has caused the employee to be alarmed and distressed, (ii) gross insubordination (*e.g.*, a poem highly critical of his immediate and ultimate supervisor(s)), and (iii) a pattern of rude and unprofessional behavior directed at the General Counsel's office and other members of the Delegation staff. (Mesher Dep., at 140-41; Employee Change Notice, effective 10/31/02, approved 11/7/02 (Mesher Dep. Ex. 46.)) The circumstances which led to that decision are as follows.

32.     In approximately October 2001, Diana Henchey, a Worcester-based employee of Saint-Gobain's Abrasives Unit, received a typewritten poem on her car windshield

at the Company's facility in Worcester. (Deposition of Diana Henchey ("Henchey Dep."), at 9, 27; Henchey Dep. Ex. 1A.)[10] Although she thought little of it at the time, on or about May 28, 2002, Henchey received two more typewritten poems via interoffice mail. (Henchey Dep., at 37-38; Henchey Dep. Exs. 3C and 3D.)

33. On or about May 28, 2002, Henchey reported the poems to Sonya Simonian, the employee in the human resources department who handled employee issues for Saint-Gobain Abrasives' Unit, where Henchey worked. (Henchey Dep., at 41; Deposition of Sonya Simonian ("Simonian Dep."), at 14, 51-53; Mesher Dep., at 68.)[11] Henchey advised Simonian that receipt of the poems made her uncomfortable and that she wanted it to stop. (Simonian Dep., at 51-54.)

34. When Simonian asked Henchey on or about May 28, 2002 who she thought might have sent her the poems, Henchey identified Saint-Gobain employee Alan Feltham. (Id.) Saint-Gobain investigated Feltham as a possible suspect but, after further investigation, concluded that he did not send the poems. (Simonian Dep., at 51-54, 61-64; Simonian Dep. Ex. 1A-1C.)

35. On or about September 27, 2002, Henchey again received a typewritten poem via the interoffice mail. (Henchey Dep., at 52; Henchey Dep. Ex. 4C.) This time, Henchey complained to Simonian that she felt that she was being "stalked." (Simonian Dep., at 67-70, 72; Simonian Dep. Exs. 3A-3B; Henchey Dep., at 68.)

---

[10] The pertinent portions of the deposition of Diana Henchey and supporting exhibits are attached to the Meixel Declaration as Exhibit F.

[11] The pertinent portions of the deposition of Sonya Simonian and supporting exhibits are attached to the Meixel Declaration as Exhibit G.

36. On or about September 27, 2002, Simonian again asked Henchey who she thought might have sent her the poem. (Simonian Dep., at 72.) Henchey thought about it and then described an individual later identified as David Bennett. (Henchey Dep., at 55-61, 68, 73; Simonian Dep., at 73-77; Simonian Dep. Ex. 3B.)

37. During one of their conversations on or about September 27, 2002, Henchey asked Simonian if the handwriting on the interoffice envelopes could be analyzed. (Simonian Dep., at 77; Simonian Dep. Ex. 3B.)

38. As a follow-up to her investigation of Henchey's complaint, Simonian contacted Cathy Ferrante, the human resources manager responsible for employees of the Law Department in which Bennett worked. (Simonian Dep., at 44, 83; Mesher Dep., at 67-68.)

39. Robert Wilk, the individual who handled forensic investigations for the Company, was then contacted about the matter. (Deposition of Robert Wilk ("Wilk Dep."), at 45-46.)[12]

40. On behalf of Saint-Gobain, Wilk met with Jean Joanne Berrie, BCFDE, CFE, an independent forensic document expert, on or about October 16, 2002. (Wilk Dep., at 67, 73, 75, 111-12.) Wilk engaged Berrie on behalf of Saint-Gobain to analyze the documents received by Henchey. (Wilk Dep., at 67-68; Mesher Dep., at 67.)

41. On October 22, 2002, after engaging in a thorough analysis of the documents, expert Berrie concluded that it was "highly probable" that Bennett had addressed the

---

[12] The pertinent portions of the deposition of Robert Wilk and supporting exhibits are attached to the Meixel Declaration as Exhibit H.

interoffice envelopes which were sent to Henchey and contained the poems. (Wilk Dep., at 93-94; Mesher Dep., at 65-66; Bennett Dep. Ex. 29.)[13]

42. Wilk and an outside consultant, Joseph M. Johnson, conducted an interview of David Bennett on October 31, 2002. (Wilk Dep., 79-81.) The purpose of the interview was to obtain information from Bennett regarding his involvement, if any, in sending the poems to Henchey. (Wilk Dep., at 76.)

43. The interview is documented in a report dated October 31, 2002 and was written on November 1, 2002. (Wilk Dep., at 145; Wilk Dep. Ex. 7.) Key points noted in the October 31, 2002 report are:

- Bennett was informed that Henchey believed that he had sent her a number of poems that had been unsigned.

- Bennett admitted that he knew Henchey.

- When asked to spell the word "meager," Bennett spelled the word "M-E-A-G-R-E." This was the same unusual spelling of the word that was used in one of the poems sent to Henchey.

- Bennett was advised that an expert had identified the writing on the envelopes as having been his and was shown the expert report.

- Bennett stated that he did not write poetry.

- Based on that statement, the investigators posed to Bennett that a search of his office should not reveal any poems. Bennett agreed to a search of his office.

- The office search was conducted. Several poems were found. Bennett claimed that some of the poems were

---

[13] Following a review of original documents, rather than copies, expert Berrie subsequently re-issued her report on November 11, 2002, to confirm that the handwriting in question was indeed Bennett's. (Ferrante Affidavit, ¶ 12)

       written to his wife. Another poem he had written related to Bennett family activities.

- Another poem was discovered which referred to workplace developments and contained derogatory remarks about Saint-Gobain managers, including Mesher and Feagans.

- Wilk questioned Bennett's credibility because Bennett told Wilk that he did not write poetry – and yet poetry which Bennett later admitted he wrote was found in his office.

(Wilk Dep., at 84-108; Wilk Dep. Ex. 7.)

      44.    After completing the interview, Wilk met with Mesher and advised him of these findings of the investigation and interview. (Mesher Dep., at 74-78, 82; Wilk Dep., at 112.) Wilk then left while Mesher and Ferrante discussed what action would be taken. (Wilk Dep., at 113.)

      45.    Mesher was quite concerned that the conduct which was described was so improper that it met the definition of Criminal Harassment under the Massachusetts Code, Chapter 265 § 43A. (Mesher Dep., at 78, 173; Bennett Dep. Ex. 35.) He was particularly concerned that an attorney in the Law Department was engaged in this type of behavior. (Mesher Dep., at 85.) Indeed, the compelling reason for Bennett's termination was that he had been engaged in a pattern of harassment of Henchey. (Mesher Dep., at 61-62.)[14]

      46.    As part of his decision-making process, Mesher read the poems that had been sent to Henchey and noted the spellings of the words "meagre" and "barre," which spellings Mesher believed to be British spellings. (Mesher Dep., at 75-76.) Mesher knew that Bennett was British and that Bennett spelled "meager" with an "R-E" at the end. (Mesher Dep., at 75-76.)

---

[14] Bennett was a participant in training and received the Management Workbook on Managing a Respectful Workplace. (Bennett Dep., at 104-06.)

47. In addition, Mesher was disturbed by the contents of the poem retrieved from Bennett's office which denigrated the Saint-Gobain managers, including Feagans and Mesher, as well as Mr. Jean-François Phelizon, the CEO of Saint-Gobain Corporation. (Mesher Dep., at 14-15, 142, 149; Mesher Dep. Ex. 56, at 2; Bennett Dep., 22, 151; Bennett Dep. Ex. 4-M; Wilk Dep. Ex. 7, at 6.) Bennett had stated during the investigation that he had written it specifically in connection with a co-worker's (Tom DiMauro) leaving the Company. (Wilk Dep. Ex. 7, at 6.) That poem referred to Mesher as "weak-kneed" and referred to Feagans as leaving his superior, Mesher, "in the dark" while Feagans "cozied" up to another manager, Mark Mathisen. (Bennett Dep. Ex. 4-M.) The poem also referred to those in the intellectual property law section of the Law Department "pray[ing]" for Feagans to "slide in" to a "fissure" and "vanish completely away." (Id.)[15]

48. Bennett also had engaged in a series of rude and unprofessional actions directed to Mesher and Feagans, among others. (Mesher Dep., at 145-46.) The most recent example was in connection with Mesher's decision to revoke the decision to relocate the Law Department. Bennett had sent an email directly to the heads of certain business units thanking them for their help in securing that result. (Mesher Dep., at 131, 180-81; Mesher Dep. Ex. 35.) Benoit Bazin, then head of the United States Abrasives Operation (Mesher Dep., at 54), forwarded that email to Feagans with a message that it was "[a]nother example of inappropriate behavior . . . If you want me to tell [Bennett] formally that his mail below is inappropriate, I can do that . . . ." (Mesher Dep. Ex. 35.) Feagans notified Mesher of these communications. (Id.)

---

[15] Bennett testified in his deposition that it was recited out loud at a party for DiMauro when he left. Present at the party were all of the IP attorneys and the administrative assistants for the group. (Bennett Dep., at 222-24.) This testimony contradicts his statement during his interview with Wilk that the only recipient of the poem had been DiMauro. (Wilk Dep. Ex. 7, at 6.)

49. In November 2001, Mesher had issued a written reprimand to Bennett for similar inappropriate conduct. (Mesher Dep., 126; Mesher Dep. Ex. 27.) At that time, Bennett had written an email to Mark Sadoff, General Counsel of the Insulation Branch and a member of the management team, stating that "[t]he basic *problem* is that, since we lost the head of the patent department last year, the patent function has been directed by the head of the [l]aw [d]epartment *John Mesher who has little interest or [sic] time* for the nuts and bolts of intellectual property practice." (Emphasis added.) (Mesher Dep., at 180; Mesher Dep. Ex. 63.) The email implied that the department had a "problem" because of the manner in which Mesher had chosen to run the department, directly criticized Mesher's ability and commitment and reflected negatively on the department in general. (Id.) Bennett admitted that his communication was inappropriate and apologized. (Answer of Plaintiff to Defendant Saint-Gobain Corporation's Second Set of Interrogatories, Interrogatory No. 1.)[16]

50. In addition, in an email dated April 12, 2001 to Feagans, relating to expense reports, Bennett had disrespectfully referred to the "Feaganesque frugality standard (let's call it the 'FF Standard')." (Mesher Dep., at 177-79; Mesher Dep. Ex. 10.) Feagans responded that the email was inappropriate. (Mesher Dep. Ex. 10, at 1.) Mesher received a copy from Feagans and asked Cathy Ferrante to place it in Bennett's personnel file. (Id.)[17] Just days later, Bennett again referred to Feagans' "frugality standard," which prompted Mesher to again forward the message to Ferrante, noting it as "another example of [the] type of arrogance (and,

---

[16] The Answer to Interrogatory 1 is attached to the Meixel Declaration as Exhibit I.

[17] Feagans noted his concerns regarding Bennett's unprofessional communications in performance evaluations for the years 1999, 2000 and 2001. (Bennett Dep. Ex. 22, at 2; Bennett Dep. Ex. 23, at 2, 4; Bennett Dep. Ex. 24, at 2, 4.) All of these evaluations were written by Feagans and approved by Mesher. (Id.; Bennett Dep., at 202.)

perhaps, insubordination) that has come from David Bennett over at least the last two years." (Mesher Dep., at 116; Mesher Dep. Ex. 11.)

51. An additional example was from April 2000, in which Bennett responded to an email sent by Mesher announcing the departure of a member of the department as, "a most ungracious and really rather 'sh---ty' recognition of [the employee's] contributions to this company...." (Mesher Dep., at 174-76; Mesher Dep. Ex. 60.) Even Bennett acknowledged this conduct to be inappropriate with an apology. (Mesher Dep., at 176-77; Mesher Dep. Ex. 6.)

52. Against this backdrop of a pattern of rude and unprofessional behavior, after considering the reports from Simonian, the findings of Wilk, the content of the poems, the results of the expert handwriting analysis (Mesher Dep. Ex. 71), and his interview with Bennett, Mesher decided to terminate Bennett's employment. (Mesher Dep., at 65-69, 74-78, 82-85, 165.) The compelling reason, of course, was the pattern of harassment of Henchey which amounted to a violation of Massachusetts criminal law. (Mesher Dep., at 61-62, 85.) The pattern of rude and unprofessional behavior and the discovery of the offensive poem were also considerations in making that decision, but would not have triggered the termination by themselves. (Mesher Dep., at 85, 140-42, 145-46, 149, 176-81; Mesher Dep. Ex. 46.)

53. Immediately after making this decision, Mesher visited the intellectual property group to advise them that Bennett had been terminated. (Mesher Dep., at 87-88.) He also advised the general law department in Worcester. (Mesher Dep., at 87.)

54. In making this decision, Mesher had some input from Cathy Ferrante. (Mesher Dep., at 61; Wilk Dep., at 113.) By contrast, Feagans had no input into the decision to terminate David Bennett. (Id.; Feagans Dep., at 79.) Feagans was advised of the decision with the rest of the general law department. (Mesher Dep., at 87.) Feagans was unaware of the

investigation of Bennett, did not make or participate in making the decision to terminate Bennett, did not participate in any of the meetings regarding Bennett's termination on October 31, 2002, and was not even aware of the termination of Bennett's employment until after Bennett had been terminated. (Mesher Dep., at 70-71; Feagans Dep., at 34-35; Saint-Gobain's Answers to Plaintiff's Interrogatories, Interrogatory No. 8.)[18]

**Replacement of Bennett**

55.     Immediately after his termination, Bennett's work was divided up and reassigned to the three remaining patent attorneys – Porter, Crosby and Ulbrich – who assumed responsibility for the work that had been performed by Bennett in addition to the work they had already been performing. (Mesher Dep., at 147; Mesher Dep. Ex. 50.) However, Ulbrich elected to retire, effective February 2003, and worked out a severance arrangement with the Company. (Ulbrich Dep., at 85-86, 104-05; Ulbrich Dep. Ex. 12.) The Company therefore sought to hire two new attorneys and, after a search, the Company hired Joseph Sullivan and Thomas Field. (Mesher Dep., at 30.) Even though he was leaving, Ulbrich participated in the selection process. (Ulbrich Dep., at 101-03.) Eventually, the work in the patent group was redistributed, and Crosby, Sullivan and Field each took responsibility for some of the work that had been performed by Bennett, in addition to their other work responsibilities. (Feagans Dep., at 58-59.)

56.     As of March 2003, the Law Department in Worcester employed:

Mike Crosby (34)  Intellectual Property Counsel
Thomas Field (29)  Intellectual Property Counsel
Mary Porter (49)  Intellectual Property Counsel
Joseph Sullivan (45)  Intellectual Property Counsel
Cheryl Comer (58)  General Assistant
Sue Gendreau (57)  General Assistant – Patent Counsel
Ruth Swan (57)  General Assistant – Patent Counsel

---

[18] The Answer to Interrogatory 8 is attached to the Meixel Declaration as Exhibit J.

    Timothy Feagans (42) Deputy General Counsel
    Frank Anthony (56) Divisional Counsel
    Joan Frank (56) Senior Legal Assistant

Although the staff was smaller, as was the case in 1999, only two of the employees were under the age of 40. (Ferrante Affidavit, at ¶¶ 6-7.)

                                                                   Respectfully submitted,

| | |
|---|---|
| Hope A. Comisky | /s/ Jill Brenner Meixel |
| Amy G. McAndrew | James Conroy (BBO# 096315) |
| PEPPER HAMILTON, LLP | Jill Brenner Meixel (BBO# 652501) |
| 3000 Two Logan Square | Donnelly, Conroy & Gelhaar, LLP |
| 18th and Arch Streets | One Beacon Street, 33rd Floor |
| Philadelphia, PA 19103 | Boston, Massachusetts 02108 |
| *Admitted Pro Hac Vice* | 617-720-2880 |
| | |
| Dated: November 4, 2005 | Attorneys for Defendants |

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by ~~mail/by hand~~ electronic filing.

Date: 11/4/05  /s/ Jill Brenner Meixel