UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WORCESTER, SS. | CENTRAL SECTION<br>CIVIL ACTION NO.: 04-40014-NMG |

| | | |
|---|---|---|
| DAVID BENNETT<br>- Plaintiff<br><br>vs.<br><br>SAINT-GOBAIN CORPORATION,<br>JOHN R. MESHER, and<br>TIMOTHY L. FEAGANS<br>- Defendants | ) ) ) ) ) ) ) ) ) | PLAINTIFF BENNETT'S<br>OPPOSITION TO<br>DEFENDANTS' MOTION<br>FOR SUMMARY<br>JUDGMENT, INCLUDING<br>CONCISE STATEMENT OF<br>MATERIAL FACTS TO<br>WHICH THERE ARE NO<br>GENUINE ISSUES |

## STATEMENT OF THE CASE

The Plaintiff David Bennett ("Bennett") brings this action against all Defendants for age discrimination and retaliation under 29 USC 623, and M.G.L. c. 151B; and against the Defendants Mesher and Feagans for aiding and abetting discrimination in violation of M.G.L. c. 151B and interference with contractual relations resulting from the termination of Bennett's employment.

All three Defendants now file a motion for summary judgment seeking to dismiss all claims.

On November 3, 2005 Bennett filed a Motion for Partial Summary Judgment requesting a finding that Bennett did not author any writings to a female employee, as the issue of authorship already had been decided and litigated between the parties at a full hearing before the Massachusetts Division of Employment and Training (DET), where Saint Gobain presented written opinion dated November 11, 2002 of its handwriting expert. After full review of all the

1

evidence, including Saint Gobain's handwriting expert, the DET made an express finding that Bennett did not author the writings, was not stalking the female employee or otherwise harassing her. The DET hearing examiner also noted that Mesher was "being somewhat disingenuous or evasive". (Plaintiff Bennett's Memorandum in Support of Motion for Partial Summary Judgment, ¶11 filed on November 3, 2005).

Defendants' motion for summary judgment must be denied because there are genuine issues of material fact, and they are not entitled to judgment as a matter of law.

## CONCISE STATEMENT OF MATERIAL FACTS

1. Bennett was hired in 1989 by the Norton Company, subsequently acquired by Saint Gobain. (Meixel Affidavit ¶ 4).

2. In 1999 Bennett, a senior patent attorney, and others in the intellectual property group began reporting directly to Feagans, who was deputy counsel and worked in Worcester. Feagans in turn reported to Mesher whose office was in Valley Forge, Pennsylvania. (Meixel Declaration ¶5).

3. By written grievance dated June 6, 2001, Bennett, Otto Lies, and Mary Porter filed age grievances against Feagans stating that he discriminated against older members of the department; on at least two occasions, Feagans stated that he wanted to get rid of older members of the IP group, specifically naming Otto Lies, Volker Ulbrich and Bennett; Feagans at a January 22, 2002 meeting with Otto Lies referred to Mr. Lies' colleagues in the intellectual property department "as bitchers and whiners"; and that Feagans would do absolutely nothing for Bennett or Ulbrich, that he was finished with them, and wanted rid of them. He wanted them to quit and

2

would do nothing to keep them, nor to address their concerns about working conditions in the department. He would do everything in his power to make them leave. The written complaint further stated that Joan (Leo) Frank who worked directly for Feagans, was told by Feagans that he wanted to hire somebody younger than she, and did not like working with her. (Michaeles' Aff., Exh. 2, Mesher Exh. 16).

4. On or about the same time, Feagans and Mesher began investigating Bennett over a $65 dinner charge on a business trip. (Michaeles' Aff., Exh. 2, Mesher Exh. 5,10,11,12, 24).

5. On August 8, 2001, two months after the filing of the written grievance against Feagans, Mesher asked Robert Wilk, head of company security, to monitor Bennett's monthly statements, copying Feagans with that communication. (Michaeles' Aff., Exh. 2, Mesher Exh. 24).

6. By written notice dated November 20, 2001 Mesher warned Bennett that Bennett's criticism of Mesher's handling of intellectual property matters would weigh heavily on Mesher's vision of the future structure and direction of the department, and at the very least would have a negative impact on Bennett's overall evaluation. Mesher copied Feagans with that communication. (Michaeles' Aff., Exh. 2, Mesher Exh. 27).

7. The written age grievances filed against Feagans on June 6, 2001 by Bennett, Lies and Porter also was supported by Volker Ulbrich, another senior attorney in the company's intellectual property department. At the time of the written grievance, Bennett was 62, Lies 64, Porter 47 and Ulbrich 4 months shy of 60. Since the filing of that age grievance against Feagans, those three oldest members of the department are no longer with the company, with Mary Porter being the sole survivor. (Ferrante Aff. ¶4).

8. By email dated January 18, 2001, Otto Lies wrote a "Dilbert" caption for which Feagans punished him by not paying his previously approved bonus and salary increase for the coming year, notwithstanding Lies' apology to Feagans. (Michaeles' Aff., ).

9. By notice dated December 11, 2001, Mesher advised Lies that his position was eliminated, and employment with the company terminated as of February 15, 2002. (Meixel Declaration, Exh. D, Lies Exh. 9).

10. By hand delivered letter dated September 23, 2002, Mesher informed the Worcester law department that the offices were closing and being moved to Valley Forge, Pennsylvania. The members of the department had the choice of either relocating to Valley Forge, being terminated, or accepting an enhanced severance package (Defendants' Statement of Undisputed Facts, ¶26).

11. Bennett and other senior members of the department visited Valley Forge to examine the facilities. (Defendants' Statement of Undisputed Facts, ¶28). Feagans advised Bennett that no office had been set aside for the group in Valley Forge, so that there was nothing to see. (Michaeles' Aff., Exh. 2, Mesher Exh.38).

12. Shortly thereafter on October 4, 2002, Mesher revoked the decision to relocate the law department to Valley Forge, and withdrew the severance offer. (Defendants' Statement of Undisputed Fact, ¶30).

13. Bennett told Mesher that the revocation of the severance offer was unclear, and that he was considering accepting it. Mesher responded on October 25, 2002 stating that he

4

wanted "to make it absolutely clear - the severance/relocation offer was withdrawn and rendered null and void effective October 4, 2004". (Michaeles' Aff., Exh. 2, Mesher Exh. 42).

14. Six days later on October 31, 2001, Mesher terminated Bennett for reportedly authoring writings to a female employee. (Defendants' Statement of Undisputed Facts, ¶31). Prior to that termination meeting, Robert Wilk had searched Bennett's office without permission. (Michaeles' Aff., Exh. 4, p.54). Bennett did not even know the name of the female employee, Diana Henchey, until the October 31 termination. (Michaeles' Aff., Exh. 7, p. 135). At the termination interview, Mesher told Bennett that Wilk wanted to prosecute this and Bennett could get up to two years in prison. (Michaeles' Aff., Exh. 7, p.153). Bennett denied authoring the writings to the female employee, and denied that it was handwriting on the envelopes. (Michaeles' Aff., Exh. 2, p.84). Mesher stated that the writings were the reason for termination, that there were other issues in the past, but those issues alone would not have triggered termination, but writings to a female employee did. (Michaeles' Aff., Exh. 2, p.85).

15. Shortly thereafter, Mesher allowed Volker Ulbrich to accept the severance package which had been denied Bennett because of it purported revocation. (Michaeles' Aff., Exh. 2, pgs. 58-60).

16. The three oldest members of the intellectual property department, Bennett, Lies, and Ulbrich all participated in the age grievance filed against Feagans on June 6, 2001. Then there were three. After the acceptance by Ulbrich of the "revoked" severance package, there were none.

17. As stated above, the hearing examiner for the DET, in a full hearing between the company, Mesher and Bennett, including the report of the company's forensic handwriting

5

examiner dated October 22, 2002, found that Bennett did not author the writings to the female employee, and was not stalking or otherwise harassing her. He further characterized Mesher's testimony as "being somewhat disingenuous or evasive". ( Plaintiff Bennett's Memorandum in Support of his Motion for Partial Summary Judgment, ¶11, filed on November 3, 2005).

18. The purported basis for determining Bennett to be the author of writings to Henchey was the October 22, 2002 report from JJ Berrie. However, Ms. Berrie never inspected original documents on that date, but only had access to photocopies. (Michaeles' Aff., Exh. 1, p.2). Nancy McCann, Bennett's expert, arguably the premier forensic document examiner in the Northeast, concluded that it was not possible to identify with any degree of certainty the authorship of the writings to Diana Henchey because of limited writing samples from the majority of the employees. She concluded that based on those limited samples, a number of employees had characteristics similar to the author including Bennett, Diana Henchey herself, and Alan Feltham. (Michaeles' Aff., Exh. 1).

## ARGUMENT

### STANDARD OF REVIEW

Under both Federal and State Rule 56, a moving party is entitled to Summary Judgment if pleadings, discovery and affidavits show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.

The purpose of summary judgment is to promptly dispose of controversies on their merit without trial, if there is no real dispute as to any salient facts, and if only questions of law are involved. Kourouvacilis v. General Motors Corp. 410 Mass 706, 715 (1991).

However, the moving party bears the burden of establishing that there is no genuine issue of material fact on every relevant issue. (Pederson v. Time, Inc. 404 Mass 14, 16-17 (1989).

The evidence must be viewed in the light most favorable to the nonmoving party, in this case Bennett. Smith v. Stratus Computer, Inc. 40 F.3rd 11, 13 (1st Cir. 1994), *cert den.* 514 U.S. 1108 (1995); Kelley v. Rossi, 395 Mass 659, 661 (1985); Community National Bank v. Dawes, 369 Mass 550, 553 (1976); and Colley v. Benson, Yung & Downs Insurance Agency Inc. 42 Mass. App. Ct. 527, 528 rev. den, 425 Mass 1105 (1997).

## SHIFTING BURDEN OF PROOF IN DISCRIMINATION CASES

The shifting burden of proof in discrimination cases is that Plaintiff has the burden of establishing a prima facia case by proving: (1) being a member of a protected class; (2) performing the job at an acceptable level; (3) termination; and (4) being replaced by someone with similar qualifications or from an unprotected class. Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116 (2000); Powers v. H.B. Smith Company, 42 Mass. App. Ct. 657 (1997), rev. den. 425 Mass 1105; Blair v. Huskey Injection Molding System, Inc., 419 Mass 437, 441 (1995), all of which have holdings similar to McDonnell Douglas Corp. v. Green 411 U.S. 792 (1973). Once Defendants have articulated a nondiscriminatory reason for termination, the burden shifts to the Plaintiff to prove that reason is false, and that the determining factor was discriminatory motive. Lipchitz v. Raytheon Co., 434 Mass 493, 504 (2001); see also Reidy v. Travelers Insurance Co., 928 F. Supp. 98 (D. Mass. 1996), aff. 107 F. 3d 1, cert den. 118 S. Ct. 50.

The most probative evidence of discrimination is when the employee is not treated neutrally. Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129 (1997) citing Smith

7

College v. Mass Commission Against Discrimination, 76 Mass 221, 228 (1978); see also Dartmouth Review v. Dartmouth College 889 F. 2d 13, 19 (1st Cir. 1989).

(1) PROTECTED CLASS

Bennett was 64 when terminated, and therefore within a protected class. (Ferrante Affidavit, ¶4).

(2) PERFORMING JOB ACCEPTABLY

In Bennett's last annual performance evaluation, Feagans gave him a 5, the highest number possible, for knowledge/aptitude, quality of work, results and being cost conscious. (Meixel Declaration B, Exhibit 24). Bennett was "one of the most respected and valuable members of the department". (Defendants' Statement of Undisputed Facts, page 6, ¶15).

(3) TERMINATION

Mesher terminated Bennett on October 31, 2002. (Defendants' Statement of Undisputed Fact, page 10, ¶31).

(4) REPLACED BY SOMEONE WITH SIMILAR QUALIFICATIONS OR FROM AN UNPROTECTED CLASS

After Bennett's termination, Feagans hired Joe Sullivan and Tom Field, both under 40. (Michaeles' Aff., Exh. 3, pgs.13-16). Joe Sullivan is performing most of Bennett's work. (Michaeles' Aff., Exh. 3, pgs.57-60).

**REASON FOR TERMINATION**

The sole reason Bennett was terminated was suspected harassment of a female employee. No other reason was given Bennett at the time of termination. (Michaeles' Aff., Exh. 2, pgs.61-64).[1] Mesher admitted that there had been other issues with Bennett in the past, but those alone would not have triggered termination. The suspected harassment triggered termination. (Meixel Declaration Exhibit A, p. 85).

## THE ARTICULATED REASON FOR TERMINATION WAS A PRETEXT FOR DISCRIMATION

The sole reason for termination was the suspected authorship of writings to a female employee.

Mesher said that Wilk wanted to prosecute this and Bennett could get up to two years in prison, and then was told he was terminated for sexual harassment of Diana Henchey. Bennett denied that he had authored any writings, said that he did not do what he was being charged with, and was innocent. (Michaeles' Aff., Exh. 7, pgs.151-154).

There is a genuine issue of material fact as to whether the articulated reason for termination was a pretext for discrimination.

Bennett did not even know Diana Henchey's name until the date of termination. (Michaeles' Aff., Exh. 7, p.135). In fact, Henchey herself did not remember Bennett ever calling her by name. (Michaeles' Aff., Exh. 6, p.62). Since he did not know her name before being terminated, he could not have possibly addressed the envelopes to her containing the writings.

---

[1] It should be noted that although Mesher testified at deposition that harassment was the reason for termination, the Defendants Saint Gobain and Mesher refused to provide the DET with the requested reasons for termination, in connection with the DET hearings (Plaintiff's Memorandum in Support of Partial Summary Judgment, page 4, ¶7, filed on November 3, 2005).

9

The hearing examiner at the DET hearing found that, after considering all of the evidence including the Defendant company's forensic document examiner's report, that Bennett did not author any writings to Henchey, and did not harass or stalk her, thereby creating a genuine issue of material fact as to the author of the writings and reason for termination.

The report of McCann Associates, which took into account all of the three reports by the Defendants' forensic document examiner, concluded that it is not possible to identify the author of the writings to any degree of reasonable professional certainty based predominantly upon limited writing samples. (Michaeles' Aff., Exh. 1, p.4).[2]

## THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER FEAGANS WAS INVOLVED IN THE DECISION TO TERMINATE BENNETT

Feagans was the supervisor of Defendant corporation's law department in Worcester. He reported to Mesher, located in Valley Forge, Pennsylvania. Feagans' duties and responsibilities included evaluating performance of the attorneys, and along with Mesher, administering their compensation. (Michaeles' Aff., Exh. 3, Feagans' position questionnaire).

Feagans signed off on all performance evaluations of the attorneys in his department, including Bennett. He singly denied Lies' bonus and annual salary increase as a result of Lies' creating a "Dilbert" writing. He also hired Sullivan and Field, both under age 40, as attorneys to replace Bennett. In addition he hired Joan Frank and in 1996 Attorney Mike Crosby.

---

[2] It should not be overlooked that in both forensic examiners' reports, Diana Henchey herself was a suspected author. For some reason, Defendants' counsel three times instructed Diana Henchey at her deposition, not to print or write anything on a chalk, and refused to allow Diana Henchey to write her name. (Michaeles' Aff., Exh. 6, p.16). Could it be that Defendants were concerned that if Bennett's forensic document examiner had additional writing samples from Henchey, that it might lead to the conclusion that Henchey was the author of the writings to herself?

10

Since he unilaterally made the decision to sanction Lies and hire attorneys, it is inconceivable that he was not involved in some way in the decision to terminate Bennett, a member of the department whom he alone oversaw. Bennett reported directly to Feagans. Feagans' denial of any involvement rings hollow in the face of constant communication about Bennett with Mesher.

Feagans' denial that he was involved in the decision to terminate is disingenuous. It is a thinly veiled attempt by the corporation to distance itself from Feagans' threats to rid the department of its older members, and therefore absolve itself from liability.

On a number of occasions, Feagans threatened to get rid of the older members of the department, specifically naming Bennett, Lies and Ulbrich. As a result, Porter, Bennett, and Lies filed an age grievance on June 6, 2001. Bennett, Lies and Ulbrich are no longer are with the company. Bennett was summarily terminated, Lies' job was "eliminated", and Ulbrich was allowed to retire with a severance package previously revoked and withheld from Bennett. Feagans threats to rid the company of the three oldest members of the IP Department have come to fruition.

Feagans and Mesher were in constant contact in connection with their concerted effort to rid the company of Bennett. The Defendants' own documents prove that Feagans was involved in the decision to terminate, as follows:

- Mesher email to Feagans dated August 3, 1999 accusing Bennett of having no idea how to make friends. (Michaeles' Aff., Exh. 2, Mesher Exh. 3).

- Mesher email dated August 13, 1999 with copy to Feagans, apologizing for Bennett's unjustified remarks. (Michaeles' Aff., Exh. 2, Mesher Exh. 4).

- Mesher email dated April 13, 2000, copying Feagans, with Bennett's explanation of travel expenses. (Michaeles Aff., Exh. 2, Mesher Exh. 4).

- Mesher email dated April 20, 2001 forwarding Feagans email to Bennett of the same date, continuing discussion of the $65 dinner. (Michaeles' Aff., Exh. 2, Mesher Exh. 10).

- Feagans email dated April 20, 2001 forwarding Bennett's email to Mesher regarding the $65 dinner. (Michaeles' Aff., Exh. 3, Feagans Exh. 4).

- Feagans email to Bennett dated April 20, 2001 continuing with the discussion of travel expenses. (Michaeles' Aff., Exh. 3, Feagans Exh. 5).

- Mesher email dated April 27, 2001 to Ferrante, copying Feagans, accusing Bennett of arrogance regarding the $65 dinner bill. (Michaeles' Aff., Exh. 2, Mesher Exh. 11).

- Mesher email dated April 30, 2001 to Bennett, copying Feagans with Mesher's continued discussion of the $65 dinner. (Michaeles' Aff., Exh. 2, Mesher Exh. 12).

- Mesher email to Feagans and others dated August 8, 2001 (two months after Bennett filed an age grievance against Feagans on June 6) asking Robert Wilk, head of company security, to monitor Bennett's monthly statements to make sure that expenses were only for company business. (Michaeles' Aff., Exh. 2, Mesher Exh. 24).

12

- Mesher email dated November 19, 2001 copying various people, including Feagans, attaching letter accusing Bennett of disrespect and undermining Mesher's role as general counsel. (Michaeles' Aff., Exh. 2, Mesher Exh. 26).

- Mesher letter dated November 20, 2001 to Bennett, copying Feagans, stating that "this latest incident will weigh heavily in my vision of the future structure and direction of the department and will, at the very least, have a negative impact on your overall evaluation". (Michaeles' Aff., Exh. 2, Mesher Exh. 27). This letter was approximately ten months before Mesher announced that the entire legal department was moving to Valley Forge, and eleven months before Bennett was terminated.

- Feagans' email of November 6, 2002 to Mesher forwarding communication to the department regarding Bennett's termination. (Michaeles' Aff., Exh. 2, Mesher Exh. 49).

Finally, Mesher admitted at his deposition that he telephoned Feagans to make sure Bennett would be available on October 31, 2002. (Michaeles' Aff., Exh. 2, pgs.70-72). It is hard to believe that there was no discussion as to why Bennett should be made available.

Based on the above, there clearly is a genuine issue of fact regarding Feagans' participation in Bennett's termination which only can be resolved by the Court's evaluation of Feagans' credibility and the above evidence proving that Feagans had to have been involved in the decision.

There is a genuine issue of fact regarding whether Feagans aided or abetted the decision to terminate Bennett, and the retaliation claim resulting from the June 6, 2001 age grievance against Feagans by the three oldest members of the department.

## **THE DECISION TO TERMINATE BENNETT WAS A PRETEXT**

As previously stated, Feagans on several occasions announced that he wanted to rid the patent department of its oldest members, specifically naming Bennett, Lies and Ulbrich. On June 6, 2001 Bennett, Lies and Mary Porter filed a written age grievance with the company, in part resulting from Feagans threats, with Ulbrich participating and supporting those grievances.

Coincidentally, all three have since had their employment with the company severed.

In addition, Feagans and Mesher spent countless hours communicating about the $65 dinner ordered by Bennett, and even had Wilk, head of company security, investigate that meal and monitor all of Bennett's travel expenses. Apparently this extraordinary effort revealed only the $65 dinner.

The Defendants take the position that the decision to terminate Bennett was not made until Mesher met with Bennett on October 31, 2002. The company's documentation is inconsistent with that position.

A Company communication dated 9/26/02 refers to the decision to transfer the Worcester legal department to Valley Forge. On the second page of that communication, Phelizan, the CEO of the company's US operations, stated that "the goal of the operation is simply to eliminate unnecessary positions (except Feagans)." (Michaeles' Aff., Exh. 2, Mesher Exh. 31). The clear implication is that the decision to move the department to Valley Forge was to eliminate the older members of the department, all of whom had filed an age grievance against Feagans, and to keep Feagans on board. This communication was approximately one month before Bennett was summarily dismissed.

When Bennett decided to visit Valley Forge to see if he would want to relocate, Feagans copied Mesher with email dated September 26, 2002 to Bennett stating that Mesher had not set aside any office space for the group so there's nothing to see. (Michaeles' Aff., Exh. 2, Mesher Exh. 38). It would seem that the announcement to move the legal department to Valley Forge, revoked on October 4 by Mesher, was merely a ruse to get the older members of the department to accept the severance package rather than to uproot their lives and move from Worcester to Valley Forge.

Mesher email dated October 2, 2002, ¶9 referring to Dennis Baker, the HR person purportedly investigating Bennett's age grievance, states "but he does not oppose the move, particularly in light of his knowledge of the significant personnel issues we have with the Worcester office. His only concern was with Dave Bennett and Tim Feagans". (Michaeles' Aff., Exh. 2, Mesher Exh. 32). See Exhibit to Michaeles' Affidavit. This concern with Bennett appears to be a harbinger to his termination which took place nineteen days later.

Bazin email dated October 8, 2002 to Feagans, with copy to Mesher, stated "I agree with you that we should work ASAP on a transition for David Bennett". (Michaeles' Aff., Exh. 2, Mesher Exh. 35). This reference approximately three weeks before Bennett's termination is clear evidence of Feagans' involvement with the decision to terminate Bennett.

Bazin email dated October 20, 2002 to Mesher instructing him to "start ASAP a transition process for Dave Bennett, by hiring a new lawyer....". (Michaeles' Aff., Exh. 2, Mesher Exh. 40). This instruction was eleven days before Bennett was to be terminated, and even before any report by the company's forensic document examiner.

15

On October 28, 2002, Mesher sent an email stating that he had an issue with one of the IP lawyers that would be resolved on Thursday. (Michaeles' Aff., Exh. 2, Mesher Exh. 43). Thursday would be October 31, and that IP lawyer would be David Bennett. Once again, the decision to fire Bennett had been made long before any documents were turned over to a forensic document examiner. The decision certainly was a pretext for discrimination.

## BENNETT WAS SINGLED OUT AND TREATED DIFFERENTLY

The most probative evidence of discrimination is when an employee is not treated the same as others. Matthews, Smith College, and Dartmouth Review *supra*.

Bennett was the only intellectual property attorney reporting to Feagans who was investigated by Robert Wilk, head of security, for his travel expenses, all resulting from a $65 dinner charge while on a business trip. (Michaeles' Aff., Exh. 2, p.99). Wilk incredulously stated that no one asked him to look into that dinner bill, even though he shared office space with Feagans at the time, and the record clearly reflects an email from Mesher to Ferrante instructing Wilk to inquire into the dinner bill. (Michaeles' Aff., Exh. 4, pgs. 125-126; Exh. 2, Mesher Exh. 24).

Although there were several suspects of who authored the writings to Diana Henchey, the first being Alan Feltham, only Bennett's office was searched for evidence, without his knowledge or permission. (Michaeles' Aff., Exh. 4, pgs.53-54). It should be noted that that the search revealed a number of notes and copies of writings which Bennett wrote to his wife at least ten years ago, suggesting that Bennett saved everything he wrote. It is curious that there are no drafts or copies of any of the writings purportedly sent to Henchey.

Keoni Dennison was another company employee accused of making unwelcomed phone calls to a female employee. Dennison was allowed to defend that accusation by producing telephone records. (Michaeles Aff., Exh. 5, p.35). Bennett was allowed no opportunity to defend. He was sat down, accused of writings to Henchey, denied those writings, and was summarily discharged.

While the company elected to search Bennett's office, Bob Wilk was not asked to investigate Dennison for a similar accusation. (Michaeles' Aff., Exh. 5, p.30).

At the end of September 2002 Mesher announced that the legal department would be transferred from Worcester to Valley Forge, and that one of the options was to accept an enhanced severance package within 45 days. Shortly after that notice on October 4, Mesher revoked and suspended the move to Valley Forge. Before the expiration of 45 days, Bennett emailed Mesher on October 25 stating that he was considering accepting the severance offer. Mesher responded by saying it is absolutely clear that the severance package had been made null and void effective October 4. (Michaeles' Aff., Exh. 2, Mesher Exh. 42).

After Mesher declined to allow Bennett to accept the severance package, he allowed Ulbrich to accept the very same package. (Michaeles' Aff., Exh. 2, pgs.58-60).

## CONCLUSIONS

For the above reasons, there are substantial genuine issues of material facts as to whether Feagans and Mesher intentionally interfered with Bennett's employment contract by creating a Machiavellian plot to terminate Bennett, that Feagans aided and abetted the decision to terminate; and that termination was a pretext for discrimination by ridding the intellectual

property department of its three oldest members, as retaliation for the June 6, 2001 age grievances against Feagans.

Accordingly, Defendants' Motion for Summary Judgment must be denied.

Respectfully submitted,
DAVID BENNETT, by his attorney,

_____
Michael J. Michaeles, Esquire
390 Main Street, Suite 1000
Worcester, MA 01608
Phone: (508) 791-8181
BBO#: 344880

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail.

Dated: 11/23/05

_____
Michael J. Michaeles