# EXHIBIT 2

Page 57

1        MS. COMISKY: Objection. Asked and
2    answered.
3        Q.  So as of September 23rd you had decided to
4    move the department; correct?
5        A.  As of that date?
6        Q.  Yes.
7        A.  Yes.
8        Q.  And then you revoked that decision;
9    correct?
10       A.  Yes.
11       Q.  When did you revoke it?
12       A.  It was soon thereafter -- very, very soon.
13    I think I had some discussions with Paris by phone
14    on October 1st, I believe, which was a Friday, and I
15    sent an announcement out revoking it and requesting
16    everyone in the Worcester law office to return the
17    relocation package on October 4th.
18       Q.  Sometime after October 4th you allowed
19    Volker Ulbrich to accept the severance package?
20       MS. COMISKY: Objection to the form.
21       A.  No, I did not.
22       Q.  Sometime after October 4th was a severance
23    package given to Volker Ulbrich?
24       A.  Volker retired, and, as part of that

Page 58

1    retirement, he agreed to severance that included
2    some consulting arrangements, yes.
3        Q.  Was there any difference in the severance
4    package in terms of the severance package under
5    which Mr. Ulbrich retired -- any difference between
6    that package and the one offered in connection with
7    the move to Valley Forge?
8        A.  The substantive terms as far as the number
9    of weeks of continuing pay and the consulting
10    arrangements were the same.
11       Q.  What was different, if anything?
12       A.  What was different was that it was made
13    very clear of my view in the document that the
14    severance arrangement that had been offered to the
15    entire department had been withdrawn, had been
16    revoked, was no longer in any force and effect.
17       Q.  Substantively, was there any difference
18    between the severance package revoked and the
19    package given Mr. Ulbrich?
20       A.  Substantively, no.
21       Q.  Has anybody else from the law department
22    retired?
23       A.  Since when?
24       Q.  Since you've been the head of the

Page 59

1    department.
2        A.  Has anyone else retired since 1997 when I
3    became the head of the department, yes.
4        Q.  Were they given the same severance package
5    Mr. Ulbrich was given?
6        A.  No.
7        Q.  How come?
8        MR. MICHAELES: I'll withdraw that
9    question.
10       Q.  Has anybody who has retired from the law
11    department been given the same severance package as
12    was given to Mr. Ulbrich?
13       MS. COMISKY: Since he's been general
14    counsel?
15       MR. MICHAELES: Since whenever he
16    knows.
17       MS. COMISKY: I object to that. He
18    can't go back to the beginning of time.
19       MR. MICHAELES: If he knows. If he
20    doesn't know, he doesn't know.
21       A.  What was the question again?
22       Q.  Are you aware of anyone who has retired
23    from the law department who has been given the same
24    severance package as Volker Ulbrich was given?

Page 60

1        A.  I think about a year after Volker retired,
2    we consolidated the physical location of the IP law
3    department and the general law department in
4    Worcester, and we eliminated a secretarial position
5    and we gave that person whose position was
6    eliminated a similar-type of package. Her name was
7    Toula Koulisis.
8        Q.  When you say "similar," what was similar
9    between the two?
10       A.  I'm trying to remember. It certainly
11    wasn't identical because I think with Volker we had
12    a consulting arrangement. With Toula Koulisis, I
13    believe she received one and one-half weeks of
14    severance for each year worked so they were similar
15    in that context. I forget exactly what Volker
16    received. I think his may have been two weeks for
17    every year of service, but she was at a lower level.
18       Q.  Were you the only person involved in the
19    decision to offer the severance package to
20    Mr. Ulbrich?
21       A.  Involved in the decision?
22       Q.  Correct.
23       A.  I consulted outside counsel.
24       Q.  Was Mr. Phelizon involved in that decision?

Page 61

1    A. No.
2    Q. Let's go to the termination of Mr. Bennett
3 on October 31, 2002. Whose decision was it to
4 terminate Mr. Bennett?
5    A. Mine.
6    Q. Was anybody else involved?
7    A. It was my decision. I think I had some
8 input discussions with Cathy Ferrante who was the
9 human resource person assigned to Saint-Gobain
10 Corporation's corporate staff.
11    Q. Did you discuss it with Mr. Phelizon?
12    A. No.
13    Q. Tell me all the reasons Mr. Bennett was
14 terminated.
15    A. Let's back up.
16    Q. Sure.
17    A. I didn't discuss it with Phelizon before I
18 terminated him. He obviously knew afterwards
19 primarily because I was sued. I think I told him
20 that the company had been sued for termination.
21    Q. Why was Mr. Bennett terminated?
22    A. The triggering event or the compelling
23 reason was that it had been demonstrated to me that
24 he had been engaged in a pattern of harassment of a

Page 62

1 female employee in Worcester.
2    Q. When was the first time you became aware of
3 that harassment?
4    A. It was on or about October 18th.
5    Q. Of?
6    A. Of 2002.
7    Q. Who made you aware of that?
8    A. Robert Wilk.
9    Q. Prior to that date had you had any
10 communication with Mr. Wilk about this harassment?
11    A. No.
12    Q. Did Mr. Wilk call you or did you meet with
13 Mr. Wilk?
14    A. He called me.
15    Q. And what did he tell you?
16    A. He said he had been asked by the human
17 resources department to investigate a harassment
18 situation, particularly with respect to the source
19 and forensic investigation of documents that had
20 been submitted to this individual and that the
21 target of the investigation was one of my employees.
22    Q. Did he name the employee?
23    A. Yes.
24    Q. What did you say to him?

Page 63

1    A. I said that I was very surprised.
2    Q. I'm sorry, when was that, what date?
3    A. It would have been on or about
4 October 18th. It may have been a little bit before,
5 but it certainly wasn't much before that. I think
6 it was the 18th. It may have been a couple of days
7 sooner, but I said I was shocked and surprised that
8 David would do such a thing, but that Bob's job was
9 to find out as best he could whether or not those
10 claims were legitimate.
11    Q. Is that the full extent of your
12 conversations with him at that time?
13    A. He said that as part of the investigation
14 they would be looking through the contents of
15 David's office and he wanted to alert me to that
16 fact. I said, Do what you have to do, do what you
17 normally do with respect to investigations.
18    Q. Did you ever suggest getting fingerprints
19 or DNA samples?
20    A. I wasn't the investigator.
21    Q. I'm asking you whether you ever suggested
22 that.
23    A. Not that I recall, no.
24    Q. Did he ever suggest either of those things?

Page 64

1    A. Not that I recall.
2    Q. So in that first conversation he told you
3 that it appeared as though Mr. Bennett had been
4 harassing a female employee and that he, Mr. Wilk,
5 was going to search his office and you said, Go
6 ahead and do whatever you have to do?
7    A. I don't think he said he was going to
8 search it. He said he was going to have the office
9 searched.
10    Q. Have you now told me everything about that
11 conversation?
12    A. Of that conversation, as I recall, yes.
13    Q. What is the next thing that happened with
14 regard to the issue of harassment?
15    A. I received a call probably the following
16 week. The 18th I think was maybe a Thursday or a
17 Friday. I received a call the following week.
18 Well, I do know. I have to back up for a second.
19 As part of the conversation on the 18th, he told me
20 that he had engaged a forensic document expert to
21 examine the handwriting on the envelopes in which
22 the poems were delivered, and I told him that I
23 wanted the best forensic document examiner that he
24 knows of.


Page 69

1  probably talked to Bob, obviously, by phone.
2  Whether I called him or he called me, I don't know.
3  I said that this requires follow-up directly with
4  David Bennett.
5      Q.  As of that conversation, had you made the
6  decision to terminate Mr. Bennett?
7      A.  No.
8      Q.  Do you know whether or not any of the
9  envelopes or things delivered to Ms. Henchey had
10  been fingerprinted?
11      A.  I don't know for a fact whether or not they
12  were, but I do believe that as part of the process
13  that Ms. Berrie would go through, she would not only
14  look at the handwriting itself but other
15  indentations and perhaps even fingerprinting. I
16  don't know.
17      Q.  But. Certainly Mr. Wilk or anyone at his
18  direction didn't fingerprint anything?
19      A.  I'm sorry?
20      Q.  Did Mr. Wilk or anyone at his direction
21  fingerprint anything that you're aware of?
22      A.  He may have asked Ms. Berrie to perform
23  that function. I don't know.
24      Q.  So what happened after that conversation

Page 70

1  with Mr. Wilk where you said that something had to
2  be done?
3      A.  We needed to follow-up. In the normal
4  course if someone is accused of these types of
5  things, you talk to the person being accused, and we
6  made arrangements for Bob Wilk and Joe Johnson, who
7  was an outside investigator helping Bob Wilk, to
8  fly, or drive in Joe Johnson's case, to Worcester
9  and interview David Bennett as a result of the
10  findings of the forensic document examiner. I would
11  attend not the interview but I would be up there
12  during that process in Worcester and Cathy Ferrante
13  would be there and so we had some coordinating of
14  schedules to do. In order to make sure that David
15  was actually in Worcester and he wasn't traveling, I
16  called Tim Feagans and said, Tim, I need to make
17  sure David Bennett is available on whatever date it
18  was. Originally, I thought it was going to be the
19  28th and there was a scheduling conflict of some
20  sort. I don't know if it was David's schedule or I
21  think he was not going to be in the office that day
22  or he had a doctor's appointment or something, so I
23  asked Tim to make sure David would be available on
24  the 31st of October 2002. I specifically did not

Page 71

1  tell him the reason why. All I said was, I want to
2  make sure David is available at whatever time we
3  decided.
4      Q.  Go ahead.
5      A.  That's it.
6      Q.  Did you tell him what this was about?
7      A.  No. He had no idea what it was about. In
8  fact, he had no idea what it was about, and I didn't
9  tell him who would be arriving with me. I just
10  said, I want to talk to Dave Bennett at an appointed
11  hour and you need to make sure that he's in the
12  office at that time, and, remember, there were two
13  different offices across the street.
14      Q.  Is there any company procedure for which
15  somebody accused of something like this or any
16  behavior resulting in termination has a forum to
17  defend himself --
18          MS. COMISKY:  Objection.
19      Q.  -- or herself?
20          MS. COMISKY:  Objection?
21      A.  Is there a procedure?
22      Q.  Is there a company procedure in place like
23  an informal hearing process?
24      A.  No. I don't know of any procedure like

Page 72

1  that, no.
2      Q.  Why wouldn't you tell or why wouldn't
3  someone tell Mr. Bennett in advance of the meeting
4  that the meeting was going to be about inappropriate
5  behavior or what the behavior was?
6          MS. COMISKY:  Objection to the form.
7      A.  We did not want to give him the opportunity
8  to rid his office of any incriminating evidence.
9      Q.  His office had already been searched;
10  correct?
11      A.  It had been searched, as I understand it,
12  on the 18th, yes.
13      Q.  Do you know what the extent of that search
14  was?
15      A.  I don't know.
16      Q.  Do you know whether any materials were
17  taken from his office?
18      A.  At that time?
19      Q.  Yes, at that time.
20      A.  Nothing was taken from his office, as I
21  understand it.
22      Q.  So let's move forward to the next thing
23  that happened after you gave Mr. Feagans a heads-up
24  to make sure that Mr. Bennett was there on the 31st.

c505a237-4a6d-44c8-82af-1f6588ba59ce

Page 85

1  general context. I showed him a copy of the
2  Massachusetts statute that prohibits this type of
3  general harassment, and I said I was appalled at
4  that type of behavior and it would not be tolerated
5  within my department, especially for someone who is
6  a lawyer and who should know better, and I told him
7  that he was going to be terminated.
8      Q.  Did you tell him the reason he was going to
9  be terminated?
10     A.  I said that the compelling reason was my
11 good faith belief that it was his writing and my own
12 conviction that it was his writing. There were some
13 other issues that he had with me in the past, but
14 those alone would not have triggered his
15 termination, but this certainly did.
16     Q.  Did you ever have any communication with
17 J.J. Berrie other than looking at her report that
18 was forwarded to you by Mr. Wilk?
19     A.  No.
20     Q.  How long did that discussion last?
21     A.  With David Bennett?
22     Q.  Yes.
23     A.  The entire meeting probably lasted
24 30 minutes because it was more that Cathy handled

Page 86

1  the HR aspects of it, asking him for his American
2  Express card, his key card for entry into the
3  department, and whatever else HR people typically
4  do.
5      Q.  Have you now told me everything that was
6  said at that meeting that you can remember?
7      A.  I did ask him how to spell "meager" and he
8  spelled it M-E-A-G-R-E. I pointed out in one of the
9  poems where that spelling of the word was used.
10 That's all I can remember.
11     Q.  What is the next thing that happened with
12 regard to the Bennett matter after that meeting?
13     MS. COMISKY:  Objection to the form.
14     MR. MICHAELES:  What is your
15 objection?
16     Q.  What is the next thing that happened?
17     MS. COMISKY:  "With respect to the
18 Bennett matter," what does that mean?
19     MR. MICHAELES:  It means him being
20 fired for being accused of writing some poems or
21 writing some things to Diana Henchey.
22     A.  What is the next thing that I'm aware of?
23     Q.  Yes.
24     A.  I probably left the meeting or the meeting

Page 87

1  room, and whether Cathy stayed behind for a little
2  bit to talk to David about picking up his personal
3  belongings or whether that was part of something
4  that Bob Wilk had talked to him about, I don't know
5  because we were very sensitive to him going back to
6  the office and picking up his personal belongings.
7  We gave the choice to him whether to do it at that
8  point or come back later after hours and after
9  everyone else had left. We were very sensitive to
10 that. I'm not sure who went with David.
11     Q.  What did you do?
12     A.  After David left, and I don't know if he
13 left with Bob Wilk and Joe Johnson or not, but he
14 left the floor. I then gathered the general law
15 employees together, including Tim Feagans,
16 Frank Anthony, and Joan Leo, and whether they were
17 all there that day I don't know but whoever would
18 have been on the floor, and I advised them that Dave
19 Bennett had been terminated and I would not discuss
20 the reasons for that with them.
21     Q.  Did anyone ask any questions?
22     A.  No.
23     Q.  Then what did you do?
24     A.  I, along with Cathy Ferrante, went across

Page 88

1  the street where the intellectual property lawyers
2  had their offices, and I gathered the employees
3  there. I think Volker may not have been there, but
4  I believe everyone else was there.
5      Q.  Do you remember what day of the week it
6  was?
7      A.  I think October 31st was a Friday, I
8  think. I gathered them and told them that Dave
9  Bennett's employment had been terminated and I would
10 not get into the reasons.
11     Q.  What time of day did you have that
12 conversation with Mr. Bennett?
13     A.  We flew up that morning, and I don't know
14 when the flight got in, but it was probably 11:00 by
15 the time I got here and Bob Wilk conducted the
16 interview, and so I probably would have talked to
17 David in the 3:00 time frame or maybe a little bit
18 later.
19     Q.  Did you keep any notes of that meeting or
20 may any record of any kind?
21     A.  No.
22     Q.  Did you do anything further with regard to
23 the Bennett case?
24     MS. COMISKY:  Objection to the form.

Page 81

1    MS. COMISKY: Objection to the form.
2    A. We would have discussed just the mechanics
3  that Bob Wilk and Joe Johnson would interview him
4  and then after that process had taken place, we
5  would get debriefed on that discussion and interview
6  and we would have to make a decision.
7    Q. Prior to that date, what communications did
8  you have, if any, with Cathy Ferrante regarding
9  Mr. Bennett being a suspect?
10    MS. COMISKY: Objection. Asked and
11  answered.
12    A. She knew that David's handwriting was being
13  analyzed. She knew that.
14    Q. Did she know that before you had told her?
15    A. I suppose Sonya Simonian told her. I
16  didn't talk at all to Cathy before the 18th because
17  I didn't know anything about the matter until the
18  18th when Bob Wilk called me.
19    Q. Prior to October 31, 2002 had you had any
20  conversations with Sonya Simonian about it, to your
21  recollection?
22    A. No.
23    Q. Prior to that conversation that you had
24  with Mr. Wilk and Mr. Johnson had you communicated

Page 82

1  with Mr. Johnson about Mr. Bennett being a suspect?
2    A. Prior to the meeting, joining the meeting?
3    Q. Correct.
4    A. No, I never talked to them.
5    (Short recess taken at 12:20 p.m. and
6  testimony resumed at 12:28 p.m.)
7    Q. After that conversation on October 31st
8  with Mr. Johnson and Mr. Wilk, was the next thing
9  then to meet with Mr. Bennett?
10    A. Yes. After the debriefing in which Johnson
11  and Wilk confirmed to me that they were convinced it
12  was David that wrote those poems, Cathy Ferrante and
13  I met with David alone.
14    Q. At any point in time were you aware that
15  Ms. Henchey thought that the poems were written by
16  somebody else?
17    A. I became aware of that in looking through
18  Sonya Simonian's write-ups of the allegations.
19    Q. Did she interview any of those people?
20    A. I do not know.
21    Q. She didn't choose to have Mr. Wilk
22  interview any of those people?
23    A. It was his investigation.
24    Q. So the next thing that happened after the

Page 83

1  conversation with Wilk and Johnson was the meeting
2  with Mr. Bennett?
3    A. Yes.
4    Q. Where did that take place?
5    A. That took place in the law library of the
6  general law department.
7    Q. Who else was there?
8    A. Cathy Ferrante.
9    Q. Tell me what each person said during that
10  meeting, as best you can remember.
11    A. I remember showing David the envelopes and
12  the poems and asking if he had seen or written the
13  poems, and he said no.
14    Q. I'm sorry, you physically showed them to
15  him?
16    A. I believe so.
17    Q. Were they the originals, or were they
18  copies?
19    A. They were copies, I believe. The poems
20  were all copies because they were typewritten. They
21  were typewritten. The poems themselves were
22  typewritten.
23    Q. Did you physically show him the exact poems
24  that Ms. Henchey received, or were they copies of

Page 84

1  the poems?
2    A. I don't know. He denied writing them or
3  seeing them. I showed him the cover envelopes.
4    Q. Were they the original envelopes?
5    A. I don't remember.
6    Q. Do you remember whether they were manila
7  colored?
8    A. I don't remember if they were the originals
9  or photocopies. I'm not sure. I asked him if that
10  was his handwriting on those envelopes. He did not
11  deny it was his handwriting. What he said was, If
12  you are saying that these poems were inside of these
13  envelopes, I'm denying that.
14    Q. Again, did you ask him whether that was his
15  handwriting on the envelopes?
16    A. Yes, and he didn't deny it. He said, If
17  you are saying that these poems were in those
18  envelopes, I'm denying that.
19    Q. What else did he say and what else did you
20  say and what else did Cathy Ferrante say?
21    A. I said that I was convinced that he was the
22  one that was harassing Ms. Henchey.
23    Q. Did you use the word "sexual harassment?"
24    A. No. I said it was harassment in the

c505a237-4a6d-44c8-82af-1f6588ba59ce

Page 97

1  David made where I thought the expense was
2  extravagant.
3      Q.  What was the expense?
4      A.  If I recall, David was traveling, and I'm
5  not sure where, maybe in Wheatfield, New York or
6  Ohio, for one of his clients, and a single dinner
7  item turned out to be about $65, and under our code
8  of ethics the approver of any expense report has to
9  make a determination as to whether or not it's
10  reasonable and necessary, and my view was, because I
11  have to approve all expense reports, not only in
12  Worcester but everyone in my department, I thought
13  that $65 for one meal in a small town, I think it
14  was a small town, was excessive, and I wanted to see
15  what he spent $65 on, and I think either I asked Bob
16  Wilk or Tim Feagans asked Bob Wilk to look at the
17  expense and determine what it was for, and it turned
18  out a large part of it was for a bottle of wine.
19      Q.  Do you know how much the bottle of wine
20  cost?
21      A.  No, but my understanding was it was about
22  half the expense.
23      Q.  Is there any policy for employees not
24  supposed to buy wine or liquor?

Page 98

1      A.  No.  You can buy wine or liquor, but
2  there's a reasonable standard.
3      Q.  What is the reasonable amount?
4      A.  I think it depends upon what part of the
5  country you're in.  New York City is different than
6  Philadelphia and that's different from Worcester and
7  that's different from Cleveland, Ohio.
8      Q.  There's no set limit?
9      A.  There's no set limit.  There is no per
10  diem, as you'd say.
11      Q.  In connection with that specific matter,
12  did Mr. Bennett submit copies of receipts which
13  ultimately you saw?
14      A.  All receipts have to be attached to the
15  report, and at that time we may not have, although
16  we've changed our policy since then, we may have not
17  have required the actual underlying expenditure
18  where you would have to show what you purchased as
19  opposed to the amount you purchased.  I think at
20  that time it was probably only a hotel bill where --
21  I think it was a room service bill and it was for
22  dinner for $65, and there was nothing that showed
23  what that expense was for other than for dinner, but
24  now we do require every expenditure for meals to

Page 99

1  include an itemization of what was purchased for
2  dinner, for lunch, or for breakfast.
3      Q.  Has Mr. Wilk investigated or looked into
4  any other expense for any other of your employees in
5  the law department?
6      A.  No, I don't think so.  Not that I recall.
7      Q.  You've never asked him to look into an
8  expense account of any other employees in your law
9  department?
10      A.  Not that I recall, and I review them very,
11  very carefully.  I think this case was only because
12  I thought it to be fairly extravagant and we didn't
13  know what it was for.
14      Q.  Tell me how you located or first determined
15  this expense?  Were you reviewing his submission?
16      A.  I have to approve every expense report for
17  every one of my employees.
18      Q.  So Mr. Bennett went on a trip and submitted
19  this expense report and in the course of reviewing
20  it, this item jumped out at you; is that it?
21      A.  It either was that or maybe it was headed
22  off by Tim who said, I have an expense report here
23  and Tim knows that I have to approve it first and it
24  cannot be paid until I approve it, so he may have

Page 100

1  called me and said, I have an expense report here
2  for David and there's something that appears to be
3  fairly extravagant, what do we do.  He knows if it
4  was sent down without pre-clearance, I would
5  probably bounce it.
6      Q.  Just to jump back a minute to the decision
7  to move to Valley Forge, had that move gone forward
8  how many people from your law department in
9  Worcester would have gone to Valley Forge -- lawyers
10  and staff?
11      A.  If they had all accepted the relocation?
12      Q.  Yes.
13      A.  I believe seven.
14      Q.  Can you somehow tell me the extent of the
15  files which would have to go with them?
16      A.  I wouldn't know firsthand what the files
17  would be.  That would be up to our facilities person
18  to deal with, like, Cathy Ferrante had a dual hat.
19  She was the HR person and the facilities person and
20  that would be her problem.
21      Q.  Had you scheduled the date by which the
22  move had to be completed?
23      A.  I think it was a fairly long period of
24  time.  It was five months.  I remember I said I

Page 141

1    A. I think there is one reason with three
2  subparts.
3    Q. The one reason is gross misconduct?
4    A. That's the overall reason, yes.
5    Q. Did you ever consider giving him a warning
6  on terms of the accusation of sexual harassment
7  rather than termination?
8    A. Absolutely not.
9    Q. Did you ever give him any prior written
10 warnings for Number 2, gross insubordination?
11   A. I believe he was -- I know that some of the
12 behaviors that he exhibited he was warned about.
13   Q. But it appears to be limited to a point
14 highly critical of his immediate supervisor, which I
15 assume would be you?
16   A. This is an example -- E-G. It's not I-E.
17   Q. Let me rephrase the question and ask it
18 again. Did you ever give him any written warnings
19 regarding conduct which you perceived as being
20 grossly insubordinate?
21   A. Yes, I gave him a written warning. I would
22 have to go through all the exhibits, but there are
23 several there. One was the Festo matter when I put
24 him on notice. He was very critical of me and my

Page 142

1  management of the department to senior people over
2  in Paris.
3    Q. Do you remember what year that was in?
4    A. I can refer to the exhibit.
5    Q. Do you think it was in 2002?
6    A. November 2001.
7        MS. COMISKY: Have you finished your
8  answer?
9    A. Also, in there as an example would be the
10 poem that he admitted writing which severely
11 criticized me, Tim Feagans, Mark Mathison, and, to a
12 certain extent, Jean-Francois Phelizon.
13   Q. Was that the poem that was discovered in
14 his office on October 31, 2002?
15   A. I saw it on October 31, 2002, yes.
16   Q. Do you know whether that was given to
17 people on the company premises -- copies of that
18 poem?
19   A. It was found in his office. If I recall
20 correctly, he showed him that during my discussion
21 with him on the 31st. His explanation was that it
22 was prepared and read to other IP lawyers who were
23 attending a function for Tom DiMauro when he was
24 leaving the company.

Page 143

1    Q. When did Tom DiMauro leave the company?
2    A. He left the company in 2000. I would have
3  to look. I think it was sometime in early 2000.
4    Q. A two-year-old poem?
5    A. Pardon me?
6    Q. A two-year-old poem?
7    A. I don't know.
8    Q. On October 21st you said it was read at
9  some point for Tom DiMauro and he left in 2000?
10   A. That's what David Bennett told me.
11       MS. COMISKY: Objection.
12   Q. Let's go back to November 2001 where he
13 criticized you to people in France.
14   A. Yes. Let me find the exhibits. Okay.
15   Q. Did you ever tell Bennett that if he did
16 something like that again he would be terminated?
17   A. I was very stern with him at the end of
18 this letter where I said "This latest incident will
19 weigh heavily in my vision of the infrastructure of
20 the department and will at the very, very least have
21 a negative impact on your overall performance
22 evaluation."
23   Q. I understand what the message said. I'll
24 ask you again. Did you tell him at that time or in

Page 144

1  connection with that e-mail that if he did something
2  like that again, he would be terminated?
3        MS. COMISKY: Other than what he just
4  read, did he say that in those very words?
5        MR. MICHAELES: Those words or similar
6  words.
7    A. I knew it was very, very --
8    Q. That's not what I'm asking, Mr. Mesher.
9  Don't give answers to the questions you want. Just
10 answer my questions.
11       MS. COMISKY: You interrupted him.
12       MR. MICHAELES: I don't think so.
13   Q. Can I see that exhibit? Thank you.
14 Exhibit 27 is a letter from you to Mr. Bennett in
15 which you express your concern about his being
16 critical of you to people in France. Did you ever
17 tell him verbally or in writing after November 20,
18 2000 or at that time that if he did anything like
19 this again, he would be terminated?
20   A. It was November 20, 2001.
21   Q. Yes or no.
22   A. I don't think I ever said he would be
23 terminated, no.
24   Q. Now, his being critical of you, as

**Mesher, John R.**

| | |
|---|---|
| **From:** | Mesher, John R. |
| **Sent:** | Tuesday, August 03, 1999 9:05 AM |
| **To:** | Feagans, Tim L. |
| **Subject:** | FW: Messages |

These guys have no idea how to make friends. I laid into Dave about this type of message. He should have called Annette to ask her to check her addresses. It turns out that the "properties" listing for Dave Bennett in her list shows that he is the lawyer in Worcester. It may be an IT problem - -she is checking.

Sorry to vent to you, but since Dave copied Annette's boss, I thought I would reciprocate.

——Original Message——
From: Bennett, David X.
Sent: Tuesday, August 03, 1999 8:35 AM
To: Scholl, Annette J.
Cc: Mesher, John R.
Subject: Messages

Annette:
I thought I could at least rely on you to send any messages to me by the direct route. I find however that your E-Mail department collective mail address sends my copies to Buckhannon! Please correct this before something really confidential ends up in the wrong hands.



EXHIBIT   3
WIT: Mesher
DATE: 8 4 05
JEAN P. ZBINDEN

SGC  00012

1

**Mesher, John R.**

| | |
|---|---|
| From: | Moran, Kathleen M. |
| Sent: | Friday, August 13, 1999 9:50 AM |
| To: | Mesher, John R. |
| Subject: | RE: |

Thank You for all your help.  I intend to look to the bright side of working as a team.  I am hoping everyone will feel the same.  Thank you again for all your help.
Kathy
-----Original Message-----
From: Mesher, John R.
Sent: Thursday, August 12, 1999 5:23 PM
To: Moran, Kathleen M.
Cc: DeAngelis, Dina M.; Feagans, Tim L.
Subject:

I again want to apologize for the unjustified remarks of Dave Bennett.  I appreciate how diligent you and others in the accounting department are in making sure we follow established controls and procedures.  If you ever have a problem with anyone in my department, call me immediately and I will take care of it.

EXHIBIT 4
WIT: Mesher
DATE: 8-4-05
JEAN P. ZBINDEN

SGC 00887

1

EXHIBIT ___5___
WIT: _Mesher_
DATE: _8-4-05_
JEAN P. ZBINDEN

**Feagans, Tim L.**

| | |
|---|---|
| From: | Mesher, John R. |
| Sent: | Thursday, April 13, 2000 1:25 PM |
| To: | Bennett, David X. |
| Cc: | Feagans, Tim L. |
| Subject: | RE: Travel & Entertainment Expenses |

I have tried my best to meet the budgetary demands over the past several years by watching controllable expenses rather than reducing headcount. If you talk to other departments, you will realize that other departments have had to either terminate people or not hire replacements. This has not been the case in the LD. So, I'm frankly tired of getting grief over my attempts to save jobs. This may have easier solution.

> -----Original Message-----
>
> | | |
> |---|---|
> | From: | Bennett, David X. |
> | Sent: | Thursday, April 13, 2000 1:14 PM |
> | To: | Mesher, John R. |
> | Cc: | Feagans, Tim L. |
> | Subject: | RE: Travel & Entertainment Expenses |
>
> John:
> Allow me to respond to your recent plea for travel restraint. I feel a certain amount of personal concern here since I have been required to travel more than normal in the first quarter and I have at least two more scheduled appearances in the EPO in Munich before the end of the year. All of this I would happily give up, not just to save your budget, but because I have long since exhausted the "pleasures" of business travel. Trust me; travel is undertaken only if absolutely necessary to do a half-way decent job for the clients.
>
> For at least two years now we have been on a bare bones travel schedule. For myself, and I believe for my colleagues, I can assure you that no unnecessary travel has been undertaken and that which has been undertaken has been with a strict view to economy. There really is no more blood to be wrung from this stone. I might add that the travel restrictions already in place are tighter than anything I have experienced in 35 years of work in the patent field.
>
> As a result we have been forced to provide a sub-standard level of service to our clients and as professionals this really hurts. We just do not like to turn down requests that we visit out-of-town locations to educate the new entrants or to conduct technology reviews with the Research and Business functions or provide any of the other on-site services that they are entitled to expect. This situation was tolerable on the basis of short term exigencies but now it appears that a sub-minimum standard of service is the base from which we must make further cuts.
>
> It would seem therefore that we should in all prudence explore ways in which the travel expenses incurred on behalf of a client be removed from budget of the Law Department. Would it be possible to identify the client on whose behalf the travel is undertaken in the Expense Report as submitted, and have that client billed directly? Where the interests of two or more clients are involved the amount could be apportioned accordingly. This would relieve you of the burden of striving after a basically unattainable goal and would allow us to return to providing the kind of service our clients deserve.
>
> -----Original Message-----
>
> SGC  00055
>
> | | |
> |---|---|
> | From: | Mesher, John R. |
> | Sent: | Thursday, April 13, 2000 9:36 AM |
> | To: | Alterman, Lauren; Battisti, Renee; Carr, Sherry; Gray, Carol; McGettigan, William; Montemayor, Linda; Peake, Walter; Plache, Alex; Pontz, Curtis; Anthony, Frank; Bennett, David; Borst, Steve; DiMauro, Tom; Feagans, Tim; Porter, Mary; Ulbrich, Volker |
> | Cc: | Scholl, Annette J. |
> | Subject: | Travel & Entertainment Expenses |
>
> Each year, the Law Department budget includes an amount for anticipated travel expenses. For year 2000, I have budgeted $115,000. (By the way, this does not include travel expenses incurred in connection with acquisitions. Acquisition-related travel is charged to the acquisition and not to my budget.)
>
> The $115,000 budget for 2000 is an educated guess, based on past experience. The actual combined travel expenses for the IP and General Law Departments for prior years were: 1999 - - $128,000; 1998 - - $71,000; 1997 - - $100,000; 1996 - - $100,000.
>
> For the first 3 months of 2000, we have spent $40,500 on travel (again, excluding acquisition-related travel). This

is about $12,000 more than the budgeted amount for the quarter. If this high level continues for the full year, we would spent $162,000 (versus a budget of $115,000). I know there have been a number of litigation matters and trials that have required extended travel in the first quarter, so I hope this trend doesn't continue. However, rather than leaving things to luck, I am asking each of you to be extremely prudent in your travel decisions. Many times, things can be handled effectively by phone, e-mail, etc. In addition, you should plan ahead where feasible to get the airfares.

I will continue to monitor the travel expenses on a monthly basis and let you know the results.

SGC  00056

2

**Mesher, John R.**

| | |
|---|---|
| From: | Mesher, John R. |
| Sent: | Friday, April 20, 2001 11:06 AM |
| To: | Ferrante, Cathy |
| Subject: | FW: Expense Reports |

FYI. This relates to a $65 dinner that Dave Bennett incurred during a recent trip to Wheatfield, NY. We reimbursed Dave, but Tim noted that he thought the expense was on the high side. The saga never ends. Please put this in David's personnel file.

-----Original Message-----
From: Feagans, Tim L.
Sent: Friday, April 20, 2001 10:31 AM
To: Mesher, John R.
Subject: FW: Expense Reports


For your information.

-----Original Message-----
From: Feagans, Tim L.
Sent: Friday, April 20, 2001 10:30 AM
To: Bennett, David X.
Subject: RE: Expense Reports


The Travel and Entertainment Policy requires me as the approving manager to review all expense reports to ensure expenses are ordinary and necessary, neither lavish or extravagant and supported by proper documentation as defined in the Policy. And Section 9.1 of the Policy directs me to verify the reasonableness of reported meals. So, I have not only the right -- but the obligation -- to question any expense submitted for reimbursement. You should not feel defensive or regard my efforts to counsel you in this regard as distasteful. It has nothing to do with your tenure with the Company, your position or your professional status. No one in the organization is (or should be) accorded any special treatment. Managers regularly communicate with their direct reports (at all levels of the organization) regarding the Policy. You should also understand there have been numerous instances where the Company has disciplined or terminated not only individual employees for failing to abide by the Policy but also supervisors for failing to enforce it.

In discharging my responsibility for approving expense reports, I not only look to the standards and practices outlined in the Policy but also to the prevailing practice followed by others within the Department and the Company generally. It has nothing to do with my own spending habits or frugality. And your suggestion in this respect is inappropriate.

I could have rejected the expense. Instead I elected to approve it (this one time) and counsel you on what the Company considers to be reasonable. It was nothing more than an effort to set expectations so as to prevent misunderstandings in the future. If it would help you to have some numerical limit for dinner meals, I would suggest you use $25 as a guide. This should not be viewed as a per diem but rather a guideline as to what the upper end of reasonable is.

Finally, it appears from your hotel receipt that you used your VISA card to charge your bill. Employees travelling on Company business are required to use the Card. I have brought this to your attention before on several occasions. Again, just to be clear and prevent any further misunderstanding, you should understand that I will no longer approve any expenses charged to your personal credit card unless I am able to confirm with the merchant that it does not accept American Express.

David, it appears your frustration in looking at this issue stems from a perception that I am being overly rigid in reviewing and approving expense reports. You should understand that I am merely following the Policy and common practice within the Company. You may want to consider speaking with Cathy Ferrante or Bob Wilk to gain some insight as to how we as a Company look at these issues.

I hope this helps.

-----Original Message-----
From: Bennett, David X.
Sent: Thursday, April 12, 2001 7:03 AM
To: Feagans, Tim L.
Subject: Expense Reports


Tim:

EXHIBIT 10
WIT: Megher
DATE: 8/4/05
JEAN P. ZBINDEN

SGC 00167

In your E-Mail of yesterday, you said:
"I did not want you to think in approving the report however that I am willing to reimburse meal expenses of this magnitude in the future", (I feel sure you intended to say "approve reimbursement").

At a threshhold level I feel that this is a matter that would have better been handled in a man-to-man conversation but now the matter has been elevated to this level, perhaps it would be better to secure a little clarification.

I have never claimed expenses that I did not consider reasonable and prudent given the circumstances at the time and I take steps to minimize expenses where this can be done without inconvenience to others. I even elect to drive to Hartford rather than take the shorter route to Boston when I fly to Buffalo because the airfare is somewhat cheaper. I find it distasteful at this stage in my career to have my judgment on what is reasonable and prudent challenged for the first time on the basis of a single meal bill. I intend to continue to use my own judgment as I have in the past and any excess over the Feaganesque frugality standard (let's call it the "FF Standard"), I shall gladly pay out of my own pocket. In this way I hope to avoid unnecessary delys in having my expenses (incurred, let us remember, while on company business) reimbursed. To facilitate this exercise it would greatly assist me if you would place a dollar figure on the FF Standard for lunches and dinners. I will report only that amount, assuming I reach it of course, though the bill submitted in support will not exactly correspond.

I hope this arrangement will save us a reiteration of this correspndence in the future.

David.X.Bennett@saint-gobain.com

SGC  00168

**Feagans, Tim L.**

EXHIBIT  11
WIT:  Mesher
DATE:  8/4/05
JEAN P. ZBINDEN

| | |
|---|---|
| From: | Mesher, John R. |
| Sent: | Friday, April 27, 2001 11:32 AM |
| To: | Ferrante, Cathy |
| Cc: | Baker, Dennis J.; Scott, Mark J.; Feagans, Tim L. |
| Subject: | David Bennett |

This is another example of type of arrogance (and, perhaps, insubordination) that has come from David Bennett over at least the last two years. This was prompted by Tim's review of one of Dave's expense reports that included a $65 room service dinner bill (in Wheatfield - - not NYC). Although we approved the expense, Tim advised Dave that we felt it was a bit much (we have since learned that nearly 50% of the bill was for a half a bottle of expensive wine).

I am not asking you to get involved at this point, but I wanted you to be aware of what Tim has to deal with on a constant basis with the IP lawyers.

-----Original Message-----
From: Feagans, Tim L.
Sent: Friday, April 27, 2001 11:12 AM
To: Mesher, John R.
Subject: FW: Expense Reports


-----Original Message-----
From: Bennett, David X.
Sent: Thursday, April 26, 2001 9:23 AM
To: Feagans, Tim L.
Subject: RE: Expense Reports


Tim:
Thanks for your lofty if delayed reply. I shall henceforth bill the company no more than your frugality standard of $25 whenever I am dining alone while on business, whatever the circumstances.

As regards the use of the Visa card, you should know that I have been authorized by a higher power, (John Mesher), to continue to use my personal card while the American Express people try to sort out why I was charged for three airline tickets obtained by a third party. Clearly with all the stress of the last 15 months, (the length of time this problem has been with me), the situation and all the related correspondence, (in which you were copied), had lapsed from your recollection. The matter is in the hands of our Saint-Gobain in-house interface with American Express, (and has been for over six months), so you can expect action within the usual time span. In the meantime I shall continue to use my Visa card.

By the way, to anticipate your further concerns, you will note that my telephone charges are not on the approved card which was withdrawn along with my AMEX card.

Also to forestall other mangerial involvement along the same lines, I understand that Mary Porter has also had her AMEX card cancelled for similar billing problems.

-----Original Message-----
From: Feagans, Tim L.
Sent: Friday, April 20, 2001 10:30 AM
To: Bennett, David X.
Subject: RE: Expense Reports


The Travel and Entertainment Policy requires me as the approving manager to review all expense reports to ensure expenses are ordinary and necessary, neither lavish or extravagant and supported by proper documentation as defined in the Policy. And Section 9.1 of the Policy directs me to verify the reasonableness of reported meals. So, I have not only the right – but the obligation -- to question any expense submitted for reimbursement. You should not feel defensive or regard my efforts to counsel you in this regard as distasteful. It has nothing to do with your tenure with the Company, your

1

```
EXHIBIT ___12___
WIT: _Mesher_
DATE: _8/4/05_
JEAN P. ZBINDEN
```

**Mesher, John R.**

From:        Mesher, John R.
Sent:        Monday, April 30, 2001 3:54 PM
To:          Bennett, David X.
Cc:          Feagans, Tim L.
Subject:     RE: Policy

David:  This summarizes our telephone conversation earlier today:

1. I (not Tim) give final approval to the T&E expense reports for the Law Department.  As you know, I am also responsible for Corporate Security, and I want those in my Department to be above reproach when it comes to T&E.

2. I am the one who initially questioned the $65 dinner expense that has prompted this and prior e-mails.

3. Although I approved the expense report, I asked Tim to follow-up with you to let you know that I believed the amount was on the high side.

4. You requested a dollar limit as to what would be considered to be reasonable for dinners.

5. $25 was suggested by Tim as a guide as to what is reasonable.  (This, of course, must be viewed in context.  We would certainly anticipate, and approve, higher costs in certain cities, such as NYC or LA, and somewhat lower costs in other cities.)

6. To the extent possible, I expect travelers to submit receipts even if the expense is less than $25 (see Section 6.5 of the Policy).

7. You should try to resolve your dispute with American Express as soon as possible (involve Mark Williams to the extent necessary), so that you can resume using the Amex card for business travel.

8. I would hope that this now concludes this issue.  All of us have more productive demands on our time.


-----Original Message-----
From: Bennett, David X.
Sent: Friday, April 27, 2001 2:13 PM
To: Feagans, Tim L.
Cc: Mesher, John R.
Subject: Policy

Tim:
In your memo of April 20th you referred to the "Travel and Entertainment Policy" and said that "(T)here have been numerous instances where the Company has disciplined or terminated not only individual employees for failing to abide by the Policy but also supervisors for failing to enforce it."

I assure you, you have nothing to fear.  You will not be disciplined or terminated on this basis.  The instances of which I am aware that fall in this general category are confined to situations involving false claims or padded Expense Reports and/or management connivance in such activity.  I am sure you will agree that there is no reason to suspect that such a situation applies here since the occasion for your remark was a single fully documented hotel meal item for US$65.00.  I wonder why you felt it necessary to raise the matter.

However I am intent on not transgressing one jot or tittle of the Policy, even erring on the side of caution in accepting, at your suggestion, that it would be extravagant to bill more than $25.00 for any meal taken while travelling on business.  I register no judgment on the appropriateness of your decision in all situations.  It is after all spelled out in paragraph 9.1 of the "Business Travel and Entertainment Policy" that "Approving managers are responsible for verifying the reasonableness of reported meal costs".  If that is the limit of "reasonableness" that you choose to enforce in the Department, so be it, assuming of course that it is applied non-discriminately.

The same paragraph goes on to say that "..receipts are required for meal expenses in excess of $25.00".  May I therefore assume that no receipts are required under the Policy for meals below $25.00?

SGC  00032

David.X.Bennett@saint-gobain.com

SGC 00033

*John. M.*

## Memorandum to John Mesher and Dennis Baker – Executive Summary

### To be presented at Meeting on June 6, 2001

#### Background
When Steve Borst stepped down as head of the IPLD, (as it was called at that time), you made a visit to Worcester to explain your proposals for our new management structure and to introduce Tim Feagans as our manager in place of Steve.

This arrangement was accepted without reservation by all members of the IPLD and all committed to work with Tim to ensure that the changes would be essentially seamless as far as the clients were concerned and to give Tim our full support and trust. This was done.

The arrangement therefore began very successfully. Unfortunately it did not continue long at this level. The substance of our complaint is that we have been subjected to extraordinarily and outrageously bad management and we are petitioning for a change.

This document presents the view of Volker Ulbrich, Otto Lies, Mary Porter and David Bennett. Mary and Otto have prepared detailed accounts of events of which they have personal knowledge not shared by the others.

#### Summary
The concern we have met to discuss relates exclusively to the way in which Tim Feagans is managing the law department in Worcester.

This is characterized by attempts on the part of Tim to create divisions within the group in which the older members are singled out for unfounded criticism and attempts are made to co-opt the younger members in his support.

The criticism is based on lies and misrepresentations and attacks the credibility of those older members of the department with law department management and even with the clients. Tim's openly declared objective is to make the conditions of employment so distasteful that the targets will leave rather than endure the hostility of the work environment that he has engendered.

A detailed list of specific examples of lies and mis-representations by Tim Feagans will be provided. The attached document recounts some of the events on this list but that compiled by Mary Porter is rather more complete. Additional corroborative written evidence is available from Otto Lies, and Volker Ulbrich and Frank Anthony will provide oral confirmation.

EXHIBIT  16
WIT: Mesher
DATE: 8/4/05
JEAN P. ZBINDEN

SGC 00670

Memorandum to John Mesher and Dennis Baker

To be presented at Meeting on June 6, 2001

*General Issues*

Trust is a gift that may be freely given but is easily lost on evidence of perfidy. That is what has happened here. We are aware of a number of instances in which Tim Feagans has lied to us, individually or as a group, and we believe he has also lied about us. On a number of occasions, which will be detailed to you, he has suggested negative comments or opinions to third parties about one of us which, if not explicitly disclaimed by the hearer, were then misrepresented to you and others as being criticisms or complaints voiced by those third parties. He has also attempted to divide the group in a manner that seemed to set aside the older members of the group as targets for poor treatment, while attempting to enlist the others as his supporters. There are even indications that he has attempted to undermine our relations with our clients. This sort of activity has give rise to the need for this meeting at which we hope to correct a management situation that is unfair, intentionally divisive, destructive of trust and cohesion within the Law Department and may even have elements that are probably illegal. While we continue to struggle to give our clients the best level of service, it can not be denied that the present situation is an unnecessary and unwelcome distraction in that enterprise and should be corrected for the good of the whole Department.

*Specific Actions*

These fall into three main situations:

1. Matters surrounding the hiring of Mike Crosby;
2. Matters relating to Otto Lies;
3. Matters relating to the year 2000 Performance Reviews; and
4. Matters relating to the creation of a hostile work environment.

1. Hiring Mike

   In an E-Mail Tim accused one of the recipients of the E-Mail, (his direct reports), of having passed on some very negative comments to candidates, about the department. All recipients of the E-mail specifically and generally deny making the alleged comments. Indeed it makes no sense that any of us would make the attributed remarks because we were eager to see the vacancy filled so that the clients' urgent needs could be served.

   When Mike was identified as a suitable candidate the entire IP group thought he would fill our needs very well. Tim however used the tactic of going to outsiders and suggesting Mike lacked some quality or other and, if this was not roundly rejected, he reported this to others as being the opinion of the outsiders. These opinions he then used to justify his reluctance to offer Mike the job and to continue the search. I am personally aware of two such situations: one of these I followed up on personally and the other was undertaken by one of my colleagues.

SGC 00671

We do not know what he said to you or what persuaded him to offer Mike the job shortly after our August 8, 2000 meeting. Prior to that time he did not want to hire Mike though now he presents himself as Mike's biggest booster.

2. Otto Lies

Otto has had an unblemished record as an employee for over 35 years. He is highly respected for his knowledge of trademarks and the soundness of his advice on TM matters. I personally have worked with Otto for about 10 years and have never found his advice to his clients on trademark matters to be unsound and that includes his advice on the "Color Purple" opposition.

On one occasion last year he circulated a sentence taken from a "Dilbert" cartoon that was not particularly complementary to Dilbert's management. By his own admitted mistake a copy went to Tim Feagans who seized on this to "make an example" of Otto. By a series of over-inflated actions and reactions he began to build a case for disciplining Otto. The success of these actions you already know.

He solicited negative comments from Mark Mathisen and (apparently) Tom Kinisky about Otto's handling of the "Color Purple" case and presented these as evidence of Client dissatisfaction in his case for giving Otto a very poor Review. It is true that Otto from the first advised against bringing the litigation and in favor of the lower cost alternative of negotiating a restriction of the registration to the point at which its effect would be unimportant and that this advice, while prudent, was unwelcome to Mark Mathisen,. However, when it became apparent that Mark would not countenance such an approach, (and indeed was somewhat offended at the proposal that we should talk to 3M), Otto threw his full weight behind the management strategy and has enthusiastically pursued the Opposition alternative.

I have been present at meetings when strategy was discussed and I am therefore speaking from first hand experience. I completely agreed with the advice given by Otto and, more importantly, so did outside counsel, (Roberta Jacobs), employed to handle our opposition. Mark Mathisen has responded positively to the overall strategy for prosecuting the Opposition. There is no evidence that he distrusts Otto's advice or how he is managing the Opposition, and while he has grumbled over the expense and over the requirements of the discovery and deposition procedures he has cooperated very well for the most part. However although Tim Feagans was present at almost all of the meetings that I attended, I never once saw or heard from him any support for Otto. This undermines the credibility of his subordinate and is frankly a very bad management technique.

On the basis of such fragmentary interactions in a very narrow context, Otto has been portrayed as an ineffectual communicator with management. I have been a close witness of Otto's activities in coordinating the deposition testimony and securing the cooperation of all levels of management and have been impressed at

how well he gets on with all of them, including I might say, Mark Mathisen. In spite of the treatment he has received, his commitment to the client remains remarkably undimmed.

3. Performance Reviews

I can speak with authority on my own review. My understandings of the reviews of Otto Lies and Volker Ulbrich comes only from hearsay. I understand however that my experience was by no means unique.

In my review I was criticized for attitude and relationships. When I questioned these comments, Tim admitted that I had excellent relationships with all my clients and with all the other members of this Department, both professional and non-professional. The only basis for the criticism was my relationship with him and, it seems, with you (John). However on no occasion has it ever been alleged that my personal relationships with departmental management has led to any deterioration in the high standard of professional service I provide to my clients.

It seems to me that in the section assessing our performance at the job we have been hired to perform, that performance should be the main focus of attention. The Review should not be an occasion for the venting of a personal animosity or revenge.

4. Hostile Work Environment

In any management situation, the relationship between managed and manager has to be built on trust and fair dealings. There is no necessity that the two should like each other but neither should work to undermine the other. In this situation however, while it began with good intentions, at least on my side, the initial goodwill has been destroyed by evidence of a clear intention of Tim Feagans to make my work conditions so difficult that I would abandon my clients and quit.

It has been reported to me that, on at least two occasions, Tim Feagans has expressed the desire to get rid of the older members of the IP group, and specifically indicated by name Otto, Volker and myself, all of whom are in our 60's. I have challenged Tim on this matter and of course he denies it. I personally feel that "anything that I say can and will be used in evidence against me" in an attempt to get rid of me. This is a feeling I have never had before since I have relied on my performance on my job to speak for itself. Now this performance is relegated to an insignificant consideration alongside my relationship with a manager that I no longer feel I can trust.

Clearly the lack of trust now exists on both sides and has led to a situation in which the IP group and its manager have kept their contacts to an absolute minimum. We have given no basis for any reports of a negative attitude or comments, and have tried to avoid actions or situations that might be reported in a negative light. It appears however that even our passive and non-confrontational attitude during your, (John's), latest budget presentation has also been

SGC 00673

misrepresented. Indeed I was told by Tim that one member of the Department, (who was not present except for the initial phase), reported that the IP group attitude was hostile and disrespectful. The person in question denies saying anything of the sort.

Tim has practised a "divide and conquer" approach not only among the IP lawyers but also among the assistants. Donna, who has faults that she fully recognizes, has been singled out precisely because her job requires frequent contacts with accounts people in Valley Forge where there have been many occasions for friction. Donna is a "take charge" kind of person who sometimes takes on tasks that would be better sent "upstairs" and this has led to some situations where criticism was voiced and might even have been justified. In response to criticisms received, she has completely transformed her relationship with Valley Forge personnel and yet has received scant credit for this. Part of Otto's trouble I feel sure is that, like a good manager, he has attempted to shield her from unfair reprisals and is suffering the consequences. Donna nevertheless remains demonized and Otto has joined her as a target for bad treatment. On the other side, Ruth, (who also has her problems), on the basis of a single positive conversation with a person at Valley Forge, was significantly advanced in her Review by Tim over the heads of her managers while Donna was downgraded. Both are good people and the disparate treatment is a transparent attempt to build allies and write off others. Again the effect, intended or not, is to attempt to make the atmosphere of the workplace selectively hostile to the dis-favored few.

The remarkable cohesion we have established in this part of the Law Department is based on mutual respect on a professional and personal level, and it is this that has kept us all together. That must say something for the positive attitude we have maintained within the group in spite of the burden of increasing workload with no added resources.

Tensions have also been increased further among our support staff by Tim's occasional unprovoked verbal abuse of the staff over minor matters such as the purchase of envelopes and a simple request for approval of an extra filing cabinet. This has left the staff very nervous and wary in their dealings with Tim. In short the atmosphere is becoming increasingly "us and him" and that leads to a perception that we must be on our collective guards on the increasingly rare occasions on which Tim has dealings with any of us. This amounts to the creation of a completely unhealthy and hostile work environment.

We have tried to shield Mike Crosby from this as much as possible, and that is the one reason we did not want him present at this meeting. He is otherwise a valued and constructive member of this group and has already acquired significant respect for his professionalism. He has not been targeted as far as I know for any bad treatment and the rest of us by no means resent this fact. The same is also true of the other young professional in our Group, Mary Porter. Indeed Tim has

SGC 00674

sought her out and confided in her. This is not resented in any respect. The fact is only mentioned to add point to the argument that it is the older members of the Group who have been marked out for abusive and disrespectful mis-management.

*Solution*

In our perception the source of the trouble is the position of Tim Feagans as manager of the group. He does not trust us and he has given us every reason not to trust him. The solution then is:

1.  attempt a wholesale re-construction of Tim Feagans as a manager through remedial instruction under the direction of Human Resources;
2.  remove Tim Feagans as manager of the IP group in Worcester; and either
    a) appoint Frank Anthony in his place; or
    b) appoint one of the senior members of this group as your interface with the IP group in Worcester, in whatever capacity you elect. For myself I do not much care whether it is Mary, Volker or myself. We have a level of mutual trust and professional respect that whomsoever you select would, I am sure, have the complete allegiance of the others and would act as an honest and truthful interface with you. Any one of these would be a constructive partner in your management of the Law Department.

David Bennett
Senior Intellectual Property Counsel

SGC 00675

Notes for meeting with John Mesher and Dennis Baker on 6/6/01
From: Otto Lies

## Feb. 2000 - DLN's Performance Review:

Donna bears the load of having to interface with a number of VF departments. She is efficient in doing this and "takes charge". Due to the many problems with VF Accounting - a department which was quite unprepared to handle the very high volume of foreign invoices from the IP Department - this led to friction from time to time. Donna had several conflicts with that department and TLF was aware of it - but did not take any action to remedy the situation and was instead rather critical of Donna. However, he felt that based on those incidents her performance rating had to be downgraded.

I had proposed just the opposite, i.e. to upgrade her rating to reward the outstanding efforts Donna had made with handling the ever increasing workload and the integration of large amounts of new trademark cases into our system. The action by TLF certainly did have a negative effect on morale. When he instructed me to revise her rating, he did so in a rather threatening manner with his finger pointed at me. He refused to take Donna's overall performance into consideration and based the rating on her (in his opinion) poor communication skills and bad relationship with accounting.

## Feb. 2001 - DLN's Performance Review:

Donna had shown significant improvements but was downgraded again, this time for poor communication skills with TLF, though there had been no further problems or incidents with accounting. The reason I was given was that once Donna had spoken to TLF in a tone that would have been reason to "fire" her.

## Color Purple Litigation:

I had been working on this opposition to 3M's attempts to register the color purple as a trademark for quite a while. I was working with outside counsel and kept Dave Bennett and TLF informed, as well as the client (M. Mathisen) as necessary.

By the middle of last year (2000) it became apparent to me that we had a good case for negotiating settlement with 3M, rather than proceeding to a long and costly litigation, which would not bring the client the desired results long term. Discussing settlement was also the significantly lower cost alternative.

I drafted a proposal to Mark Mathisen and TLF did seem to agree with it. In the meeting following I presented the proposal to MM who "did not like it". TLF did not make any attempt to assist me to convince MM that I had presented a sound legal opinion (also supported by D. Bennett and outside counsel) and instead sided with MM and instructed me to proceed with the opposition. I did not argue the case any further and gave my full energies to proceed with the prosecution. I was personally very disappointed with the manner in which TLF had "abandoned"

SGC 00676

me in that meeting because it undermined my credibility with the client.

However I continued my efforts, as directed, towards the opposition against 3M and I believe that I performed very well and with great success. The amount of work involved became enormous and began to absorb a major portion of my time as well of DLN's.

Later there were several instances, where MM was reluctant to cooperate during discovery, and even though TLF was aware of it, he never came to my support and this further undermined my credibility with the client.

## 2001 Performance Review:

The whole dimension of TLF's action became only clear to me when he severely criticized me in my performance review for my handling of the "purple" case. He attributed negative feedback about my handling of the case to MM and Tom Kinisky (who is not involved with the case!). However I have received no indication from M.Mathisen or Tom Kinisky of any dissatisfaction with my performance, rather the opposite from M.Mathisen.

He accused me of not being a team player, being unable to build consensus, and my inability of properly supervising and directing Donna Neylon. He also criticized my relationship with the VF people, namely John Mesher, Annette School, Donna Prawecki (I never met her or talked with her!) and the MIS group (I had no contact with them in 2000, however there had been points of friction in 1999 and then TLF was equally frustrated with them!). He said that all had given him negative feedback about me. When I asked for specifics about such negative feedback, he would not give it to me; which makes me believe that it was invented.

TLF admitted that his poor rating of my communications skills is based on my relationship with him and the VF people, and that he has no negative comments from other clients (I also elaborated this in my comments to my performance review). The performance review was totally unbalanced and unfair.

When I became aware that others of my colleagues in my age bracket (Volker Ulbrich, Dave Bennett, and Frank Anthony) got similar unbalanced critical reviews, I could only conclude from it that TLF intentionally attempts to create a hostile environment, probably to motivate me and others to voluntarily leave the company. This is consistent with the desire he had expressed to a colleague.

## Norton Company name change:

TLF has again demonstrated that he no longer values my professional opinion in the context with the Norton Company name change. When that change was announced, I made a rough estimate of the possible cost of trademark recordals and other work necessary worldwide as I had done in the past in connection with previous name changes or mergers.

It appears that TLF felt that the high possible costs that I had projected would be unwelcome to the client. Rather than discuss this with me first, he went to other parties, all less familiar with international trademark matters, to solicit their comments. This clearly is an expression of lack of confidence and further undermines my reputation with the client. Later I found out that he had previously been advised to speak to me about this matter - because of my expertise in this type of work which I have successfully handled for at least 5 years or longer.

SGC 00677