Characterization of my colleagues:

In a meeting on January 22, 2001, TLF made the following characterizations of my colleagues:

**"bitchers and whiners",**
**"vindictive to Mesher",**
**"challenge every action and policy",**
**"get involved in endless debate",**
**"have negative views about everything",**

and he suggested that I should limit my contacts with them to **"occasional contact at the water cooler".**

I find these characterizations disrespectful and insulting, and even though these comments were made about my colleagues and not about me, they have insulted me personally as much as they must have my colleagues. Such remarks are at best unprofessional and unproductive.

SGC 00678

June 6, 2001

To Meeting Attendees:  Dennis Baker, John Mesher, David Bennett,
        Volker Ulbrich, Otto Lies, Frank Anthony
From: Mary Porter

Subject: Tim Feagans Management Issues

1. Negative, hostile work environment
2. Pattern of misrepresentations
3. Poor Communications; Jekyl & Hyde personality; divide and conquer style
4. Undermining subordinates' work with clients
5. Destroying subordinates' reputations within SGC
5. Activities creating potential legal liabilities for SGC

Incidents Illustrating Management Issues

August 8, 2000
In a discussion about Mike Crosby, then a candidate for the open position for a
patent attorney, Tim falsely attributed a negative opinion of Mike to one of Mike's
future clients. Tim made the false attribution to John Mesher, David, Volker and
me, while encouraging John not to hire Mike. I recognized the negative opinion
as one Tim had proposed to me four times during the week before the August 8
meeting, and each time I had disagreed. The client confirmed the negative
opinion was one Tim had offered to the client to elicit support, but the client
neither agreed with, nor supported, Tim's position.

August 9, 2000
Tim told me he was going to extend an offer of employment to Mike. He said this
was a shame because Mike was going to come cheaply in an otherwise
expensive market for patent attorneys. He said hiring Mike would make it very
hard for Tim to make a case with John and HR to get more money for me (and
only me) to bring me up to a market scale salary. He intimated David and Volker
made more money than I did and their salaries were undeserved.

Tim stated he would do absolutely nothing for David and Volker, he was finished
with them and he wanted rid of them. As far as he was concerned, he wanted
them to quit and he would do nothing to keep them, nor to address their
concerns about working conditions in our department. He threatened he would
do everything in his power to make them leave.

October 2000
Sue Gendreau came to me with tears in her eyes describing a phone
conversation she had with Tim, asking his permission to buy some used file
cabinets we needed to accommodate new files coming in from acquisitions. He

1                                        SGC  00679

rudely refused, asking why was it that the IP group was always complaining and asking for things, and the Valley Forge people never complained about what they had. In November he approved the purchase of the cabinets.

December 5, 2000
In a meeting Tim called with David Bennett and me, the first contact between Tim and David since the August 8 meeting, Tim delivered negative news from Tom Kinisky regarding David's offer to carry out the transition and training in Europe of the new attorney. The indirect delivery of this type of news was very out of character for Tom Kinisky, who always had spoken directly with David and me on patent issues in the past and who had been in direct contact with us on this subject during the previous month.

Tim spent the entire 45 minutes of our meeting with his back turned towards David Bennett, who was sitting across the table from me. Tim addressed both of us, but looked only at me. It was one of the most inexplicably rude, bullying behaviors from a manager I have ever witnessed within a business setting. David was calm and professional and did nothing to provoke Tim's behavior.

February 2001
Tim called me to discuss some negative elements of Ruth Swan's performance review that Volker and David had prepared. I demurred because I was not her supervisor. Tim persisted, falsely stating he had left a phone message for Volker, but Volker had not gotten back to him and Tim needed to complete Ruth's evaluation that day and he needed my opinion. I said I agreed with the negative comments and whatever rating Volker and David had made on their draft.

Volker later shared with me that Tim had not called or consulted with him, and that Ruth's rating had been significantly increased by Tim, apparently on the basis of a single positive comment by Jim Harkins, thereby undermining Volker and David's ability to effect an improvement in her substandard areas of performance.

March 2001
In a meeting with Tim to discuss his draft revision of my MICP goals, Tim stated he had added one of the goals on the basis of an unverified comment made to him at a business dinner about my alleged failure to return a phone call to an unidentified person in R&D about an important invention. He and I had never discussed the project, or the comment. When I explained the project was within my routine work duties, he removed it as a goal.

SGC  00680

2

Tim added another goal obliging me to consolidate my outside patent work with one of two named law firms, where possible. I objected to one the firms. I understand this law firm had communicated to one or two SGC IP attorneys that it had checked the SGC affiliates list and found no conflict of interest. The day before our meeting I had learned of a conflict of interest when I was notified of our possible infringement of a patent drafted by this firm. The patent is owned by our competitor who is a client of the firm. The firm admitted it had failed to disclose the conflict to us. Tim refused to remove this firm from my goal.

April 2001
Tim called me on speakerphone from a meeting in his office with Joan Leo and asked for my legal opinion on the IP consequences of the Norton Company name change.

I offered patent comments and, on the trademarks, indicated I had handled such a global name change for a previous employer 7 or 8 years ago and knew there were mandatory, costly name change formalities needing our attention. I could not remember the details because it had been so long, and suggested Tim speak with Otto who would know such details from recent projects he handled and that Otto was the only one within SGC with international trademark experience. Tim said he would call Otto.

Apparently Tim never called Otto, or anyone else about the trademarks before issuing the name change notice. When Tim issued the notice, Otto responded to it with his comments on potential TM costs and Tim sent out a message that served only to undermine Otto's reputation with the business manager and Otto's colleagues. (See attached e-mails.)

April 27, 2001
Tim met with Mike Crosby and me to discuss Sue Gendreau's proposal for Friday vacation days during the summer.

In reply to Tim's concern about whether this would create problems with the other Assistants or loss of coverage in the office, I offered my expectation that Ruth's work performance as a team member always was an issue, but the others would provide more than adequate coverage. Tim's response was a pronounced sneer in my direction and the comment "I don't know where this question about Ruth's work performance comes from. I've been told by others that her performance is outstanding." When I asked which others had expressed this view, he answered "Volker and David."

SGC 00681

3

Volker and David have assured me Tim misrepresented their view of the subject and he lacked sufficient knowledge of our day-to-day office environment to form such a judgment on his own.

## May 7, 2001
Tim met with the General Assistants to explain the notice about Alex Plache and the plans to move the work previously done by Steve Borst to Valley Forge. Tim apparently told them not to worry because this did not mean the Worcester IP law office was being closed. Tim's comments produced the reverse effect of creating concern among the Assistants that what he had denied actually is occurring and his comments have created a heightened level of stress for them.

## May 17 or 18, 2001
I called Joan (Leo) Frank to invite her to this meeting. She declined, citing fear of retaliation from Tim and said she had just gotten divorced and needed her job. She shared many stories of Tim's abusive treatment of her, some of which she apparently has taken to Sherry Carr. Joan said Tim told her he wanted to hire someone younger than she and he did not like working with her, but he was stuck with her. She said Tim recently (in the past couple of weeks) had become incredibly polite and kind to her, even helping her move into an apartment on a Saturday.

## May 1999-April 2001
Tim repeatedly complained to me in meetings and on the phone about how he disliked working with Otto, Volker, David, and Donna Neylon and Steve Borst and about how they created a negative perception about the IP group among people working in Valley Forge. (These complaints to me ended several weeks ago.)

Tim repeatedly called on me for IP law administrative tasks and issue resolution in areas outside of my defined responsibility. I generally cooperated. When I lacked knowledge or experience to handle the task, I identified the one with knowledge of the situation. Tim usually offered he would contact the person, but seldom did so, and typically pressed me to go forward.

Each SGC employee who does (or did) report to Tim, has described to me instances of Tim's abusive or rude treatment of them or other subordinates, often in front of other subordinates. His behavior towards subordinates exists in sharp contrast with his friendly, polished, highly political style towards business clients and his management.

AgendaJune 6-2001.doc

SGC 00682

4

## Mesher, John R.

| | |
|---|---|
| **From:** | Ferrante, Cathy |
| **Sent:** | Wednesday, August 08, 2001 2:35 PM |
| **To:** | Mesher, John R.; Feagans, Tim L. |
| **Cc:** | Wilk, Bob |
| **Subject:** | RE: AMEX LIMIT |

Ok--will handle.

Cathy



EXHIBIT 24
WIT: _Mesher_
DATE: 8/4/05
JEAN P. ZBINDEN

-----Original Message-----
| | |
|---|---|
| **From:** | Mesher, John R. |
| **Sent:** | Wednesday, August 08, 2001 2:23 PM |
| **To:** | Ferrante, Cathy; Feagans, Tim L. |
| **Cc:** | Wilk, Bob |
| **Subject:** | RE: AMEX LIMIT |

Cathy: I think we should just tell him the facts - - his previous issues (even though perhaps caused by AMEX) resulted in AMEX requiring a corporate guaranty of his card. This type of guaranty has a limit.

By the way, I would like Bob Wilk to monitor Dave's monthly statement to make sure it is only used for company business.

-----Original Message-----
| | |
|---|---|
| **From:** | Ferrante, Cathy |
| **Sent:** | Wednesday, August 08, 2001 1:56 PM |
| **To:** | Feagans, Tim L.; Mesher, John R. |
| **Subject:** | RE: AMEX LIMIT |

Tim, John,

The reason Dave Bennett has a limit on his Amex now is because we had to guarantee payment of his account. As you will recall, Dave was delinquent on his prior account with Amex, and they cancelled his account. There were lots of issues with his account (some of them errors on the part of Amex), but Dave did not put issues in dispute with Amex, he just did not pay his bill. As a result, Amex would not issue a new card to him unless we guaranteed it. What this means is that the company is ultimately responsible for the balance on Dave's card. If Dave goes passed 180 days without paying his bill--even if he has already been reimbursed for his expenses by the company--the company is responsible for payment. We will then have to try to recover those costs from Dave.

I'm not sure I want to tell Dave all of this--I don't want to give him a comfort zone to not pay the bill. How do you want me to handle responding to his question?

Cathy

-----Original Message-----
| | |
|---|---|
| **From:** | Bennett, David X. |
| **Sent:** | Monday, August 06, 2001 10:03 AM |
| **To:** | Ferrante, Cathy |
| **Cc:** | Feagans, Tim L.; Mesher, John R. |
| **Subject:** | RE: AMEX LIMIT |

Thanks very much Cathy. One residual question? Why do I have a limit whereas none of my colleagues will admit to having such a privilege?

-----Original Message-----
| | |
|---|---|
| **From:** | Ferrante, Cathy |
| **Sent:** | Monday, August 06, 2001 9:55 AM |
| **To:** | Bennett, David X. |
| **Cc:** | Feagans, Tim L.; Mesher, John R. |
| **Subject:** | AMEX LIMIT |

SGC 00875

Dave,

Your limit has been raised to $6,000 effective as of midnight Friday evening, August 3.

Cathy Ferrante
Director of Administrative and Human Resource Services
Saint-Gobain Corporation
610-341-7804
Fax: 610-341-7981
*PLEASE NOTE CHANGE IN EMAIL ADDRESS TO:* cathy.ferrante@saint-gobain.com

SGC 00876

CONFIDENTIAL

**Baker, Dennis J.**

| | |
|---|---|
| **From:** | Mesher, John R. |
| **Sent:** | Monday, November 19, 2001 4:28 PM |
| **To:** | Baker, Dennis J.; Scott, Mark J. (HR) |
| **Subject:** | Dave Bennett |

Attached is a draft of a fairly self-explanatory letter I would like to send to Dave Bennett in response to another in a series of his challenges to the structure and reporting authority within the Law Department. Please let me know if you agree with the tone of the letter. We will need to talk about the action that needs to be taken.



34763v1.doc



EXHIBIT 26
WIT: Mesher
DATE: 8-4-05
JEAN P. ZBINDEN

SGC 01139

CONFIDENTIAL

November 21, 2001

David Bennett
Senior Intellectual Property Counsel
Saint-Gobain Corporation
One New Bond Street
Worcester, MA  01615

Dear David:

I have become aware of the enclosed e-mail, dated November 16, 2001, which you sent to Mark Sadoff and Alex Plache. Your e-mail was in response to a question from Mark Sadoff regarding the Law Department's position on a pending litigation matter.

In this e-mail, you state that "[t]he basic **problem** is that, since we lost the head of the patent department last year, the patent function has been directed by the head of the Law Department **John Mesher who has little interest or [sic] time** for the nuts and bolts of intellectual property practice." (Emphasis added.)

Your e-mail clearly characterizes me as a "problem" and directly criticizes both my ability and commitment to run the Law Department. I find this to be extremely disrespectful, highly arrogant and totally unacceptable, particularly since your comments were addressed not only to another lawyer within the Department (Alex Plache), but also to Mark Sadaff, the General Counsel of the Insulation Branche and a member of the management team in Paris.

You have been previously warned, both in writing and verbally, that this type of attitude and behavior will not be tolerated. You have again crossed the line.

I have not yet decided how I will handle this latest example of your obvious disdain and disrespect for me individually and the Law Department as a whole. I will, however, review this with other members of senior management. In the meantime, it should be obvious to you that I am extremely upset with your ongoing attempts to undermine my role as General Counsel.

Sincerely,

John R. Mesher

cc:  Jean-Francois Phelizon
     Mark J. Scott
     Dennis J. Baker
     Cathy Ferrante
     Timothy L. Feagans

34763

SGC 01140

SAINT-GOBAIN
CORPORATION

NOV 2 1 2001

CONFIDENTIAL

November 20, 2001

John R. Mesher
Vice President, General Counsel &
Secretary

David Bennett
Senior Intellectual Property Counsel
Saint-Gobain Corporation
Worcester, MA  01615

Dear David:

I have become aware of an e-mail, dated November 16, 2001, which you sent to Mark Sadoff and Alex Plache. Your e-mail was in response to a question from Mark Sadoff regarding the Law Department's position on a pending litigation matter.

In this e-mail, you state that "[t]he basic **problem** is that, since we lost the head of the patent department last year, the patent function has been directed by the head of the Law Department **John Mesher who has little interest or [sic] time** for the nuts and bolts of intellectual property practice." (Emphasis added.)

As you know, my role is one of oversight and general direction with respect to the Worcester intellectual property function, with Tim Feagans having direct responsibility for the day-to-day management activities. Tim, of course, keeps me advised of important developments and I will get involved as I deem appropriate. The "nuts and bolts" of the intellectual property practice is your responsibility and if a significant issue arises, you should seek guidance from Tim.

Therefore, it is totally inappropriate for you to imply that the Department has a "problem" because of the manner in which I have chosen to run the Department. Your comments directly criticize my ability and commitment to run the Law Department, and reflect negatively on the Department in general. I am particularly disturbed by your comments because they were addressed not only to another lawyer within the Department (Alex Plache), but also to Mark Sadoff, the General Counsel of the Insulation Branche and a member of the management team in Paris.

You have been previously warned, both in writing and verbally, about your negativism and divisiveness. This incident is yet another example of behavior that undermines the effectiveness of our organization to function as a team and to maintain the professionalism required to best service our clients.

Accordingly, this latest incident will weigh heavily in my vision of the future structure and direction of the Department and will, at the very least, have a negative impact on your overall performance evaluation.

Sincerely,

John R. Mesher

EXHIBIT 27
WIT: Mesher
DATE: 8-4-05
JEAN P. ZBINDEN

cc:   Jean-Francois Phelizon          Mark J. Scott              Timothy L. Feagans
      Dennis J. Baker                 Cathy Ferrante

SGC 01237

34763

Saint-Gobain Corporation
750 E. Swedesford Road · Valley Forge, PA 19482 · Tel: (610) 341-7108 · Fax: (610) 341-7087

CONFIDENTIAL

**Baker, Dennis J.**

| | |
|---|---|
| **From:** | Mesher, John R. |
| **Sent:** | Monday, November 26, 2001 12:54 PM |
| **To:** | Baker, Dennis J.; Scott, Mark J. (HR); Ferrante, Cathy; Feagans, Tim L. |
| **Subject:** | FW: Festo Litigation |

FYI. This relates to my November 20 letter to David Bennett, a copy of which was sent to you.


-----Original Message-----
From: Bennett, David X.
Sent: Monday, November 26, 2001 11:44 AM
To: Sadoff, Mark
Cc: Mesher, John R.; Phelizon, Jean-Francois
Subject: Festo Litigation

Mark:
It seems my E-Mail to you on the subject of a possible Department "Amicus" brief in the "Festo" appeal has had totally unintended consequences. Indeed I have had an official reprimand letter placed in my file by John Mesher because he interpreted it as a negative and divisive attack on his leadership of the Department.

To clear the record, I intended to imply no criticism of John Mesher for any inactivity on the matter of the Festo litigation. Rather the opposite since I am well aware of the burdens he has assumed in recent months and for that he has my understanding and sympathy. He has quite enough on his plate without having to consider a "Delegation Position" on something that is perhaps a somewhat arcane though important aspect of patent law.

I only intended to indicate that, in the circumstances, no one is in a position to take an official position on behalf of the Delegation.

David Bennett
Senior Patent Counsel

Tel: 508-795-2466
FAX: 508 795-2653
E-Mail: david.x.bennett@saint-gobain.com

SGC 01238

1

**From Bazin to Phelizon – 9/26/02**                    CONFIDENTIAL

I just learned that John Mesher told the Worcester legal team of his intention to transfer the department to Valley Forge. I don't know exactly what guided this decision. Since my arrival here, I had already identified (there are a few key people for the business – maybe more):  *[handwritten: 35% nonAbr/ 40% Abrasia / 25% Ceam) 95%]*

- <u>The two IP individuals</u> (Dave Bennett and Mary Porter): they are both 100% busy with company business, almost exclusively Abrasives. Dave Bennett knows his 3M counterpart very well and there are at least a dozen "pending" issues that are critical to the Coated, Ceramic Grains, etc. businesses. Having seen these people today, I'm not at all sure that they accept the offer made to them to go work at a local law firm to start up an IP department.
And even if they do, would there really be any savings?

- <u>Tim Feagans</u> is a "super lawyer" and has been a part of all the Abrasives adventures for the last 10 years. He renegotiated the KNO Japan contract for a whole year in 1999/2000. He supports the management team daily (I know that Pierre André never signed anything without having him read it; Tim advised me to do the same thing and I don't see how I could conveniently do that if the person is in VF). He supports us on legal issues with the UAW (for things as simple and "local" as the Greendale township lines to determine perimeters in case of strike). It is the opinion of those who know him well, and I concur after talking with him today, that Tim will not go to Valley Forge. It's much easier for him to work at a good firm in Boston and earn a better living. He's well settled and has 3 children in school here. He seems very effective but attached to his independence. Tim told me at lunchtime that he *[handwritten: not true]* disapproves of this decision.

These departures would be a total loss for the business. We could not replace them with new people who would need a lot of time to learn the Abrasives business. And it wouldn't be easy to learn while in Valley Forge and the "client". I don't want to interfere with a Group decision, which is perhaps for the best. But it must be well weighed (cost? effectiveness?, etc.) especially knowing with quasi-certitude that we will be loosing these high quality experienced employees. I had the impression that there was large enough critical mass around Worcester, Northboro and other sites in the area to justify a small team dedicated to what is, in effect, a rather specific business.

I have had very negative reaction from some usually moderate people, like Steve Stockman. Mark Mathisen told me today that he had been told of this in April-May, indicating that he didn't agree, but with no effect on John. I don't know the reaction on the Ceramics side. For myself, and for the record, I regret that John didn't mention this to me before announcing it, possibly taking advantage of the Delegation meeting we all attended last week. *[handwritten: not true]*

Please keep me advised if there is still time to rectify or if I can help smooth out things here.



EXHIBIT 31
WIT: Mesher
DATE: 8-4-05
JEAN P. ZBINDEN

SGC 00516

### From Streiff to Caccini, Phelizon, de Chalendar, Crouzet 9/26/02

1. As to content: what is the advantage of this operation?
2. As to how this is going to work: none of the directors of C&P divisions, heavily involved, is aware of this, neither was I, or MA Chupin, or any of the SOA Abrasive directors.

As I understand the issue (discussions with Joe Menendez - directly involved, MA Chupin, etc.) I feel that we are making a big mistake, **_and I'm formally requesting that we put a hold on this move,_** to have time to think about this.

### From Phelizon to Streiff, Bazin, Mesher 9/26/02

This move has been planned for a long time, at least a year, and has been the subject of numerous discussions between J. Mesher and D. Baker and/or M. Mathisen.
The goal of the operation is simply to eliminate unnecessary positions (except Feagans).
In fact, John Mesher's opinion is not at all what you heard locally. John thinks that we don't need as many patent lawyers (who, by the way, are very localized in Worcester, but report directly to him).
John will call you both directly to explain his point of view. I agree that we should put this on hold until everyone can agree.

### From Streiff to Phelizon, Bazin, Mesher 9/26/02

not true

OK – Thanks.
Dennis Baker doesn't agree with this analysis. I don't think Mark did either. What I'm hearing here is that, in addition to Tim who will be a serious loss of knowledge and know-how since he will not move, the cost of our IP protection could significantly increase. I'm still having trouble forming a clear opinion on this. I'll work on it and get back to you.

not true - I spoke to Donnis

**CONFIDENTIAL**

EXHIBIT 32
WIT: Mesher
DATE: 8-4-05
JEAN P. ZBINDEN

# Mesher, John R.

| | |
|---|---|
| **From:** | Mesher, John R. |
| **Sent:** | Wednesday, October 02, 2002 11:37 AM |
| **To:** | Streiff, Christian; Bazin, Benoit |
| **Cc:** | Phelizon, Jean-Francois |
| **Subject:** | Worcester Law Office |

CONFIDENTIAL

There have been a number of e-mails on this topic, but not much of a dialogue.  In fact, no one has yet talked with me directly.  So, Jean-Francois asked me to put some of my thoughts in writing to form the basis for a telephone discussion.

1.  This decision has been a long time coming and, in my mind, is overdue.  Although the centralization of the Department in Valley Forge might create some short-term service issues with Abrasives and Ceramics, particularly with the patent lawyers, my role is to provide an economical and efficient distribution of legal resources to the entire Saint-Gobain group.  I believe that this can best be accomplished by having a central office in Valley Forge.

2.  The stand-alone Worcester Department costs about $2 million per year and does not foster good morale or efficiency.  The Worcester location has been extremely difficult to manage.  This has been particularly true with respect to the patent lawyers ever since the Norton acquisition.  They have never wanted to be part of the "team" and have actively attempted to undermine virtually all decisions relating to the Worcester office.  In fact, two years ago, the patent lawyers sent me a written request to leave the company and form (or be part of) their own law firm.  In essence, they were themselves asking to be outsourced.  At the time, I didn't agree with their request since a critical part of their proposal was to work for a law firm while still occupying their current space and having the Company absorb the office and support staff costs.  I didn't see any benefit to the Company - they wanted autonomy without accountability.

3.  Although every business person and / or researcher would like to have his /her lawyer "down the hall," the reality is that lawyers work primarily with e-mail, voice mail and phone calls.  Face-to-face visits are fairly rare.  I was in Worcester for nearly 3 years handling Abrasives matters - I can count on one hand the number of times I was in the Administration Building for legal issues.  I acknowledge that the IP lawyers may perhaps have unique needs to visit the R&D personnel.  I have never, ever impeded legitimate travel needs and would not do so if the function was serviced from VF.

4.  The use of outside IP lawyers for Abrasives and C&P is already significant - $1.3 million for Abrasives and $2 million for C&P in 2001, so the perception that the in-house IP lawyers handle all of the work and are indispensable just isn't true.  Bob Ayotte did a thorough study several years ago for Ceramics and concluded that additional in-house IP lawyers vs. outside patent work did not make economic sense.

5.  27% of all work for Abrasives is already handled out of VF; if the IP work is excluded, the percentage is 50%.  For instance, all litigation, employment, environmental and OSHA legal work is already handled from VF.  Likewise, 50% of all non-IP work for C&P is handled out of VF (including all of Performance Plastics' legal work)

6.  Here is a breakdown of the allocation of time spent by the Worcester lawyers

Bennett - 40% Abrasives; 35% NorPro; 25% Materials

Porter - 90% Abrasives

Ulbrich - 70% PPL; 29% Bicron

Crosby - 28% Structural Ceramics; 23% Fine; 28% Semicon; 11% HPR

Feagans - 80% Abrasives; 7% Sekurit

Anthony - 90% Ceramics (very little in Worcester)

7.  I have given plenty of notice of my decision (nearly 5 months).  I have asked the lawyers to make their relocation decision by November 15, so we won't know for sure who will move until then.  For those who do relocate, they have until June 30 to move.  Indications are that several may move to VF.  I have had a number of discussions with Tim Feagans and feel that he is getting closer to a decision to relocate.

8.  The discussions between the IP lawyers and the outside firm seem positive so far.  This would be a good solution to preserve knowledge base and build continuity.

SGC  00452

9. I have again spoken with Dennis Baker about this issue. You should feel free to talk to him yourself, but he does not oppose the move, particularly in light of his knowledge of the significant personnel issues we have had with the Worcester office. His only concern was with Dave Bennett and Tim Feagans.

10. If the Business units (Abrasives and C&P) strongly believe that it is essential for the <u>patent lawyers</u> to stay in Worcester and be absorbed by Abrasives and Ceramics in Worcester, I would not oppose this decision. We would, however, need to have a clear understanding of the types of activities that could occur without the involvement of the Law Department. For instance, as General Counsel, I (or one of my deputies) would have to be involved in litigation matters and major disputes.

11. You should also be aware of the substantial costs that would need to be directly absorbed by the Business Units in employing the patent lawyers. For Bennett, Porter, Ulbrich and Crosby and their support staff, the payroll costs alone (assuming a target bonus) is about $800,000. This does not include benefits, pension, occupancy, office supplies, library resources, travel and other costs.

I understand that Marie-Armelle Chupin has arranged for a conference call on Friday, October 4 at 9:30. Jean-Francois and I look forward to speaking with you then.

_____

*John R. Mesher*
*Vice President, General Counsel & Secretary*
*Saint-Gobain Corporation*
*610-341-7108 (phone)*
*610-341-7087 (fax)*
*john.r.mesher@saint-gobain.com*

CONFIDENTIAL

SGC 00453

# Feagans, Tim L.

**From:**    Feagans, Tim L.
**Sent:**    Tuesday, October 08, 2002 9:22 AM
**To:**      Mesher, John R.
**Subject:**  FW: FYI - DBennett


-----Original Message-----
**From:** Bazin, Benoit
**Sent:** Tuesday, October 08, 2002 12:19 AM
**To:** Feagans, Tim L.
**Subject:** FYI - DBennett

Tim
Another example of inappropriate behavior. I know that you fully share this point of view. In addition, Dave Bennett should cc you on all his email, which is not always the case. If you want me to tell him formally that his mail below is inappropriate, I can do it. But I do not want to give him too much importance (since this is exactly what he is looking for). I agree with you that we should work asap on a transition for David Bennett.
Benoit.

-----Original Message-----
**From:** Bennett, David X.
**Sent:** Monday, October 07, 2002 7:01 AM
**To:** Bazin, Benoit; Streiff, Christian; Chupin, Marie-Armelle; Walsh, Gerard; Crowe, John T.; Kinisky, Thomas G.; Zanoli, Alain; Menendez, Joseph; Maddox, Stephen
**Subject:** FW: Consolidation of Law Department in Valley Forge


For any help you were able to provide in securing this result, a sincere Thank You.

-----Original Message-----
From:          Mesher, John R.
Sent:          Friday, October 04, 2002 10:23 AM
To:            David Bennett; Frank Anthony; Mary Porter; Mike Crosby; Tim Feagans; Volker Ulbrich; Joan Frank; Cheryl Comer; Ruth Swan; Sue Gendreau; Toula Koulisis
Cc:            Phelizon, Jean-Francois; Scott, Mark J. (HR); Ferrante, Cathy; Bazin, Benoit; Streiff, Christian; Carothers, Vinnie; Chupin, Marie-Armelle; Levy, Pierre-Emmanuel; Walsh, Gerard; Crowe, John T.; Lazard, Roland; Kinisky, Thomas G.; Zanoli, Alain; Menendez, Joseph; Baker, Dennis J. - Worcester, MA; Deck, Howard; Foster, Mark
Subject:       Consolidation of Law Department in Valley Forge


Pending further input from, and discussions with, the Ceramics & Plastics and Abrasives business unit managers regarding the geographic and direct reporting structure of the Worcester-based Intellectual Property law function, I have decided to suspend until further notice the previously announced consolidation decision. Accordingly, you should immediately return to Cathy Ferrante the severance/ relocation packages that were delivered to you on September 23.

Please let me know if you have any questions.



*John R. Mesher*
*Vice President, General Counsel & Secretary*
*Saint-Gobain Corporation*
*610-341-7108 (phone)*



EXHIBIT   35
WIT:  Mesher
DATE:  8|4|05
JEAN P. ZBINDEN

SGC 01014

10/15/02

EXHIBIT
WIT: _Mesher_
DATE: _8-4-05_
JEAN P. ZBINDEN

**Mesher, John R.**

| | |
|---|---|
| **From:** | Feagans, Tim L. |
| **Sent:** | Thursday, September 26, 2002 4:34 PM |
| **To:** | Mesher, John R. |
| **Subject:** | FW: Visit to VF |

CONFIDENTIAL

FYI

-----Original Message-----
From: Feagans, Tim L.
Sent: Thursday, September 26, 2002 4:41 PM
To: Bennett, David X.
Cc: Ulbrich, Volker R.; Porter, Mary E.; Crosby, Mike W; Ferrante, Cathy
Subject: RE: Visit to VF

John does not have any office space set aside for our group yet so there is nothing to see at the office.  Once he has a final count on the number of people relocating, he will look at the space issues and secure whatever space is necessary.  As for touring the local real estate market, please contact Cathy Ferrante so she can set things up for each of you through Greg Kirkwood.

-----Original Message-----
From: Bennett, David X.
Sent: Thursday, September 26, 2002 9:29 AM
To: Feagans, Tim L.
Cc: Ulbrich, Volker R.; Porter, Mary E.; Crosby, Mike W
Subject: Visit to VF

Tim:
We need to investigate the VF option as a matter of urgency in view of the narrow time window for making our decision.  To save money and time Mary, Volker, Mike and I would propose to go down there next week, Wednesday through Friday, to view the proposed accomodation in VF and to look into housing availability.  If you approve the trip, I shall ask Cathy Ferrante to set up a local realtor who can show us all around at the same time.

SGC 00518

9.38

CONFIDENTIAL

## Mesher, John R.

| | |
|---|---|
| **From:** | Bazin, Benoit |
| **Sent:** | Sunday, October 20, 2002 1:47 PM |
| **To:** | Mesher, John R. |
| **Subject:** | RE: Worcester Office - Meeting in Paris |

John,

On October 23rd, I will be in a meeting with Home Depot (Atlanta) between 10:30 am and 12. Before that, I am flying from Boston to Atlanta. Then I fly at 3:30 pm from Atlanta to Las Vegas. So not very easy for me on October 23rd, except from may be 1pm to 2:30pm? But please go forward with Christian. I do not need to be involved since both of you know my thoughts, which are mainly:

- Start asap a transition process for Dave Bennett, by hiring a new lawyer, with strong (or "normal"!) team / Group spirit; we need to know who can work on this with Dave: Dennis Baker is may be burnt due to past discussions he had with Dave? Vinnie Carothers who is new and could be seen as neutral?
- In the mean time, I think ot could be beneficial for Tim and his team to be relocated in one common area in the AB (Administration) Building in Worcester
- I do not care that much (even though having the lawyer in Worcester / Northboro might be easier) about the final localization of the IP attorneys, providing that they have a strong commitment to the business (with some king of dedicated time / expertise) and a strong knowledge.

I did not hear that much about NYCO in the recent days. I hope it has cooled down in the right way? Thanks,

Benoit.

-----Original Message-----
**From:** Mesher, John R.
**Sent:** Friday, October 18, 2002 10:00 AM
**To:** Bazin, Benoit
**Subject:** FW: Worcester Office - Meeting in Paris

I have not yet received an answer. I will keep you informed.

-----Original Message-----
**From:** Mesher, John R.
**Sent:** Tuesday, October 15, 2002 11:29 AM
**To:** Duperdu, Annie
**Subject:** RE: Worcester Office - Meeting in Paris

On second thought, you might want to ask Mr. Streiff if he wants Benoit Bazin to participate by phone from the U.S. If so, we may have to schedule the meeting for later in the day.

-----Original Message-----
**From:** Duperdu, Annie
**Sent:** Tuesday, October 15, 2002 9:31 AM
**To:** Mesher, John R.
**Subject:** RE: Worcester Office - Meeting in Paris

Thank you.

-----Message d'origine-----
**De :** Mesher, John R.
**Envoyé :** mardi 15 octobre 2002 15:06
**À :** Duperdu, Annie
**Objet :** RE: Worcester Office - Meeting in Paris

This is fine. It should only take 30 - 45 minutes.

-----Original Message-----
**From:** Duperdu, Annie

EXHIBIT 40
WIT: Mesher
DATE: 8-4-05
JEAN P. ZBINDEN

SGC 00534.A

1

**Mesher, John R.**

| | |
|---|---|
| From: | Mesher, John R. |
| Sent: | Friday, October 25, 2002 11:26 AM |
| To: | Bennett, David X. |
| Cc: | Ferrante, Cathy |
| Subject: | RE: Department Organization |

My e-mail message of October 17 (the text of which is set forth below) regarding the previously announced relocation decision was clear and unequivocal.

"I understand that there may be some confusion about my message of October 4, 2002.

I want to make it absolutely clear - the severance/relocation offer was withdrawn and rendered null and void effective October 4, 2002.

If you haven't done so already, you should return the package to Cathy Ferrante immediately."

-----Original Message-----
From: Bennett, David X.
Sent: Friday, October 25, 2002 10:38 AM
To: Mesher, John R.
Subject: Department Organization

John:
I feel I owe you a word of explanation over the requested return of the Separation Agreement and General Release papers. As you may know I have not complied with this request as yet and you have a right to know why.

As you might well understand, the whole matter of the future of this department has been cast under a cloud of doubt in recent weeks. First I was offered the relocation package and went to the trouble of making a scouting visit to Valley Forge thereby introducing a good deal of turmoil into the life of my family. Then I and my colleagues investigated the Mirick, O'Connell opportunity and received an enthusiastic initial response but nothing after Tim Feagans spoke to them on the Monday of your E-Mail message. All this uncertainty has been extremely unsettling and it is only prudent for me to analyze the situation carefully before electing a course to follow.

To fully understand the options that remain available to me I need to analyze the language you used to announce the change regarding the Valley Forge move. In your position, you would not use imprecise language and in the announcement you indicated that the relocation decision was "suspended" pending "further discussions". That leaves a lot of room for doubt. However, when Tim Feagans spoke to this group on the changed plans he used the words "revoked" and "off the table". Now perhaps he was referring only to the move as it affects the general lawyers and not to the IP lawyers but there is here a clear variance in the messages conveyed that should be addressed. I would be greatly assisted by a clear indication of how you view the continued future of this section of your department, at least to the extent the further discussions have now made it possible to address the subject.

As regards the Agreement and Release papers, I followed the advice in Article 15 to consult an Attorney for a complete understanding of my rights under Massachusetts law. I then asked for a reading on the revocability of an offer tendered when the offeree has been given a fixed time to accept and that time has not elapsed. I have not yet received guidance on that point and until I know exactly what the law provides it would be folly to voluntarily terminate my ability to accept.



EXHIBIT 42
WIT: Mesher
DATE: 8-4-05
JEAN P. ZBINDEN

SGC 00046

RE: Worcester Law Office

Page 1 of 2

**From:** Mesher, John R. [John.R.Mesher@saint-gobain.com]
**Sent:** Monday, October 28, 2002 8:42 AM
**To:** Bazin, Benoit
**Subject:** RE: Worcester Law Office

CONFIDENTIAL

No, not yet. I have an issue with one of the IP lawyers that will be resolved on Thursday. After that, I will have Tim give you a call to begin the process of moving the office to the AB building. I will call you on Thursday morning to let you know what the issue is.

———Original Message———
**From:** Bazin, Benoit
**Sent:** Monday, October 28, 2002 8:34 AM
**To:** Mesher, John R.
**Subject:** RE: Worcester Law Office

OK for me. Have you already made Tim aware of the decision to move to the AB Building? Please let me know how you want me to handle this aspect. Thank you.

-----Original Message-----
**From:** Mesher, John R.
**Sent:** Monday, October 28, 2002 7:10 AM
**To:** Bazin, Benoit
**Cc:** Phelizon, Jean-Francois; Streiff, Christian
**Subject:** RE: Worcester Law Office

We will maintain the status quo for the next several months, but move all of the lawyers into one area (the AB building?). We will then determine (jointly with you, Christian and Alain) whether the reporting and budgeting aspects of the IP group should be shifted to the business units.

———Original Message———
**From:** Bazin, Benoit
**Sent:** Saturday, October 26, 2002 1:20 PM
**To:** Mesher, John R.
**Subject:** RE: Worcester Law Office

John,
Sorry I was not available for your meeting. What is the output? Thank you.
Benoit.

-----Original Message-----
**From:** Mesher, John R.
**Sent:** Friday, October 11, 2002 3:51 PM
**To:** Streiff, Christian; Bazin, Benoit



EXHIBIT 43
WIT: Mesher
DATE: 8-4-05
JEAN P. ZBINDEN

SGC 00481

RE: Worcester Law Office

**Cc:** Phelizon, Jean-Francois
**Subject:** Worcester Law Office

CONFIDENTIAL

As a follow-up to our phone call earlier this week, I have attached a revised document which now contains several alternatives for dealing with the Worcester office. I hope to discuss this further with Christian (with Benoit participating by phone) when Jean-Francois and I are in Paris on October 22 and 23.

If you have any questions or comments before then, please feel free to give me a call.

Early next week I will send you information on the number of U.S. patent applications and grants for the Abrasives and Ceramics & Plastics branches since 1/1/2000, compared with the other U.S. operations.

<< File: 38535.1DOC >>  << File: 2003 Law Dept. Budget Allocation.xls >>  << File: 2001 Legal Fees by Branch.ppt >>  << File: mesher-IP standalone.doc >>  << File: SGC Law Dept Org Chart.ppt >>

*John R. Mesher*
*Vice President, General Counsel & Secretary*
*Saint-Gobain Corporation*
*610-341-7108 (phone)*
*610-341-7087 (fax)*
*john.r.mesher@saint-gobain.com*

SGC  00482

2/11/2005

**Feagans, Tim L.**

EXHIBIT 19
WIT: Mesher
DATE: 8-4-05
JEAN P. ZBINDEN

| | |
|---|---|
| **From:** | Feagans, Tim L. |
| **Sent:** | Wednesday, November 06, 2002 5:20 PM |
| **To:** | Mesher, John R. |
| **Subject:** | FW: Transition Plans |

For your information.

-----Original Message-----
**From:** Feagans, Tim L.
**Sent:** Wednesday, November 06, 2002 5:03 PM
**To:** Porter, Mary E.; Ulbrich, Volker R.
**Cc:** Anthony, Frank S.; Crosby, Mike W
**Subject:** RE: Transition Plans

I understand the concerns you both have expressed regarding your time commitments but we need to make an extra effort until David's replacement can be found to assist the client groups with their IP needs. They have supported us in the past and they deserve our support now. I also view the extra effort as part of the stretch activity contemplated by the MICP goals which is something we all need to work on before year end.

I know from speaking with the business units and R&D functions that they expect something more than just a referral to an outside firm. They need someone to call in-house to get simple, routine matters handled efficiently. They also need an in-house attorney to help them navigate the relationship with outside counsel. Frank Anthony has stepped in to perform this role on two separate occasions (the first following Tom DiMauro's departure and a second time when Mike was on medical leave). Both events occurred at a time when Frank was extremely busy with numerous acquisitions and litigation work. He was able to handle this additional responsibility while doing his other work and the client groups were delighted. And he is not an IP lawyer. Perhaps you are reading more into the description of the role than what is really necessary.

I am going to send out the memo as is. When we meet to review the business unit priority lists, we can discuss ways to help you manage your workload.

-----Original Message-----
**From:** Porter, Mary E.
**Sent:** Wednesday, November 06, 2002 4:03 PM
**To:** Feagans, Tim L.; Ulbrich, Volker R.; Crosby, Mike W
**Cc:** Anthony, Frank S.
**Subject:** RE: Transition Plans
**Importance:** High

Tim
Please reconsider making the following statement in your message:

*The IP Law contact person will assist each group respectively on routine matters (such as non-disclosure agreements), assist in identifying the key needs of the group for the short-term and assist in procuring outside counsel assistance, as necessary, on patent cases or other projects.*

As I said in our meeting, I cannot handle any more substantive work and I do not recall any discussion during our meeting of this part of the proposed transition plans. The agreement review and counseling portions of our work consume an enormous portion of our time. It is not possible to give an acceptable level of service to these clients. I strongly recommend having all agreement and other substantive work assigned to outside counsel and putting the outside counsel in direct contact with the clients for counseling.

I will, of course, do what is needed, but I am afraid the clients will be unhappy with the arrangements.
Mary

SGC 00932

-----Original Message-----
From: Feagans, Tim L.
Sent: Wednesday, November 06, 2002 2:38 PM
To: Ulbrich, Volker R.; Porter, Mary E.; Crosby, Mike W
Cc: Anthony, Frank S.
Subject: Transition Plans

Here is the memo I propose to send to the business units regarding our transition plan. It generally follows the direction we discussed on Monday but I have decided to divide David's work into three pieces and assign one group to each IP attorney. This is the only fair way to do this and it will give the business units more comfort to know that their contact person is an IP attorney.

I have sent the memo to John Mesher and expect to have his sign-off by the end of the day at which point I plan to distribute the memo to key business unit managers. I will follow-up with each of you separately tomorrow and Friday to review the "priorities" list that have been provided to me by each business unit/group. At that time we can discuss how key matters should be handled.

I have already shared with several business and R&D managers the key elements of this plan and it has been well received. They appreciate our efforts to ensure their IP needs will be taken care of in the short term.

Feel free to call or stop by with any questions.

PROPOSED MEMO
----------------------------------------------------------------------

As a follow-up to John Mesher's email message of October 31 regarding David Bennett's departure, I would like to confirm the arrangements we have made for managing David Bennett's workload for the near term. Our plans are based on significant input I have received over the last few days from business unit managers, R&D management and our current general law and intellectual property law staff in Worcester. John Mesher will be discussing our long term plans with Jean-Francois Phelizon over the next several days and I will issue a follow-up e-mail after that time.

During the interim, we will manage David's workload through a combination of in-house and outside counsel resources. Each of our in-house IP attorneys will be assigned to serve as contact points for one of the business units previously assigned to David. These assignments will be as follows:

| Business Unit | IP Law Contact |
|---|---|
| Coated Abrasives | Mary Porter<br>phone: 508-795-2555<br>fax: 508-795-2653 |
| Materials Division | Mike Crosby<br>phone: 508-795-5174<br>fax: 508-795-2653 |
| NorPro | Volker Ulbrich<br>phone: 508-795-5564<br>fax: 508-795-2653 |

SGC 00933

The IP Law contact person will assist each group respectively on routine matters (such as non-disclosure agreements), assist in identifying the key needs of the group for the short-term and assist in procuring outside counsel assistance, as necessary, on patent cases or other projects . With the assistance of Alain Zanoli, I have asked each business unit to provide me with a list of the key projects and matters that were being handled by David with a brief explanation for each matter of its priority and/or significance to the business and any relevant time requirements. I will review this information with the IP Law contact for each business unit respectively and ask them to confirm with the relevant manager for each matter the handling of the work during the transition period. Any matters requiring significant ongoing legal assistance will most likely be assigned to

4/12/2005

outside counsel. We have already identified and contacted outside counsel for each business unit. Your IP Law contact will assist you in assigning work to the outside counsel as needed.

If you experience any difficulties or have any concerns during this transition process, please contact me.

Please forward a copy of this e-mail to key people within your respective Coated Abrasives, Materials and NorPro operations, especially R&D personnel.

Tim Feagans
Deputy General Counsel
Phone: 508-795-2129
Fax: 508-795-5344
tim.l.feagans@saint-gobain.com

SGC 00934

J2mFile



**SAINT-GOBAIN
CORPORATION**

EXHIBIT 5/
WIT: Mesher
DATE: 8-4-05
JEAN P. ZBINDEN

November 20, 2001

John R. Mesher
Vice President, General Counsel &
Secretary

David Bennett
Senior Intellectual Property Counsel
Saint-Gobain Corporation
Worcester, MA 01615

Dear David:

I have become aware of an e-mail, dated November 16, 2001, which you sent to Mark Sadoff and Alex Plache. Your e-mail was in response to a question from Mark Sadoff regarding the Law Department's position on a pending litigation matter.

In this e-mail, you state that "[t]he basic *problem* is that, since we lost the head of the patent department last year, the patent function has been directed by the head of the Law Department *John Mesher who has little interest or [sic] time* for the nuts and bolts of intellectual property practice." (Emphasis added.)

As you know, my role is one of oversight and general direction with respect to the Worcester intellectual property function, with Tim Feagans having direct responsibility for the day-to-day management activities. Tim, of course, keeps me advised of important developments and I will get involved as I deem appropriate. The "nuts and bolts" of the intellectual property practice is <u>your</u> responsibility and if a significant issue arises, you should seek guidance from Tim.

Therefore, it is totally inappropriate for you to imply that the Department has a "problem" because of the manner in which I have chosen to run the Department. Your comments directly criticize my ability and commitment to run the Law Department, and reflect negatively on the Department in general. I am particularly disturbed by your comments because they were addressed not only to another lawyer within the Department (Alex Plache), but also to Mark Sadoff, the General Counsel of the Insulation Branche and a member of the management team in Paris.

You have been previously warned, both in writing and verbally, about your negativism and divisiveness. This incident is yet another example of behavior that undermines the effectiveness of our organization to function as a team and to maintain the professionalism required to best service our clients.

Accordingly, this latest incident will weigh heavily in my vision of the future structure and direction of the Department and will, at the very least, have a negative impact on your overall performance evaluation.

Sincerely,

John R. Mesher

cc:   Jean-Francois Phelizon          Mark J. Scott              Timothy L. Feagans
      Dennis J. Baker                 Cathy Ferrante

34763

**SGC 00316**