# EXHIBIT 3

Page 13

1  salary was?
2      A. No, I do not.
3      Q. I assume you don't remember what his bonus
4  was?
5      A. In 2002?
6      Q. Yes.
7      A. I'm sorry. I don't recall that, no.
8      Q. And I assume you don't recall for Volker
9  Ulbrich?
10     A. I don't recall.
11     Q. The two gentlemen who were hired after the
12 departure of Messrs. Bennett and Ulbrich were Field
13 and Sullivan?
14     A. Correct.
15     Q. Is it Thomas Field?
16     A. Thomas Field and Joseph Sullivan.
17     Q. Do you know what their annual salaries are?
18     A. At this point right now?
19     Q. Yes.
20     A. No, I really don't. I don't recall the
21 exact number. They've had a raise or two since they
22 joined.
23     Q. Do you know what their first annual salary
24 was?

Page 14

1      A. I don't recall the specific number. I
2  believe it was 130,000, but I could be mistaken. I,
3  obviously --
4      Q. It's an approximation?
5      A. It's an approximation. I believe it was
6  130 for Joe, and I think Tom was maybe 2 or 3,000
7  less. But those are approximations on my part.
8      Q. Did either of them have an intellectual
9  property background?
10     A. Yes.
11     Q. To your best knowledge, how old is Joe
12 Sullivan?
13     A. I don't know.
14     Q. Under 40?
15     A. Under 40?
16     Q. Yes.
17     A. No.
18     Q. What about Tom Field?
19     A. I don't know.
20     Q. Do you think he's under 40?
21     A. I would imagine so, yes.
22         MS. COMISKY: I'm going to caution
23 you not to guess when you answer. Approximations are
24 fine, but don't guess.

Page 15

1          THE WITNESS. Okay. Thank you.
2      Q. And your present title is?
3      A. Deputy General Counsel.
4      Q. In general, can you tell me what your
5  duties are?
6      A. My present duties?
7      Q. Yes.
8      A. Well, from a practicing law standpoint, I'm
9  responsible for the legal services that are provided
10 to what we call the "HPM Group," the High Performance
11 Materials Group, which is one of five Saint-Gobain
12 sectors. I'm responsible for the provision of labor
13 work to their activities in North America, both from a
14 general business law standpoint and then the
15 intellectual property law standpoint. My management
16 responsibilities include managing the General Law and
17 IP law staff in Worcester.
18     Q. In terms of your management, did you hire
19 either Tom Field or Joe Sullivan?
20     A. Yes, I did. I did hire those two.
21     Q. Was there anyone else involved in the
22 hiring process?
23     A. Yes.
24     Q. Who?

Page 16

1      A. Pretty much everybody that was in the
2  Worcester group at the time when we were recruiting
3  for those two positions. Certainly, Mary Porter was
4  involved. Volker Ulbrich was involved before he left.
5  Mike Crosby was involved. Those would have been the
6  three individuals from the IP side.
7          And Frank Anthony was involved as well.
8  And then John Mesher became involved. In addition to
9  that, we had quite a few people from the business
10 unit, particularly in the R&D Group in Northborough,
11 participate in interviews and reviewing resumes as
12 well.
13     Q. Were the interviews by the members of the
14 IP Department, with these two lawyers, to see if there
15 was good chemistry, or did they --
16     A. It was more than that.
17     Q. Would they give feedback as to whether they
18 thought they were good --
19     A. Yes. Their responsibility was to interview
20 them and to make sure there was not only good
21 chemistry but also that they felt that they were
22 qualified, that they had the right experience and the
23 right scientific backgrounds that we were looking for,
24 in terms of filling those two positions.

Page 57

1   MR. MICHAELES: Can we stipulate
2 that this is a business record?
3   MS. COMISKY: Yes.
4   Q. Your E-mail down at the bottom, second full
5 paragraph from the bottom, refers to Joe and Tom.
6 That would be Joe Sullivan and Tom Field?
7   A. Yes.
8   Q. Did either of them assume any of
9 Mr. Bennett's duties?
10   A. Yes.
11   Q. Did they assume any of Mr. Volker's duties?
12 Volker Ulbrich, I mean.
13   A. Did either of them assume Volker's -- I
14 believe so.
15   Q. Can you put a percentage on how much both
16 of them, Messrs. Field and Sullivan, cumulatively
17 assumed of Mr. Bennett's duties? Did they assume 100,
18 50, 40, or 30 percent of his duties?
19   A. I can't put any figures.
20   Q. Is it fair to say that some of
21 Mr. Bennett's duties were assumed by Messrs. Sullivan
22 and Field, and those duties, which were not assumed by
23 them, were outsourced?
24   A. No. That would not be a correct statement.

Page 58

1   Q. What happened to Mr. Bennett's duties after
2 he was terminated?
3   MS. COMISKY: Thank you. You can
4 answer that question.
5   A. In the short run, my recollection is that
6 David had three principal client responsibilities at
7 the time he left Saint-Gobain. One was Coated
8 Abrasives. One was Materials. And the other was
9 NorPro. In the short run, what I did: I had three IP
10 attorneys left.
11   That would have been Volker, Mary, and Mike
12 Crosby. After consultation with them and some
13 business unit people that were constituents, I
14 basically divvied that up into thirds, because all
15 three of those lawyers were very busy. I asked each
16 one of them to oversee one-third of David's work. In
17 the short run, they had permission to use outside
18 counsel and, in the short run, to handle requests
19 until we could find suitable replacements and make
20 permanent assignments once the new people had been
21 hired. That was my short-term plan, which ran about
22 two or three months.
23   Q. What was the long-term plan? What was the
24 long-term reality?

Page 59

1   A. The long-term reality is that Joe Sullivan
2 is holding most of what David Bennett had, and that
3 would be Coated Abrasives and Materials. At the time
4 we hired Joe Sullivan and Tom Field, it was -- we all
5 agreed we were looking for the best possible
6 candidates with the best scientific backgrounds. And
7 every member of the IP group expressed concern to me
8 that their workload was not balanced to others in the
9 department, and they asked if I would consider
10 reallocating everybody's work at the time that Joe and
11 Tom came on board. So it would be inaccurate to
12 suggest that David's work ended up with one person or
13 two people. Everybody saw -- it was everybody but
14 really Mary Porter.
15   Mary Porter stayed the same. Among Mike
16 Crosby, Joe Sullivan, and Tom Field: What we did was
17 to reassign the business unit responsibilities based
18 upon (a) workload and, (b) scientific background of
19 the lawyer, in terms of whether he was better suited
20 to handle Plastics versus Crystals or some other
21 technologies. So that's what the process was.
22   Q. I will show you Exhibit No. 10, which
23 appears to be a performance evaluation of David
24 Bennett, from January 1, 2001 through December 31,

Page 60

1 2001. Is that correct?
2   MS. COMISKY: Actually, this is a
3 draft. It is a business record, but it's a draft.
4 It's not the final performance review for that period
5 of time.
6   Q. Do you know how the final version differed
7 from the draft?
8   MS. COMISKY: I have the final in
9 my briefcase. It was an exhibit from Mr. Bennett's
10 deposition. Do you want me to pull it out?
11   MR. MICHAELES: Do you want to
12 substitute?
13   MS. COMISKY: Yes.
14   MR. MICHAELES: We'll make a copy.
15 Let's use the final one rather than the draft.
16   MS. COMISKY: I'm pretty sure I
17 have it. Let me check. The final version is Exhibit
18 24 from Mr. Bennett's deposition.
19   (Recess taken.)
20   MR. MICHAELES: Okay. Let's mark
21 the final version as Exhibit 10 instead of the draft
22 copy.
23   (Exhibit No. 10 is remarked for
24 identification.)



## Feagans, Tim L.

**From:** Feagans, Tim L.
**Sent:** Wednesday, April 11, 2001 6:12 PM
**To:** Mesher, John R.
**Subject:** FW: Expense Report - Wheatfield Trip

FYI

-----Original Message-----
From: Feagans, Tim L.
Sent: Wednesday, April 11, 2001 6:10 PM
To: Bennett, David X.
Subject: RE: Expense Report - Wheatfield Trip

I would have responded to this sooner but have been too busy over the past several weeks to attend to the administrative aspects of my job. Before too much time passed by, I wanted to communicate my expectations with regard to meal expenses.

Yes, meals do not come cheap at hotels, but quite frankly this expense is outside the norm of what we normally see and what we regard as reasonable. I have never seen anyone put in for an expense of this magnitude for dinner. Most people can order a meal and a beverage for under $30 even at expensive hotels. It is difficult for me to see how one could get to $65 unless one ordered an expensive bottle of wine or perhaps several ala carte items. Quite frankly when I am confronted with an overly-priced room service or hotel restaurant menu, I usually order a salad, an appetizer and a bottle of beer to soothe my aggravation.

With regard to your point regarding this being the only meal charged on your report, all I can say is I assume you must have eaten dinner somewhere- perhaps you had dinner with clients and they picked up the tab -- I do not know. If you incurred other meal expenses, I would encourage you not to hold these back. I have no problem authorizing reimbursement of reasonable meal expenses for each day of business travel.

As a whole, the cost of your trip (particularly the air fare and hotel rate) was very reasonable (I recognize and appreciate this) and I approved your expense report on this basis. I did not want you to think in approving the report however that I am willing to reimburse meal expenses of this magnitude in the future.


-----Original Message-----
From: Bennett, David X.
Sent: Thursday, March 29, 2001 3:05 PM
To: Feagans, Tim L.
Subject: RE: Expense Report - Wheatfield Trip

As you will have noted the dinner expense about which you enquire was for room service dinner for one at the hotel. I arrived somewhat late and ordered room service while I prepared for the meetings next day. I did not dine extravagently but you must understand that room service does not come cheap. You will further note that apart from breakfast two days later, that was the only meal charged on this expense report.

-----Original Message-----
From: Feagans, Tim L.
Sent: Thursday, March 29, 2001 2:47 PM
To: Bennett, David X.
Subject: Expense Report - Wheatfield Trip

I need an explanation regarding your dinner expense of $100 CDN (US$65) from your recent trip to Wheatfield. This expense is much too high for one person so I assume you must have bought dinner for one or more of your clients. Nothing was listed on the entertainment section of the report however. Please explain. Thanks.

4/17/01

SGC 00075

EXHIBIT 5
WIT: Feagans
DATE: 8-3-05
RACHEL M. GRADY

**Feagans, Tim L.**

| | |
|---|---|
| From: | Feagans, Tim L. |
| Sent: | Friday, April 20, 2001 10:30 AM |
| To: | Bennett, David X. |
| Subject: | RE: Expense Reports |

The Travel and Entertainment Policy requires me as the approving manager to review all expense reports to ensure expenses are ordinary and necessary, neither lavish or extravagant and supported by proper documentation as defined in the Policy. And Section 9.1 of the Policy directs me to verify the reasonableness of reported meals. So, I have not only the right – but the obligation – to question any expense submitted for reimbursement. You should not feel defensive or regard my efforts to counsel you in this regard as distasteful. It has nothing to do with your tenure with the Company, your position or your professional status. No one in the organization is (or should be) accorded any special treatment. Managers regularly communicate with their direct reports (at all levels of the organization) regarding the Policy. You should also understand there have been numerous instances where the Company has disciplined or terminated not only individual employees for failing to abide by the Policy but also supervisors for failing to enforce it.

In discharging my responsibility for approving expense reports, I not only look to the standards and practices outlined in the Policy but also to the prevailing practice followed by others within the Department and the Company generally. It has nothing to do with my own spending habits or frugality. And your suggestion in this respect is inappropriate.

I could have rejected the expense. Instead I elected to approve it (this one time) and counsel you on what the Company considers to be reasonable. It was nothing more than an effort to set expectations so as to prevent misunderstandings in the future. If it would help you to have some numerical limit for dinner meals, I would suggest you use $25 as a guide. This should not be viewed as a per diem but rather a guideline as to what the upper end of reasonable is.

Finally, it appears from your hotel receipt that you used your VISA card to charge your bill. Employees travelling on Company business are required to use the Card. I have brought this to your attention before on several occasions. Again, just to be clear and prevent any further misunderstanding, you should understand that I will no longer approve any expenses charged to your personal credit card unless I am able to confirm with the merchant that it does not accept American Express.

David, it appears your frustration in looking at this issue stems from a perception that I am being overly rigid in reviewing and approving expense reports. You should understand that I am merely following the Policy and common practice within the Company. You may want to consider speaking with Cathy Ferrante or Bob Wilk to gain some insight as to how we as a Company look at these issues.

I hope this helps.

-----Original Message-----
From: Bennett, David X.
Sent: Thursday, April 12, 2001 7:03 AM
To: Feagans, Tim L.
Subject: Expense Reports


Tim:
In your E-Mail of yesterday, you said:
"I did not want you to think in approving the report however that I am willing to reimburse meal expenses of this magnitude in the future", (I feel sure you intended to say "approve reimbursement").

At a threshhold level I feel that this is a matter that would have better been handled in a man-to-man conversation but now the matter has been elevated to this level, perhaps it would be better to secure a little clarification.

I have never claimed expenses that I did not consider reasonable and prudent given the circumstances at the time and I take steps to minimize expenses where this can be done without inconvenience to others. I even elect to drive to Hartford rather than take the shorter route to Boston when I fly to Buffalo because the airfare is somewhat cheaper. I find it distasteful at this stage in my career to have my judgment on what is reasonable and prudent challenged for the first time on the basis of a single meal bill. I intend to continue to use my own judgment as I have in the past and any excess over the Feaganesque frugality standard (let's call it the "FF Standard"), I shall gladly pay out of my own pocket. In this way I hope to avoid unnecessary delys in having my expenses (incurred, let us remember, while on company business)

1

SGC 00076



**SAINT-GOBAIN CORPORATION**

Position Questionnaire

| HR Use Only |
|---|
| Title_____ |
| Position #_____ |
| Points_____ Date_____ |

**Division/Location:** Delegation/Worcester

**Position Title:** Associate General Counsel & Assistant Secretary     **Incumbent:** Timothy L. Feagans

**Supervisor Title:** Vice President, General Counsel & Secretary     **Supervisor:** John R. Mesher

**General Function** - State the intent and objective of the position.

The incumbent is primarily responsible for the legal affairs (both general and intellectual property) of the Abrasives Branch and the North American activities of the Industrial Ceramics Branch, including Norton Company and its subsidiaries, and for managing the Law Department's offices in Worcester. Provides legal advice directly to all levels of management of the Abrasives and Industrial Ceramics Branch and supervises other attorneys in the provision of legal services to these business units. Usually receives legal work directly from clients (although some specialized projects are assigned by the General Counsel) and actively participates with senior managers in developing the clients' business strategy as it relates to legal issues. Has authority to independently render opinions, consult with and advise clients and represent the organization in dealing with others. Retains outside counsel as necessary (with guidance from General Counsel) and actively manages their delivery of services.

**Duties/Responsibilities** - Indicate the main duties and responsibilities of the position and estimate the percentage of your total time spent on each. Only include duties which account for at least 10% of the total time. These should be ranked by importance from most to least.

| % of time | Duties/Responsibilities |
|---|---|
| 60 | Provide legal advice and prepare and negotiate the documentation necessary for major corporate and commercial transactions including (i) acquisitions, divestitures and joint ventures; (ii) supply, distribution and other commercial arrangements; (iii) plant construction projects; and (iv) real estate matters. |
| 20 | Provide legal advice and counsel to business managers on a wide variety of matters to ensure the Company's legal interests and business objectives are protected and that the Company's business operations are being conducted in compliance with applicable law. Responsibilities in this area include making preventive law presentations to business managers (e.g., antitrust compliance). |
| 10 | Retain outside counsel, decide strategy, determine settlement terms (with business clients) and manage all litigation matters relating to the business units for which the position is responsible (excluding only labor, environmental and product liability-related matters). |
| 10 | Provide general guidance to lawyers and paralegals reporting to the position in the performance of their work; delegate work to and evaluate the performance of direct reports and, along with General Counsel, administer their compensation. Assist the General Counsel in developing and drafting Saint-Gobain Corporation policies and procedures as they relate to legal matters (business ethics, antitrust, contract review, etc.). |

3114

SGC01300

**Magnitude** - Provide monetary figures for the areas most significantly impacted by this position. Items included may be revenue, sales, budgets, purchases, etc.

**Company/Group/Sales:** $2.4 billion      **Annual Outside Counsel Expenditures:** $2.3 million

**Other Significant Measures (please explain):** The Industrial Ceramics and Abrasives Branches are actively involved in the evaluation and acquisition of other businesses. Occasionally, business units are divested. In the past 9 years, there have been 36 such transactions involving these business units.

**Problem Solving** - Briefly describe the nature of decision making or problem solving which is part of this position. Include the extent to which this position is governed by established practices, rules, regulations, manuals, counsel/advise and independent thinking.

This position must deal with the highest levels of management in the business units it serves on complex and often novel legal issues. Independent and creative thinking and decision-making are required, without resort to established practices, manuals, etc. The incumbent must have good judgment, the ability to relate business objectives to the legal framework, and be able to think strategically (for the benefit of individual business units and the Company generally). Legal counsel for the opposing party in the suit or transaction includes some of the largest and most well regarded law firms in the U.S. Therefore, this position requires a strong, independent thinker with proven leadership and negotiation and communications skills.

**Knowledge** - Indicate the minimum level of formal education and work experience that is required to carry out the responsibilities of this position. When considering the experience requirement, assume that the education standard has been satisfied. Include any special knowledge, certification or license which is required.

This position requires a BA or BS degree, a Juris Doctor (Law) degree and admission to a state Bar. The incumbent should have a minimum of 10 years legal experience, including 3 to 5 years of practice with a major law firm. The person must have a very broad and extensive background in commercial and corporate matters and have considerable expertise in one or more legal areas of relevance to the Company's operations such as antitrust and acquisitions. An in-depth understanding of the Company's operations, corporate structure and the inter-relationship of the Company's various businesses and departments is also essential.

**Organizational Chart** - Complete the organization chart below by title:

See organizational chart(s) on attached page.

**Number Supervised:**      **Direct**      **Indirect**
                                     6            6

**Comments** - Indicate any physical/mental demands which are required to perform this job. Also, briefly include any information relative to this position that would impact successful job performance. (e.g. nature of internal/external contacts, planning activities, travel requirements).

This position requires some travel in the U.S. and Canada and occasionally outside of the U.S. The incumbent also communicates with lawyers and businesspeople at Compagnie de Saint-Gobain and its subsidiaries located outside of the U.S.

_[signature]_ 8/27/99
Supervisor's Signature/Date

3114

SGC01301