# EXHIBIT 4

Page 53

1    A. Yes, I did.
2    Q. When was the first time you had
3 communication with John Mesher about the Bennett or
4 Henchey matter?
5    A. I believe it was either the day of or the
6 day before we decided to search Mr. Bennett's office.
7    Q. Do you remember what day you searched
8 Mr. Bennett's office?
9    A. I believe it was the 18th.
10    Q. Of October?
11    A. That is correct.
12    Q. Who searched his office?
13    A. It would have been Mr. Joseph Johnson, and
14 I believe -- I'm not 100 percent sure about this -- to
15 the best of my memory, a Saint-Gobain security
16 officer, Mr. Richard Ferguson.
17    Q. Did anyone report to you to say what they
18 had found?
19    A. Yes, they did.
20    Q. Did they do that in any kind of record form
21 or just verbally?
22    A. Both.
23    Q. Are those records in that envelope that you
24 have for your file?

Page 54

1    A. Yes.
2    Q. What did they find?
3    A. Poems.
4    Q. Do you know if they got permission from
5 Mr. Bennett to search his office?
6    A. No, they did not.
7    Q. Was there a search of anybody else's
8 office, regarding the Henchey matter?
9    A. No, there was not.
10    Q. I'm going to try to recreate the sequence
11 here, Mr. Wilk. Tell me if I'm wrong. Regarding the
12 Henchey matter, the first thing you got was a phone
13 call from Cathy Ferrante?
14    A. That's correct.
15    Q. And then maybe some passing discussions
16 with Mr. Mesher?
17    A. No. I didn't have any conversations with
18 Mr. Mesher, I don't believe, until that call that I
19 mentioned that took place either the day of or the day
20 before. I'm just not sure, Mr. Michaeles, whether it
21 was within a 48-hour window of when we searched
22 Mr. Bennett's office. That would have been the first
23 call that I made to Mr. Mesher.
24    Q. Who made the decision to do the October

Page 55

1 18th search of Mr. Bennett's office?
2    A. I did.
3    Q. What information did you base that on?
4    A. Based on the report that I had received
5 from Cathy, the sexual harassment report that was
6 taken by Sonya, and based on a brief conversation that
7 I had with Ms. Henchey.
8    Q. When did you have a conversation with
9 Ms. Henchey?
10    A. Sometime after I spoke with Cathy Ferrante.
11 I don't remember specifically when.
12    Q. Would it have been before the October 18
13 search?
14    A. Yes.
15    Q. Can you tell me how long that conversation
16 lasted?
17    A. It was extremely short. I can't tell you
18 how long it lasted.
19    Q. Will you give me your best memory?
20    A. Best guess, I would say, 10 or 15 minutes,
21 if that.
22    Q. Will you give me your best memory of what
23 you said to her and what she said to you?
24    A. I believe I asked her -- which would be, my

Page 56

1 normal practice -- to just -- I know it was something
2 along the lines: I know you already went through this
3 with Sonya. I know it's very difficult, but I take
4 these matters very seriously. The company takes them
5 very seriously. It's important that you discuss with
6 me or tell me exactly what happened and so forth and
7 so on. And I had her replay the conversation she had
8 with Sonya to, one, get a feel for the situation and,
9 two, to compare the facts against Sonya's written
10 report.
11    Q. Do you remember, with any more detail,
12 exactly what she told you?
13    A. No, Mr. Michaeles, I really don't.
14    Q. Did she mention that she thought it was
15 Mr. Bennett who wrote those?
16    A. I'm sure that was a part of the
17 conversation, but I don't remember that specifically.
18    Q. Do you remember her giving you any reasons
19 why she thought it was Mr. Bennett?
20    A. I remembered her telling me something about
21 how uncomfortable he made her feel at a gym. That's
22 about the best I can do.
23    Q. So we have a call from Cathy Ferrante. We
24 have an October 18 -- excuse me. We have a call from

Page 65

1      A. I believe it was Cathy Ferrante. I'm not
2   100 percent sure if she was the only one.
3      Q. Okay.
4      A. You know, you would probably have to ask
5   Cathy that.
6      Q. The next name, Mr. Wilk, is Kenneth F.
7   Laliberte.
8      A. Yes, I remember that.
9      Q. Do you know if samples were obtained from
10  him?
11     A. Yes.
12     Q. They were?
13     A. Yes.
14     Q. And sent to J.J. Berrie?
15     A. Yes.
16     Q. What about David Riegger, R-I-E-G-G-E-R?
17     A. Yes.
18     Q. Samples were sent to J.J. Berrie?
19     A. Correct.
20     Q. Barbara A. Zeena, Z-E-E-N-A?
21     A. Yes.
22     Q. Samples sent to Berrie of her?
23     A. Correct.
24     Q. Susan Barre?

Page 66

1      A. Yes.
2      Q. Samples?
3      A. Correct.
4      Q. Anyone else who had samples sent to J.J.
5   Berrie?
6      A. No.
7      Q. Anyone else's office searched other than --
8   forgive me if I asked this -- David Bennett's, on the
9   Henchey matter?
10     A. You asked that. No.
11     Q. Were these handwriting samples sent to J.J.
12  Berrie before the October 18 search?
13     A. Yes.
14     Q. Did you get some sort of report from her
15  before the search, or did she send a report to
16  anybody?
17     A. Can you define "report"?
18     Q. Did --
19     A. Are you talking about a written report?
20     Q. Let me give you a better question, if I
21  can. After Berrie received writing samples from
22  various people, did she get back to anybody to say who
23  she thought the handwriting matched up with?
24     A. Can you repeat the question? I'm sorry.

Page 67

1      Q. Sure. After Berrie received all the
2   handwriting samples, presumably sent by Catherine
3   Ferrante --
4      A. Collected by Cathy Ferrante. I believe
5   some were sent, after collecting, to me; and I
6   delivered them personally to J.J. Berrie.
7      Q. After she received all those samples, did
8   J.J. Berrie tell you or anybody else at the company
9   what her opinion was as to the author?
10     A. She had a discussion with me, yes.
11     Q. Was that at a meeting with you?
12     A. That would have been the day I dropped them
13  all off. We were sitting in the office, and we were
14  discussing -- she was telling me about her techniques,
15  what she planned on doing, the instruments that she
16  used, and so forth and so on. And she was looking at
17  the documents at that point. She pulled the document
18  out and said, I can tell you this looks similar.
19     Q. Whose writing was that?
20     A. Mr. Bennett's.
21     Q. As a result of that, is that why you
22  decided only to search Bennett's office?
23         MS. McANDREW: Objection. You can
24  answer.

Page 68

1      A. If you're asking me if that was part of my
2   decision process to look at Mr. Bennett's office, yes.
3      Q. What was the other part?
4      A. The conversation I had with Ms. Henchey and
5   the reports that Ms. Henchey filed with Ms. Simonian.
6      Q. Do you remember the date of that meeting
7   you had with J.J. Berrie?
8      A. October 16th.
9      Q. At that October 16 meeting, you said that
10  you had brought some documents and that some had been
11  sent directly by Cathy Ferrante, so as --
12         MS. McANDREW: Objection. That's
13  not what he said.
14     Q. Have I mischaracterized your testimony,
15  Mr. Wilk?
16     A. I lost something from the time you started
17  to ask the question. I heard "objection," and then
18  you had just asked me if --
19     Q. You brought some writing samples directly
20  to J.J. Berrie, correct?
21     A. Yes.
22     Q. And I thought you also told me that other
23  handwriting samples had been collected by Cathy
24  Ferrante and forwarded directly to J.J. Berrie?

Page 97

1    A. Let me clarify that. We turned them over
2  to Human Resources. We did not remove them from the
3  office.
4    Q. So he told you --
5    A. It was Cathy Ferrante, from Human
6  Resources, who took them from the office.
7    Q. Johnson took them out of the drawer. They
8  were placed somewhere, and then Cathy Ferrante took
9  them?
10    A. I believe that's what happened.
11    Q. Were these the same poems or writings that
12  Mr. Johnson had found when he did the search on
13  October 16?
14    A. I'm sure some of them were, but I believe
15  they found some -- or we found some additional poems.
16    Q. But you're not suggesting that those poems
17  were written after October 16, 2002, are you?
18    A. I don't believe so.
19    Q. When Mr. Johnson did his search on October
20  16, did he make copies of anything?
21        MS. McANDREW: Objection. Wasn't
22  the search the 18th?
23        MR. MICHAELES: I'm sorry. I
24  stand corrected. The search was October 18th.

Page 98

1    Q. When Mr. Johnson did the search on October
2  18, did he make copies of any documents?
3    A. Yes, he did.
4    Q. Do you know who he gave copies to?
5    A. He faxed some copies to me.
6    Q. Do you know if he faxed them to anybody
7  else?
8    A. No, he did not.
9    Q. Did you send them to anybody else?
10    A. No, I did not.
11    Q. Okay. So we're now in Mr. Bennett's
12  office, and he's asked you not to remove his writings
13  to his wife. Then what happens?
14    A. We found another poem that concerned his
15  family's activities. He said that that was, in fact,
16  written for his family. He was commenting that it
17  was, in his words, "pretty poor poetry." Then I had
18  found a spiral-type notebook, a stenographer's
19  notebook. It had some poems in there, and I read a
20  little section of the poem.
21        And Bennett said, That isn't poetry, and I
22  said that it sounded like poetry to me. And he said
23  that it was his thoughts or musings on one of
24  Tchaikovsky's symphonies, you know. And Johnson then

Page 99

1  asked, I believe, if this was something that he did
2  currently or if it was done years ago, and Bennett
3  said that he just didn't know. Then Joseph and I --
4  once we had assembled a significant number of these
5  poems, I asked Johnson to step outside and talk to me
6  for a minute so we could discuss our findings. When
7  we came back, either when we came back or during -- I
8  don't remember exactly how it transpired -- at some
9  point, Dave Bennett told Cathy Ferrante that he was
10  leaving the office.
11        Cathy had told Dave Bennett that he really
12  shouldn't make any comments to his coworkers similar
13  to what he said when he first walked in there.
14    Q. When did Cathy Ferrante enter the room? I
15  thought it was still just you, Johnson, and
16  Mr. Bennett.
17    A. No. It was the three of us that went down
18  to his office.
19    Q. Oh, she was there --
20    A. If you remember, I said Cathy would come
21  down and act as a witness.
22    Q. Okay. She was in his office when the three
23  of you arrived?
24    A. Yeah. I believe the door was open.

Page 100

1    Q. When you and Johnson stepped out of the
2  office to discuss your --
3    A. She --
4    Q. I'm sorry?
5    A. She remained.
6    Q. She stayed in there. When you and Johnson
7  went out of the office, what did you say to him and
8  what did he say to you?
9    A. I don't remember specifically, but I wanted
10  to -- I thought we had enough of the poems and that we
11  should leave his office. I just wanted to go back to
12  the privacy of the law library.
13    Q. Was the --
14    A. I wanted to make sure he had no problem
15  with that.
16    Q. Was the discussion, between you and
17  Johnson, outside the office, limited to what further
18  search should be made? Or did you talk about anything
19  else?
20    A. Again, to the best of my memory, I wanted
21  to go back to the privacy of the law library. But I
22  wanted to make sure that Mr. Johnson didn't have a
23  need to search any further and whether or not he
24  agreed with me that we should go back upstairs.

95c5de1c-0a11-4520-b15e-373923f2c9d8

Page 105

1  his family feel? How would others feel if they
2  received these types of poems? And he said, I don't
3  know.
4    And we asked, What if your wife received
5  them? And he just laughed and said, She'd probably be
6  flattered.
7    Q. So you thought that was an appropriate line
8  of questioning?
9    A. Did I think it was appropriate to --
10   Q. To ask him what his wife would feel or what
11  his daughter would feel if she received writings like
12  that.
13   A. At the time, yes.
14   Q. And I suppose Johnson also thought so
15  because he issued those words, correct?
16      MS. McANDREW: Objection.
17   A. That's right.
18   Q. So what else happened?
19   A. And we still didn't get the feeling that he
20  understood why we were taking this to the extent and
21  to the level that it needed to be investigated. And
22  we just kept telling him, Look -- you know, I remember
23  saying that fear of the victim is their perception.
24  You can't judge it. I mean, it's theirs. But we gave

Page 106

1  up, and we just said -- well, we just continued.
2    Q. So you had shown him the poems. You had
3  shown him the envelopes. He denied writing the poems
4  to Henchey. He denied signing the envelopes, and you
5  then continued to impress upon him the severity of
6  sexual harassment. Do I understand that that is your
7  testimony? Do you know what I'm saying?
8    A. We were conveying the reason that we were
9  conducting this investigation.
10   Q. But he already told you before then that he
11  didn't do it, right?
12   A. That's right.
13   Q. Okay.
14   A. That's right. Then I showed him another
15  poem, and he looked at it and smiled and said, Yeah, I
16  wrote that and it had to do with the retirement of a
17  former Intellectual Property attorney, Tom DiMauro.
18  And he said it was written -- I don't remember
19  specifically whether it was for a party, but it had to
20  do with his departure from the company.
21   Q. How did a copy of --
22   A. I'm sorry?
23   Q. How was a copy of that poem obtained?
24   A. It was in his office.

Page 107

1    Q. Was it in hard copy in his office, or was
2  it in his computer?
3    A. I believe it was hard copy.
4    Q. Was it found on the 31st, or was it found
5  by Johnson on the 18th?
6    A. I don't remember.
7    Q. So you showed him the poem. There was some
8  conversation about it being in connection with
9  DiMauro's retirement or whatever. Then what happened?
10   A. When he said that, I was a little bit
11  confused because of the timing, you know. And I
12  wasn't sure if Phelizon was the president of the
13  company or Caccini was the president of the company.
14  In fact, subsequent to the interview, I corroborated
15  the fact and found out it couldn't have been written
16  for Tom DiMauro's -- at the time of his departure,
17  because Phelizon wasn't, in fact, the president of our
18  company.
19   Q. Did that writing, connected to DiMauro,
20  have some reference to Phelizon?
21   A. Yes.
22   Q. As of this point in time, had you had any
23  communication with Phelizon, regarding David Bennett?
24      MS. McANDREW: As of what point in

Page 108

1  time?
2      MR. MICHAELES: At the point in
3  time that he verified that Phelizon was not the
4  president.
5    A. Did I have any conversation with him?
6    Q. Any communication.
7    A. No.
8    Q. Nor he with you?
9    A. Correct.
10   Q. So we're still at the meeting?
11   A. At the interview?
12   Q. Yes.
13   A. That was the end of the interview.
14   Q. Then what happened?
15   A. I went ahead and briefed John Mesher on the
16  findings of the investigation overall, and --
17   Q. Excuse me, Mr. Wilk, can I interrupt you?
18  Where are you now? Did you leave Bennett in the
19  library when you went to see Mesher?
20   A. I believe Johnson was with -- Johnson, I
21  believe, was with Mr. Bennett.
22   Q. Okay.
23   A. I don't remember specifically.
24   Q. But you left with who, Ferrante, and went

Page 125

1    A. I was asked by my secretary -- I shouldn't

2    say "my secretary" -- the department's secretary, if I

3    can help her out.

4    Q. But --

5    A. That's what I did.

6    Q. But your testimony is that nobody asked

7    you, or anyone who reports to you, to look into

8    Mr. Bennett's stay at the Niagara Falls Marriott,

9    correct? Is that your testimony?

10   A. That's the way I remember it, correct.

11   Q. And did you report this to anybody at the

12   company?

13        MS. McANDREW: Objection.

14   A. Did I report -- I gave it back to the

15   secretary.

16   Q. Okay. But you didn't discuss it with

17   Mesher or anybody else?

18   A. Definitely not Mesher. It possibly could

19   have been to Feagans, you know. I do seem to remember

20   Tula saying to Tim, See, this is why we should have

21   gone to Bob, or I should have gone to Bob. Bob does

22   this for a living. He made it look so easy.

23        It was something along those lines. And

24   that's not specifically.

Page 126

1    Q. Was Feagans' first name "Tim"?

2    A. Tim, T-I-M?

3    Q. Yes.

4    A. Correct.

5    Q. Now, your secretary said she had some

6    conversation with Tim Feagans? I didn't get that.

7    Who had a conversation with --

8    A. You asked me if there was anyone else.

9    Q. Yes.

10   A. After I gave this to Tula Koulisis, she

11   might have -- I seem to remember -- I'm not 100

12   percent sure, but she was, for lack of a better term,

13   rather "impressed" as to how quickly I got her this

14   information. I seem to remember Tula Koulisis

15   mentioning to Tim, in the area, Look how fast Bob got

16   this. Or she said, He makes it look so easy. It was

17   something along those lines. I'm not 100 percent sure

18   about that.

19        I just seem to remember that.

20   Q. When you made this inquiry, you were

21   working out here in Massachusetts; is that right?

22   A. Yes. We were all sharing the same office.

23   Q. Were you sharing the same office with Tim?

24   A. Yeah. We were in the same office, same fax

Page 127

1    machine, everything.

2    Q. Now, the next number is SGC 01121. The top

3    of the page is stamped --

4    A. Which one, please?

5        MR. MICHAELES: Mark this, please.

6        MS. McANDREW: It's a page of

7    handwritten notes. I think it's the one that we faxed

8    to you this morning.

9        (Exhibit No. 2 marked for

10   identification.)

11   A. Oh, I'm sorry. Hold on. I have it.

12   Q. Hold on one second, please. Mr. Wilk, the

13   number I just referred to --

14   A. Just to confirm, could you give me that SGC

15   number again?

16   Q. SGC 01121.

17   A. Okay. I have that in front of me.

18   Q. Is this your handwriting?

19   A. No.

20   Q. Do you know whose it is?

21   A. I've never seen this before.

22   Q. In the upper right-hand corner, it looks

23   like a date of 5-2 and, I think, '01. It looks like

24   "report for B. Wilk."

Page 128

1    A. Is there a question there?

2    Q. Do you know what this is?

3        MS. McANDREW: I'm going to object

4    because he's never seen it before and hasn't authored

5    it. How could he interpret it?

6    Q. Keep on answering. Do you know what this

7    is?

8    A. No, I don't. I've never seen this before.

9    If you are asking me if I wrote it, no, I did not.

10   Q. You don't recognize the handwriting at all?

11   A. I'm not going to guess at the handwriting

12   unless my attorney advises me to.

13   Q. Well, I'm going to ask you to guess. Does

14   it look anybody's writing that you know?

15   A. I'm sorry. I didn't hear that.

16   Q. Does it look like anybody's writing with

17   which you are familiar?

18        MS. McANDREW: Don't guess.

19        THE WITNESS: Are you saying I

20   should guess?

21        MS. McANDREW: No. I'm

22   instructing you not to guess. That's not the purpose

23   of your deposition. If you recognize the handwriting,

24   that's fine. If you don't know, that's fine also.

95c5de1c-0a11-4520-b15e-373923f2c9d8