# EXHIBIT 5

Page 33

1   A. I never had a conversation with Chloe.
2   Q. Based on your information of the phone
3   call, did the phone call contain any allusions to
4   sexuality, or anything sexual about it?
5   A. I don't recall.
6   Q. What upset her about the call?
7       MS. McANDREW: Objection. You can
8   answer, if you understand the question.
9   A. I believe it may have been language used,
10  but I don't exactly recall.
11  Q. Do you have any memory of whether that
12  language was foul language, or sexually-oriented
13  language?
14  A. I don't recall.
15  Q. Do you have any records of that
16  investigation?
17  A. I have some documents on my computer.
18  Q. Would you produce them?
19      MS. McANDREW: Objection. Any
20  request of production can be made through counsel.
21  Q. So how were these documents labeled in your
22  computer?
23  A. I don't recall.
24  Q. If I ask for all computer documents

Page 34

1   relating to the Chloe Mizuta situation, that would
2   cover everything?
3   A. Potentially more Keoni Dennison.
4   Q. So I should reference it to Keoni?
5   A. Yes.
6       (Discussion off the record.)
7   Q. Is it fair to say that you called Keoni
8   Dennison, told him what the situation was, and sat
9   down with him?
10  A. Yes.
11  Q. Was he by himself, or did he have anybody
12  with him?
13  A. There were others, but I don't recall,
14  because there was more than one discussion, and I
15  don't recall who sat in on which discussion.
16  Q. Did he at any time have a lawyer with him?
17  A. A lawyer?
18  Q. Yes.
19  A. No.
20  Q. Do your computer records indicate how many
21  discussions you had with him, and what was said on
22  each day?
23  A. Yes.
24  Q. Is it fair to say that he produced

Page 35

1   telephone records from phones that he had access to,
2   and based on no calls going within a certain time
3   frame to Chloe, he was exonerated?
4   A. Yes.
5   Q. Were there any other suspects, other than
6   Mr. Dennison?
7   A. No.
8   Q. Your entire file on Keoni Dennison is in
9   your computer?
10      MS. McANDREW: Objection. Do you
11  understand what that means, "your entire file"?
12  A. I am not sure I understand.
13  Q. When I refer to the Keoni Dennison matter,
14  it is limited to the alleged call or calls he made
15  to Chloe Mizuta. Are all the company records on
16  your computer?
17  A. No.
18  Q. What other records are there, other than on
19  your computer?
20  A. With regards to?
21  Q. The call to Chloe Mizuta.
22  A. I don't know what other documents. I don't
23  have all the copies.
24  Q. Where would they be kept?

Page 36

1   A. He is no longer an employee of ours. He is
2   terminated from the company, so I would not
3   necessarily retain everything in my possession. It
4   may be in the administration building where the
5   personnel files are retained.
6   Q. What do you have that relates to Keoni
7   Dennison?
8   A. Where?
9   Q. Just your computer?
10  A. Where?
11  Q. Anywhere.
12  A. Me personally?
13  Q. Yes.
14  A. I would just have whatever documents are on
15  my computer.
16  Q. What other documents would the company
17  have, and where would they be located?
18      MS. McANDREW: Objection.
19  Obviously to the extent you know.
20  A. Whatever other documents there would be
21  would be potentially in his personnel file in the
22  administration building.
23  Q. You said he was terminated. Do you know
24  why?

Page 29

1  Q. Was Mr. Dennison located in Worcester?
2  A. Yes.
3  Q. At some point you had access to all the
4  information regarding the investigation, is that
5  correct?
6  A. I'm not sure I understand the question.
7  Q. You were on a trip when this thing started.
8  You came back. I assume as HR manager, that you
9  would have been filled in or had access to
10 everything that had gone on in this Keoni Dennison
11 situation while you were away?
12 A. Yes.
13 Q. So describe, as best you can remember, from
14 the beginning what this situation involved.
15 A. It involved a phone call that Chloe had
16 received. I don't recall exactly what was the basis
17 of the phone call, other than that she was upset
18 with it. She had gone to the HR manager in
19 Bensonville and raised this issue. The HR manager
20 then made my boss aware of the situation. With my
21 travelling, my boss asked somebody else to look into
22 it, to begin the investigation.
23     When I returned to the office, I recall
24 having a discussion with Keoni, raising the

Page 30

1  situation to him, asking him if he was aware whether
2  or not he had, in fact, made the phone call.
3  Q. Did he say that he did or did not?
4  A. He said that he did not.
5  Q. Did you call Mr. Wilk into the situation?
6  A. No.
7  Q. Did you call any investigators into the
8  situation, or any security?
9     MS. McANDREW: Objection. Is this
10 her personally?
11    MR. MICHAELES: The company.
12 A. No.
13 Q. Was there only one phone call?
14 A. That's what I recall.
15 Q. Were Mr. Dennison's telephone records
16 checked to see whether the call came from his phone?
17 A. He provided that documentation to me.
18 Q. Did it appear that any call had been made
19 from any phones to which he had access to Chloe
20 Mizuta?
21 A. No.
22 Q. As I understand the sequence, Chloe came to
23 you, told you what happened, and then you had some
24 communication with Mr. Dennison?

Page 31

1  A. Yes, I did.
2  Q. What was the first communication you had
3  with him?
4  A. The first communication was to inform him
5  that I was taking over the investigation. I was
6  going to be asking him some questions, that he most
7  likely had already answered, so that I could be
8  brought up to speed as to the entire situation; that
9  I was going to ask him some additional questions.
10 Q. Did you meet with him in your office?
11 A. Yes.
12 Q. Can you tell me everything you said to him
13 and everything he said to you during that meeting?
14 A. No, I can't. I don't recall.
15 Q. Can you tell me the substance of what you
16 discussed?
17 A. Basically it would have been to try and
18 determine whether or not he, in fact, had made the
19 phone call, and what his relationship with Chloe
20 was.
21 Q. Was there a relationship with him and Chloe
22 at any point in time?
23 A. Professional working relationship.
24 Q. She worked out here and transferred to

Page 32

1  Illinois at some point?
2  A. No.
3  Q. Vice versa?
4  A. He was an employee of Worcester, and his
5  job at the time required him to travel to the
6  Bensonville facility.
7  Q. Did you have any kind of a recording of
8  that telephone call?
9  A. When you say "recording," I'm not sure I
10 understand.
11 Q. Was the call recorded by Chloe, or anybody
12 else?
13 A. "Recorded" meaning?
14 Q. By any recording device.
15 A. No.
16 Q. The recording was not a phone message, it
17 was a discussion; somebody called Chloe and had a
18 discussion with her?
19 A. Yes.
20 Q. Based on what Chloe told you, were there
21 any sexual overtones in that conversation?
22    MS. McANDREW: Objection. I don't
23 think it's been established she ever had a
24 conversation with Chloe.

Page 49

1  to having the original versus having a copy.
2  However, based on our conversation yesterday, I will
3  investigate as to where the original might be.
4      MR. MICHAELES: I would like the
5  original.
6      MS. McANDREW: We can talk about
7  that.
8  Q. There are three memos dated May 28, one at
9  10:10, one at 11:15, and one at 3 PM. Is that
10 correct?
11 A. Yes.
12 Q. When did you prepare the 10:10 one?
13 A. During my discussion with Diana, I would
14 have handwritten it.
15 Q. Then typed it after she left?
16 A. Yes.
17 Q. Would that be true with the other two?
18 A. Yes.
19 Q. Do you have copies of your handwritten
20 notes that you used to prepare this?
21 A. No.
22 Q. What happened to them?
23 A. I would have shred them.
24 Q. Is that your practice?

Page 50

1  A. Yes, it is.
2  Q. The only final documents are these three
3  memos of the meetings on May 28?
4  A. Yes.
5  Q. And there are no copies of any documents
6  you used to prepare these memos?
7  A. Correct.
8  Q. Who received a copy of each one of these
9  three memos dated May 28?
10 A. Cathy Ferrante, and I believe Amy. And I
11 don't recall, and I don't know of anybody else.
12 Q. You certainly can look at your memo dated
13 10:10. Can you tell me from the beginning of the
14 day on May 28, how this situation surfaced? How did
15 you first receive any kind of contact from anybody
16 about the Diana Henchey matter?
17 A. I am sorry, I am not sure I understand the
18 question.
19 Q. How did the Diana Henchey situation first
20 come before you? Did you get a call from somebody?
21 A. Diana came to my office.
22 Q. Did she call in advance?
23 A. No.
24 Q. She came in to your office at 10:10?

Page 51

1  A. Yes.
2  Q. Was she by herself?
3  A. Yes.
4  Q. Only the two of you were there?
5  A. Yes.
6  Q. Other than taking handwritten notes, did
7  you record the conversation with her by any other
8  means?
9  A. No.
10 Q. No tape-recording or anything?
11 A. No.
12 Q. Can you tell me, as best you can recall,
13 and certainly you are free to look at this, what she
14 said to you and what you said to her?
15 A. She came to my office. She wanted someone
16 to be aware of an envelope she had received in the
17 interdepartmental mail which contained two
18 typewritten poems. She would not have thought
19 anything of the situation if this had been the first
20 time that she received such a thing, but in October
21 of 2001, there was a poem that had been left on the
22 windshield of her car in the company's parking lot.
23 And this having been the second incident, she was a
24 little concerned.

Page 52

1      I asked her who she thought may have done
2  this, who these may have come from. She said that
3  possibly Alan Feltham, it looked like his
4  handwriting, but she wasn't sure. But she did not
5  know why he would have done such a thing. They have
6  a professional working relationship, and she just
7  couldn't understand why he would do something like
8  that.
9      She has for a while felt uncomfortable with
10 him in the department. Again, he's never approached
11 her that she has any reason to feel that way, but
12 just a feeling that she's had with him.
13 Q. Did you ask her why she felt uncomfortable?
14 A. I believe I did, but she just said it was a
15 feeling you have sometimes with someone, and it was
16 left at that.
17 Q. What position does Diana Henchey have with
18 the company?
19 A. She's in customer service.
20 Q. Does she sit at a desk?
21 A. Yes.
22 Q. Is it a cubicle or a private office?
23 A. At what time period are you asking?
24 Q. When she came into your office on May 28.

Page 53

1   A. A cubicle.
2   Q. Where was Mr. Feltham located in relation
3   to her cubicle?
4   A. In the same room in a cubicle, but I don't
5   recall whether they were across from each other or
6   next to each other.
7   Q. Using this room as something to multiply,
8   how much larger is the area or where the cubicles
9   are?
10  A. Maybe another half of this, of the entire
11  department. And there are several cubicles in that
12  room.
13  Q. How many people in that room?
14  A. I don't know exactly.
15  Q. Fewer than six?
16  A. No. Six to seven possibly.
17  Q. What department is it?
18  A. Customer service.
19  Q. Alan Feltham is in customer service?
20  A. Yes.
21  Q. That's servicing Saint-Gobain customers who
22  are manufacturing and so forth?
23  A. Primarily super abrasive business.
24  Q. Is that the extent of your discussion with

Page 54

1   Diana Henchey --
2   A. No.
3   Q. -- at that meeting?
4   A. No, it isn't.
5   Q. Tell me what else you said to her and she
6   said to you.
7   A. I asked her what she wanted to come out of
8   the situation. She had come to me, obviously
9   wanting me to do something. And she said she just
10  did not feel comfortable addressing this personally
11  with Alan, and wanted me to address it with him. She
12  wanted whoever was doing this, if it was Alan, for
13  it to stop.
14      So I told her that I would speak with him,
15  and that I would try to get back to her by the end
16  of the day.
17  Q. Have you now told me everything about the
18  discussion you had with her at that first meeting at
19  10:10 on May 28?
20  A. All that I can recall, yes.
21  Q. Is it fair to say that she showed you this
22  envelope that says "to," and there is the name
23  "Diana D. Henchey," and "confidential"? Did she
24  bring that in with you?

Page 55

1   A. 1E?
2   Q. Did she show that to you?
3   A. Yes.
4   Q. Was 1E --
5   A. These are reversed.
6      (Discussion off the record.)
7   Q. Is it your understanding that 1D is the
8   interdepartmental envelope?
9   A. Yes.
10  Q. That's the thing, if someone wants to send
11  it from one department to another, you put the
12  person's name and the department, is that right?
13  A. Yes.
14  Q. There is a place for who sends it or sent
15  by, and this department. Do people normally fill
16  that in?
17  A. Not as a rule.
18  Q. Is it fair to say that 1E was the envelope,
19  and in that envelope was placed 1D, which is a
20  confidential envelope?
21  A. 1E, yes.
22  Q. So in the confidential envelope, 1E, then
23  there two writings which were 1F and 1G?
24  A. Yes.

Page 56

1   Q. When she handed you that, that pile, were
2   they together in the envelopes, or were they loose?
3   A. I don't recall.
4   Q. Were they in plastic bags?
5   A. No.
6      MR. MICHAELES: This is going to
7   be Exhibit 2.
8      (Exhibit No. 2 marked for
9   Identification.)
10  Q. Exhibit 2A through 2C was the writing
11  allegedly placed on her windshield in October?
12  A. Yes.
13  Q. If you go to 2C, there is "10/2001" with a
14  question mark. Do you know who wrote that?
15  A. Me.
16  Q. Did Diana tell you what day she received
17  that?
18  A. No.
19  Q. Did she give an approximate date?
20  A. No.
21  Q. Are you aware of whether or not she was out
22  of the office at any time during the month of
23  October?
24  A. I'm not aware.

Page 57

1  Q. Is there a way to check?
2  A. I don't know if her manager would keep
3  records, and whether he would still have it back
4  from then.
5  Q. Was there any discussion about this
6  windshield poem or windshield writing?
7  A. When?
8  Q. At this first meeting.
9  A. Other than to tell me this had been left on
10 her windshield.
11 Q. Did she hand it to you?
12 A. No.
13 Q. You didn't read it at that time?
14 A. I did not see it at that time.
15 Q. Did she say why she kept it?
16 A. I didn't ask her.
17 Q. Did she say?
18 A. No.
19 Q. Did you have any conversation about the
20 windshield poem?
21     MS. McANDREW: Other than what she
22 has already testified to?
23     MR. MICHAELES: Right.
24 A. No.

Page 58

1  Q. Have you now told me everything that you
2  discussed with Diana Henchey at the meeting at 10:10
3  on October 28?
4     MS. McANDREW: You said October.
5  I think you meant to say May.
6  Q. May 28?
7  A. At the 10:10 meeting? To the best of my
8  knowledge, yes.
9  Q. The last line on that 10:10 memorandum
10 states that "she was satisfied and left my office"?
11 A. Um-hum.
12 Q. Why did you write that?
13 A. She indicated to me that she was okay with
14 what I was going to do.
15 Q. Which was to talk to Alan?
16 A. Yes, exactly.
17 Q. Do you normally write that on memos?
18 A. I might. I think it would all depend on
19 the situation. If the outcome or the next step is
20 to their satisfaction, yes, it's very likely I
21 would.
22 Q. What happened to the original poems or
23 writings? I should say 1D and F, and 2A? Did she
24 take them back, or did you keep them?

Page 59

1  A. 2A, I never received.
2  Q. She just told you about it?
3  A. She just told me about them.
4  Q. She didn't bring it in to that meeting?
5  A. Not in the May 28 meeting.
6  Q. Just referred to it?
7  A. Yes.
8  Q. What about the two writings she did bring
9  in with the two envelopes, did you keep those or did
10 she take them back?
11 A. I kept them.
12 Q. What did you do with them?
13 A. That day or subsequent?
14 Q. Starting from that day to right now.
15 A. I retained them during my initial
16 investigation of the situation until it was deemed
17 that there was another employee potentially involved
18 in this that I needed to consult with and discuss
19 with another HR director. And I no longer have the
20 originals.
21 Q. Where did they go? Where did you deliver
22 them?
23 A. I think to Cathy Ferrante. I'm not sure.
24 Q. Do you know whether she still has them or

Page 60

1  not?
2  A. No, I don't.
3  Q. So you had a meeting at 10:10, then you had
4  another meeting about an hour later at 11:15? I'm
5  sorry, how long did the 10:10 meeting last?
6  A. I don't recall.
7  Q. Do you think it was more than a half an
8  hour?
9  A. It's possible, but I don't recall.
10 Q. There were only two of you in that meeting?
11 A. Yes.
12 Q. You had another meeting at 11:15?
13 A. With someone else.
14 Q. Okay. Any discussion with anybody between
15 the 10:10 meeting and the 11:15 meeting? Have you
16 had any discussion with anyone on the Henchey
17 situation during that time frame?
18 A. During which time frame?
19 Q. Between the first meeting and the second
20 meeting.
21 A. The 11:15 meeting?
22 Q. Between the 10:10 and the 11:15.
23 A. No.
24 Q. Why not?

Case 4:04-cv-40014-FDS    Document 47-8    Filed 11/23/2005    Page 7 of 8

EXHIBIT A
HENCHEY
DATE: 8-2-05
N. FLYNN BORELLI

EXHIBIT A
SIMONIAN
DATE: 8-2-05
N. FLYNN BORELLI

## SEXUAL/GENERAL HARASSMENT

***** CONFIDENTIAL *****

Discussion: Diana Henchey
Date of Discussion: May 28, 2002        Time: 10:10 AM
Location of Discussion: HR Managers' Office
Attendees during Interview: Sonya Simonian, Diana Henchey

Description of Incident: Diana Henchey received 2 poems in inter-department mail

### Sexual Harassment Complaint:
Name of Alleged Recipient: Diana Henchey
Name of Alleged Harasser: Alan Feltham

**Discussion:**
Diana came to my office because she wanted someone to be aware of an envelope she received in the inter-departmental mail, which contained 2 poems, type-written. She would not have thought anything of this situation but in October of 2001 a poem had been left on her car windshield in the Norton Company parking lot. She thought nothing of it at the time. It was a piece of paper, typewritten, put in a plastic sleeve.

Today she received the 2 typewritten poems and wanted someone to know. The only person she spoke to about this incident and the one in October 2001 was Chris Collette.

When I asked Diana who she thought might have done this she said Alan Feltham. It looked like his handwriting but she was not sure. She also did not know why he would be doing this; she is not encouraging anything with him. Diana said she was soon going to be moving out of her sisters home into her own and she was uncomfortable with this and wanted it to stop. She has felt uncomfortable with Alan since he was in the department but never told Guy (CS Manager) or myself of this. Alan has never approached her nor made gestures to her.

I asked Diana what she wanted to come out of this. She said she did not feel comfortable enough addressing this personally with Alan. I told her I would but that it was one word against the other. We would have to wait and see what he said and I would get back to her by the end of the day.

She was satisfied and left my office.

_____
(legal signature)

Sonya L. Simonian
(printed name)

Sonya L. Simonian
Human Resources Manager

Confidential                      Page 1                    DHenchey 5-28-02

SGC 00115



# SEXUAL/GENERAL HARASSMENT

## \*\*\*\*\* CONFIDENTIAL \*\*\*\*\*

Discussion: Alan Feltham
Date of Discussion: May 28, 2002    Time: 11:15 AM
Location of Discussion: HR Managers' Office
Attendees during Interview: Sonya Simonian, Alan Feltham

Description of Incident: Investigation to 2 poems Diana Henchey received in inter-departmental mail

### Sexual Harassment Complaint:
Name of Alleged Recipient: Diana Henchey
Name of Alleged Harasser: Alan Feltham

Discussion:
I showed Alan an inter-department envelope and asked if he had seen it before or knew whose handwriting it may have been. He said it looked like engineering style block printing but it was not his and he did not recognize it. Some of the letters reminded him of Guy (Mathieu) however he does do something different with some of his letters. He said his block was a different style and had a different look. It could be someone from Product Design but he could not be specific. I then showed him the confidential envelope and asked again if he knew whose handwriting it may have been. He said it was not his name on the envelope and he did not recognize the handwriting. I said I thought it was engineering style also and since he is an engineer thought he might be able to help me. He suggested I speak with other engineers in the plant, namely, Marc Lamoureux, Dennis Facteau, or Corey Cooper.

I thanked him and said if after leaving my office he thought further about it and could think of whose handwriting to let me know. I never showed him the contents of the envelope.

_____
(legal signature)

_____
(printed name)

Sonya L. Simonian

Human Resources Manager

Confidential                    Page 1                    DHenchey 5-28-02, #2

SGC 00116