IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DAVID BENNETT,

      Plaintiff,

v.

SAINT-GOBAIN CORPORATION, JOHN R.
MESHER, AND TIMOTHY L. FEAGANS,

      Defendants.

CIVIL ACTION

NO. 04-CV-40014-FDS

**DEFENDANTS' RESPONSE TO PLAINTIFF'S CONCISE STATEMENT
OF MATERIAL FACTS CONTAINED IN PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Saint-Gobain Corporation ("Saint-Gobain" or "Company"), John Mesher ("Mesher") and Timothy Feagans ("Feagans") (collectively "Defendants"), by their undersigned counsel, submit this response to Plaintiff's Concise Statement of Material Facts contained in Plaintiff's Opposition to Defendants' Motion for Summary Judgment.[1]

    1.    Admitted.

    2.    Admitted, except that Feagans' title is Deputy General Counsel. (56.1 Statement, at ¶ 5.)

    3.    Denied. It is admitted only that, on about June 6, 2001, David Bennett ("Bennett" or "Plaintiff"), Mary Porter ("Porter") and Otto Lies ("Lies") made an internal written grievance regarding Feagans' management of the intellectual property law group in Worcester.

---

[1] References to the 56.1 Statement are to the Statement of Undisputed Facts Pursuant to Local Rule 56.1 in support of Motion of Defendants for Summary Judgment, filed with this Court on November 4, 2005 and supported by the Declaration of Jill Brenner Meixel, Esq. ("Meixel Declaration").

(Affidavit of Michael J. Michales in Support of Plaintiff Bennett's Opposition to Motion for Summary Judgment ("Michaeles Aff."), Ex. 2, Mesher Dep. Ex. 16.) Any characterization of the written grievance is denied.

4. Denied. By way of further response, in March 2001, Bennett incurred a $65 dinner charge on a business trip, which charge Feagans and Mesher noticed while in the routine process of the Company-required manager's approval of Bennett's travel and expense report and which charge Feagans and Mesher believed to be excessive. (Mesher Dep., at 96-98, 114-16, Mesher Dep. Exs. 9, 10, 12; Feagans Dep., at 37-41.)[2] Feagans and Mesher then further inquired into the excessive charge in April 2001 – two months before the filing of the June 2001 grievance. (Mesher Dep., at 96-98, 114-16, Mesher Dep. Exs. 9, 10, 12; Feagans Dep., at 37-41.) It is specifically denied that either Feagans or Mesher investigated Bennett based upon the dinner charge. (Mesher Dep., at 96-97.)

5. Denied as stated. On August 8, 2001, defendant Mesher sent an email to Saint-Gobain Director of Human Resources Cathy Ferrante ("Ferrante") and defendant Feagans, with a copy to Robert Wilk, then Saint-Gobain's Director of Corporate Security, asking Wilk "to monitor Dave's monthly [American Express] statement to make sure it is only used for company business." (Michaeles Aff., Ex. 2, Mesher Dep. Ex. 16.) That request was made in response to an email from Ferrante advising Mesher and Feagans that Saint-Gobain was now required to guaranty Bennett's American Express Card because "Dave was delinquent on his prior account

---

[2] To the extent that the documentation from the discovery record supporting the citations in the text has not yet been filed of record with the Court, on this date, Defendants also have filed with the Court the Supplemental Declaration of Jill Brenner Meixel, Esq. ("Supplemental Meixel Declaration"). The pertinent portions of the deposition of John Mesher and supporting exhibits are attached to the Supplemental Meixel Declaration as Exhibit 1. The pertinent portions of the deposition of Timothy Feagans are attached to the Supplemental Meixel Declaration as Exhibit 2.

with Amex, and they cancelled his account. . . . As a result, Amex would not issue a new card to him unless [Saint-Gobain] guaranteed it." (Id.)

      6.    Admitted that Mesher sent a written letter dated November 20, 2001 to Bennett. That letter is a written document which speaks for itself, and any characterization of that document is denied.

      7.    Admitted in part; denied in part. It is admitted only that Bennett was 62, Lies was 64, Porter was 47 and Volker Ulbrich ("Ulbrich") was 59 at the time that Bennett, Porter and Lies made an internal written grievance regarding Feagans' management of the intellectual property law group in Worcester on June 6, 2001 and that Bennett, Ulbrich and Lies are no longer employed by Saint-Gobain. The remaining allegations of this paragraph are denied. By way of further response, there is no evidence in the record that Ulbrich "supported" the internal grievance made by Bennett, Porter and Lies, and Bennett cites to nothing in the record to support that allegation. To the contrary, Ulbrich testified at his deposition that he could not recall ever making a complaint that Feagans treated Ulbrich differently because of Ulbrich's age. (Ulbrich Dep., at 56.)[3] Moreover, while Porter, Lies and Bennett all submitted written memoranda regarding their grievance against Feagans, Ulbrich submitted no such memorandum. (Michaeles Aff., Ex. 2, Mesher Dep. Ex. 16.) Indeed, Ulbrich did no more to support Bennett's age grievance than did Frank Anthony, which was simply to attend the two meetings held with Dennis Baker ("Baker") and Mesher in June and July 2001. (Mesher Dep., at 42; Lies Dep., at 107.)[4] Furthermore, it is undisputed that Porter, who submitted a grievance in June 2001 and

---

    [3] The pertinent portions of the deposition of Volker Ulbrich are attached to the Supplemental Meixel Declaration as Exhibit 3.

    [4] The pertinent portions of the deposition of Otto Lies are attached to the Supplemental Meixel Declaration as Exhibit 4.

Anthony, who attended the meetings with Baker and Mesher in June and July 2001, remain employed by Saint-Gobain. (56.1 Statement, ¶ 56.)

8.  Denied as stated. This statement is not supported by any citation to the record. It is admitted only that Saint-Gobain took disciplinary action against Lies as the result of a January 18, 2001 email message sent by Lies to Feagans, Ulbrich, Bennett, Porter, Steve Borst and Mike Crosby in which Lies criticized Feagans' management of the Law Department in Worcester. The disciplinary action included reduction of a previously approved bonus and no salary increase for the upcoming calendar year. Plaintiff's characterization of the disciplinary action as "punishment" is denied. By way of further response, Feagans consulted with Mesher and Ferrante before taking any disciplinary action against Lies. (Feagans Dep., at 22.)

9.  Denied as stated. By way of further response, on or about December 12, 2001, Mesher met personally with Lies and with Donna Neylon to advise them of his decision to outsource the trademark function, that the transition would take about two months and that the transition would be completed by February 15, 2002. (56.1 Statement, at ¶ 22.) They each were offered a severance arrangement, which included outplacement and salary continuation for a significant period of time. (56.1 Statement, at ¶ 22.) Admitted that the severance is memorialized in Lies Dep. Ex. 9, attached as part of Ex. D to Meixel Declaration.

10. Denied as stated. It is admitted only that, on September 23, 2002, by hand delivered letters and a face-to-face meeting, Mesher informed each of the Worcester-based members of the Law Department, including Bennett and Feagans, that he had decided to close the Worcester office of Saint-Gobain's Law Department and to consolidate it with the rest of the Department in Valley Forge, Pennsylvania. (56.1 Statement, at ¶ 26.) Mesher further advised the employees that they could relocate to Valley Forge. (56.1 Statement, at ¶ 26.) If they chose

not to relocate, their employment would terminate on February 28, 2003, and they would be eligible to receive the normal severance package. (56.1 Statement, at ¶ 26.) Or, if they signed a Separation Agreement and General Release, they would receive an enhanced severance package. (56.1 Statement, at ¶ 26.)

11. Admitted in part; denied in part. It is admitted that Bennett and Ulbrich considered the proposal to relocate to Valley Forge and that Bennett and Ulbrich went on a trip to Valley Forge to examine the facilities and the housing. (56.1 Statement, at ¶ 28.) By email dated September 26, 2002, Feagans advised Bennett that Mesher "does not have any office space set aside for our group *yet* so there is nothing to see at the office. *Once he has a final count on the number of people relocating, he will look at the space issues and secure whatever space is necessary.*" (Emphasis added.) (Michaeles Aff., Ex. 2, Mesher Dep. Ex. 16.) Furthermore, as of September 2002, the Company had begun plans for the provision of office space for the attorneys who would relocate from Worcester to Valley Forge, but the move was not expected to take place until at least February 2003. (Mesher Dep., at 101-02.) The only reason that office space had not been specifically designated as of September 2002 was because the Company did not know at that time how many individuals would be relocating. (Mesher Dep., at 102-03.)

12. Admitted.

13. Admitted.

14. Admitted in part; denied in part. It is admitted that Mesher terminated Bennett's employment on October 31, 2001 and that the compelling reason for the termination was the pattern of harassment of Henchey. It is further admitted that the pattern of rude and unprofessional behavior and the discovery of the offensive poem in Bennett's office, while considerations in making the termination decision, would not have triggered the termination by

themselves. It is further admitted that, during Mesher's meeting with Bennett on October 31, 2001, Bennett denied writing the poems which were sent to Henchey. It is further admitted that Bennett testified that Bennett did not know Henchey's name until October 31, 2001. By way of further response, Wilk did not search Bennett's office prior to October 31, 2001, but a search of Bennett's office was conducted by another individual. (Wilk Dep., at 53.)[5] An additional search, with Bennett's permission, was performed on October 31, 2001. (Bennett Dep., at 141.)[6] It is denied that Mesher told Bennett that Wilk wanted to prosecute and that Bennett could get up to two years in prison. (Mesher Dep., at 78, 84-85.) Moreover, during their meeting on October 31, 2001, Bennett did not deny that it was his handwriting on the envelopes sent to Henchey. (Mesher Dep., at 84.)

15. Denied. By way of further response, Ulbrich elected to voluntarily retire, effective February 2003, and worked out a severance arrangement with the Company. (56.1 Statement, at ¶ 55.)

16. Denied. This paragraph is not supported by any citation to the record. By way of further response, on about June 6, 2001, Bennett, Porter and Lies made an internal written grievance regarding Feagans' management of the intellectual property law group in Worcester. (Michaeles Aff., Ex. 2, Mesher Dep. Ex. 16.) Ulbrich did not participate in the grievance other than to attend the two meetings held with Baker and Mesher regarding the grievance in June and July, 2001. (Ulbrich Dep., at 56; Mesher Dep., at 42; Lies Dep., at 107.) Furthermore, Lies' position with the Company was eliminated due to Mesher's decision to outsource the trademark

---

[5] The pertinent portions of the deposition of Robert Wilk are attached to the Supplemental Meixel Declaration as Exhibit 5.

[6] The pertinent portions of the deposition of David Bennett are attached to the Supplemental Meixel Declaration as Exhibit 6.

function. (56.1 Statement, at ¶ 22.) Ulbrich voluntarily elected to retire, effective February 2003, and worked out a severance arrangement with the Company. (56.1 Statement, at ¶ 55.)

        17.     Denied. The citation contained in this paragraph to a memorandum of law is not a citation to a proper portion of the record. By way of further response, there was not a full hearing before the DET. To the contrary, the DET hearing was conducted by telephone and lasted approximately one hour. (Affidavit of David Bennett in support of his Motion for Partial Summary Judgment ("Bennett Aff."), at ¶ 5, Exhibit 1, at 3, 48.) The DET hearing examiner did not allow Saint-Gobain to participate in the telephone hearing as "a fully interested party" and instead allowed Saint-Gobain to participate only as a witness, due to the failure of Saint-Gobain to respond to Bennett's initial application for benefits. (Bennett Aff., at ¶ 5, Exhibit 1, at 13-14.) As a result, Saint-Gobain did "not have a right of cross-examination [and did] not have a right to make a closing statement" at the hearing. (Bennett Aff., at ¶ 5, Exhibit 1, at 14.) The hearing examiner stated that "[t]he employer's sole purpose or participation [in the telephone hearing was] to answer such questions as [the hearing examiner] cho[]se to put to the employer for purposes of elucidating the facts." (Bennett Aff., at ¶ 5, Exhibit 1, at 14.) Following the hearing, the DET awarded unemployment compensation benefits to Bennett. (Bennett Aff., at ¶ 5, Exhibit 3, at 4.) Furthermore, the hearing examiner noted that he believed that defendant Mesher was "being somewhat disingenuous or evasive" only with regard to Mesher's inability to adequately define a limerick. (Bennett Aff., at ¶ 5, Exhibit 1, at 40.)

        18.     Denied. By way of further response, Mesher made the decision to terminate Bennett, against a backdrop of a pattern of rude and unprofessional behavior by Bennett, after considering the reports from Sonya Simonian, the findings of Wilk, the content of the poems sent to Diana Henchey, the results of the expert handwriting analysis performed by

J.J. Berrie and his interview with Bennett. (56.1 Statement, at ¶ 52.) Furthermore, the reports of J.J. Berrie and Nancy McCann are written documents which speak for themselves, and any characterization of those reports is denied, except that it is admitted that McCann could not rule out Bennett as the author of the writings delivered to Henchey.

SAINT-GOBAIN CORPORATION, JOHN R. MESHER, and TIMOTHY L. FEAGANS, By their attorneys,

| | |
|---|---|
| Hope A. Comisky<br>Amy G. McAndrew<br>Pepper Hamilton LLP<br>3000 Two Logan Square<br>18th and Arch Streets<br>Philadelphia, PA 19103<br>*Admitted Pro Hac Vice* | /s/ Jill Brenner Meixel<br>James B. Conroy (BBO# 096315)<br>Jill Brenner Meixel (BBO# 652501)<br>Donnelly, Conroy & Gelhaar, LLP<br>One Beacon Street, 33rd Floor<br>Boston, Massachusetts 02108<br>617-720-2880 |

Dated: December 13, 2005