# EXHIBIT 1

Page 1

FLYNN REPORTING ASSOCIATES
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303

Date:                   August 23, 2005

To:                     Hope A. Comisky, Esq.

From:                   Jean Parrish Zbinden
                        Court Reporter
Case Name:              Bennett v. Saint-Gobain
Name of Witness:        John R. Mesher
Date Taken:             August 4, 2005

Enclosed Please Find:  Minuscript of transcript
and original of signature page and errata page.

Signature Requirements:  Original signature page
and errata sheet enclosed for deponent's
signature.  If the deponent wishes to make any
corrections, the errata sheet should be used
listing the page number, the line number, the
correction to be made, and the reason for the
correction, and returned to:

     WOLFSON, KEENAN, COTTON & MEAGHER
     BY:  Michael J. Michaeles, Esq.
     390 Main Street, 10th Floor
     Worcester, Massachusetts 01608
DO NOT mark up the transcript.
Remarks:
CC:  Michael J. Michaeles, Esq.

Page 14

1   the law department and patent department

2   specifically immediately after the merger?

3       A.    Steve Borst, Dave Bennett, Volker Ulbrich.

4   Those were the only lawyers.

5       Q.    Was Otto Lies there as well?

6       A.    Otto Lies was there.

7       Q.    Did your title change after this?

8       A.    It changed several times progressively from

9   1988 through -- my last title change was in 1997.

10      Q.    What was that change?

11      A.    I believe in 1992 I was named deputy

12  general counsel and assistant secretary, I believe.

13      Q.    Who did you report to immediately?

14              MS. COMISKY:  Currently, right now?

15              MR. MICHAELES:  Yes.

16      A.    The CEO of the entire U.S. operations of

17  Saint-Gobain.  His name is Jean-Francois Phelizon --

18  P-H-E-L-I-Z-O-N.

19      Q.    In the year 2002 who did you report to

20  immediately?

21      A.    The general counsel of the company at that

22  time was Thomas A. Decker -- D-E-C-K-E-R.

23              MS. COMISKY:  In 2002?

24      A.    I'm sorry, I thought you meant 1992 after

1   the takeover.  In 2002 it was still Jean-Francois

2   Phelizon.

3       Q.   Was there anything that you had to get

4   authority from Mr. Phelizon to do?

5            MS. COMISKY:  Objection to the form.

6       A.   I don't know what you mean.

7       Q.   I assume that there are varieties of

8   decisions that you can make on your own in the law

9   department.  What I'm asking you is, Is there any

10  decision or a type of a decision that you would

11  first have to get clearance from him to make, such

12  as hiring a new attorney?

13      A.    If I wanted to hire a new attorney today

14  and it was not a replacement for someone who left, I

15  would have to get approval from him to increase the

16  headcount of the department, yes.

17      Q.   What if you wanted to terminate an

18  attorney, would you have to under any circumstances

19  get approval from him?

20      A.   No.

21      Q.   I assume that in connection with this

22  deposition you've spoken with Hope Comisky and other

23  members of her law firm?

24      A.   Only Hope.

Page 42

1   You can answer.

2        A.   I attended a meeting that was convened I

3   guess at a mutual time by Dennis Baker.  The meeting

4   was outside of Dennis Baker's office, I believe.

5   The attendees of that meeting would have been David

6   Bennett.  In addition to myself and Dennis Baker,

7   David Bennett, Mary Porter, Volker Ulbrich,

8   Otto Lies, and Frank Anthony.

9        Q.   Do you recall the date of that meeting?

10       A.   It was early June, maybe June 6th.

11       Q.   Where was it?

12            MS. COMISKY:  Objection.  Asked and

13   answered.  You can answer it again.

14       Q.   I think you said outside of Mr. Baker's

15   office?

16       A.   Yes.  There was a conference room outside

17   of Dennis Baker's office.

18       Q.   Was Mr. Baker's office in the same building

19   as the law department?

20       A.   No.

21       Q.   What is Mr. Baker's title or what was it

22   then?

23       A.   He was vice president of human resources of

24   Saint-Gobain Corporation.

Page 48

1    Q.    Have you told me everything you know about

2    the Dennis Baker investigation or the grievances

3    filed by those three employees?

4    A.    No.

5    Q.    Please tell me everything you know about

6    that.

7    A.    I know that Dennis Baker took this very

8    seriously.  It was his responsibility to get to the

9    bottom of the grievance.  I let him do his job.  He

10   had been an HR professional for 25 years.  He's the

11   top HR professional within our company in the U.S.

12   which covers 30,000 employees.  He hired outside

13   counsel to help him with this process.

14   Q.    Do you remember who he hired?

15   A.    He hired Dee Moschos from Mirick,

16   O'Connell, your former law firm.  He took it very

17   seriously and wanted to do it right.  The other

18   thing I distinctly remember of that investigation

19   was at the June 6th meeting, whenever there was a

20   discussion about Tim Feagans and an allegation that

21   he made age-related comments to some employees, I

22   specifically asked each person there, because it was

23   very serious to me, and if Tim did something like

24   that, I wanted to know.  I asked every person.  I

1    said, Did you hear Tim Feagans say anything

2    age-related or any age-based comments at all.  I

3    asked Mary, David, Volker, Otto, and Frank.  I went

4    around the table and said to each one of them, Did

5    you hear him say anything directly, and everyone

6    answered no.

7         Q.    Including Mary Porter?

8         A.    Including Mary Porter, absolutely.

9         Q.    So although Mary Porter wrote that in her

10   report or her grievance, she recanted that?

11              MS. COMISKY:  Objection to the form.

12        A.    I don't recall that she said in her report

13   or her written document that he said anything

14   directly to her about age, and I asked them all at

15   that meeting.

16        Q.    Do you remember specifically what you asked

17   Mary Porter?

18        A.    I asked everyone the same question.

19        Q.    Which was?

20        A.    Did any of you hear Tim directly, not

21   hearsay, say anything about age, and they all said

22   no.

23        Q.    Including Mary Porter?

24        A.    Including Mary Porter, yes, or maybe she

Page 78

1    wanted to press criminal charges against

2    Mr. Bennett?

3        A.    I said, This type of behavior is clearly

4    covered by the criminal harassment statute in

5    Massachusetts, and that's one of the reasons I was

6    so upset at this behavior by one of my employees and

7    that I was tempted to contact the Worcester police

8    through Bob, who has a good relationship with the

9    Worcester police, and see if they wanted to bring

10   criminal charges, and Bob Wilk convinced me

11   otherwise.

12       Q.    And you were tempted to do that without

13   even having spoken to Mr. Bennett?

14       A.    I was talking to Bob Wilk about it.

15       Q.    I understand, but you had not yet talked to

16   Mr. Bennett about it?

17       A.    It was before I spoke to David Bennett.

18       Q.    So far I think that you testified about the

19   communications concerning the Bennett matter --

20   communications with Wilk, two conversations and a

21   report from J.J. Berrie, and this conversation on

22   October 31st?

23       A.    Yes.

24       Q.    Had you had any other communications of any

1    the poems?

2        A.    I don't know.  He denied writing them or

3    seeing them.  I showed him the cover envelopes.

4        Q.    Were they the original envelopes?

5        A.    I don't remember.

6        Q.    Do you remember whether they were manila

7    colored?

8        A.    I don't remember if they were the originals

9    or photocopies.  I'm not sure.  I asked him if that

10   was his handwriting on those envelopes.  He did not

11   deny it was his handwriting.  What he said was, If

12   you are saying that these poems were inside of these

13   envelopes, I'm denying that.

14       Q.    Again, did you ask him whether that was his

15   handwriting on the envelopes?

16       A.    Yes, and he didn't deny it.  He said, If

17   you are saying that these poems were in those

18   envelopes, I'm denying that.

19       Q.    What else did he say and what else did you

20   say and what else did Cathy Ferrante say?

21       A.    I said that I was convinced that he was the

22   one that was harassing Ms. Henchey.

23       Q.    Did you use the word "sexual harassment?"

24       A.    No.  I said it was harassment in the

1  general context.  I showed him a copy of the

2  Massachusetts statute that prohibits this type of

3  general harassment, and I said I was appalled at

4  that type of behavior and it would not be tolerated

5  within my department, especially for someone who is

6  a lawyer and who should know better, and I told him

7  that he was going to be terminated.

8      Q.    Did you tell him the reason he was going to

9  be terminated?

10     A.    I said that the compelling reason was my

11  good faith belief that it was his writing and my own

12  conviction that it was his writing.  There were some

13  other issues that he had with me in the past, but

14  those alone would not have triggered his

15  termination, but this certainly did.

16     Q.    Did you ever have any communication with

17  J.J. Berrie other than looking at her report that

18  was forwarded to you by Mr. Wilk?

19     A.    No.

20     Q.    How long did that discussion last?

21     A.    With David Bennett?

22     Q.    Yes.

23     A.    The entire meeting probably lasted

24  30 minutes because it was more that Cathy handled

Page 96

Q.   Any others other than that?

A.   I believe we won several.

Q.   Do you remember the names of the cases?

A.   We have an employment lawyer that handles those, and she doesn't report directly to me unless there's a major problem.

Q.   Other than the Henchey writings, are you aware whether or not Robert Wilk has been involved in looking into any matters involving David Bennett aside from the Henchey writing?

MS. COMISKY:  Objection to the form. You can answer.

A.   Ask that again.

Q.   We've talked about the Bennett termination as a result of the company's determination that he had written poems to Diana Henchey, and Mr. Wilk was involved in that investigation?

A.   Uh-huh.

Q.   Aside from that, did Mr. Wilk, to your knowledge, look into anything else that Mr. Bennett did while Mr. Bennett was employed?

A.   I became aware -- it wasn't an investigation, but I think he tried to track down the substance of an expense report submission that

Page 97

1  David made where I thought the expense was

2  extravagant.

3      Q.   What was the expense?

4      A.   If I recall, David was traveling, and I'm

5  not sure where, maybe in Wheatfield, New York or

6  Ohio, for one of his clients, and a single dinner

7  item turned out to be about $65, and under our code

8  of ethics the approver of any expense report has to

9  make a determination as to whether or not it's

10 reasonable and necessary, and my view was, because I

11 have to approve all expense reports, not only in

12 Worcester but everyone in my department, I thought

13 that $65 for one meal in a small town, I think it

14 was a small town, was excessive, and I wanted to see

15 what he spent $65 on, and I think either I asked Bob

16 Wilk or Tim Feagans asked Bob Wilk to look at the

17 expense and determine what it was for, and it turned

18 out a large part of it was for a bottle of wine.

19     Q.   Do you know how much the bottle of wine

20 cost?

21     A.   No, but my understanding was it was about

22 half the expense.

23     Q.   Is there any policy for employees not

24 supposed to buy wine or liquor?

1    A.   No.  You can buy wine or liquor, but

2  there's a reasonable standard.

3    Q.   What is the reasonable amount?

4    A.   I think it depends upon what part of the

5  country you're in.  New York City is different than

6  Philadelphia and that's different from Worcester and

7  that's different from Cleveland, Ohio.

8    Q.   There's no set limit?

9    A.   There's no set limit.  There is no per

10  diem, as you'd say.

11    Q.   In connection with that specific matter,

12  did Mr. Bennett submit copies of receipts which

13  ultimately you saw?

14    A.   All receipts have to be attached to the

15  report, and at that time we may not have, although

16  we've changed our policy since then, we may have not

17  have required the actual underlying expenditure

18  where you would have to show what you purchased as

19  opposed to the amount you purchased.  I think at

20  that time it was probably only a hotel bill where --

21  I think it was a room service bill and it was for

22  dinner for $65, and there was nothing that showed

23  what that expense was for other than for dinner, but

24  now we do require every expenditure for meals to

1  would be very, very flexible in dealing with

2  individual situations.  For instance, if someone had

3  someone in school and didn't want to leave before

4  whenever school let's out in Worcester.  Personal

5  reasons and other things -- I would be very flexible

6  in the timing of people moving.  I didn't expect

7  them to all arrive on Monday on whatever date.

8      Q.   Is it fair to say that the first date

9  people could arrive in Valley Forge would be

10  February of 2003; does that ring a bell?

11      A.   I think for those people who did not elect

12  to relocate that would be their termination date.

13      Q.   What about those who elected to go to

14  Valley Forge, when was the first date they could

15  move down there and start sharpening their pencils?

16      A.   If someone wanted to move soon, I would

17  have let them.  If they wanted to wait until the

18  summer, I would have let them.  I didn't expect all

19  one moving van with all seven people at once.

20      Q.   What accommodations, if any, had been made

21  to the facilities at Valley Forge to take care of

22  the new people from the Worcester law department and

23  their files?

24      A.   I knew that would be an issue because we

1  are on one floor right now with the law department

2  there.  We were looking into perhaps using space

3  adjacent to our building for both files and maybe

4  even pieces of the law department.  In fact, I know

5  some of our businesses use an office building across

6  the little street and have done so for a long time.

7  We would also have the ability to divide up some of

8  the offices.  We had started a process to look at

9  how to divide the offices down there.  Some of the

10  offices are '60s buildings where some people have,

11  like any other building that was created for other

12  purposes, some large offices that were too large for

13  them.  We could divide those.  Other floors of that

14  building were partitioned in a much different way

15  than we had ours, and even if we needed to, we could

16  have certainly fit everyone in there here by

17  dividing offices which are very easy to do or move

18  to another floor.

19      Q.   Physically had anything been done to

20  accommodate them?

21      A.   We could not do that until we knew who was

22  moving.

23      Q.   So your answer is no?

24      A.   We didn't start tearing down walls, no.

1     Q.    Nothing had been done?

2     A.    No action had been taken, but we had

3     started a plan.

4     Q.    But no action had been taken?

5     A.    No.

6     Q.    When was the first time that you, the

7     company, hired outside counsel to deal with the

8     Bennett termination?  By that "termination" I mean

9     also included in the Henchey writings.

10    A.    I don't understand the question.

11    Q.    That was a bad question.  When was the

12    first time the company hired or consulted with

13    outside counsel regarding Mr. Bennett's being a

14    suspect of the writing to Ms. Diana Henchey?

15    A.    Are you asking if I hired outside counsel?

16    Q.    When was the first time you had consulted

17    with outside counsel or hired outside counsel?

18    A.    Not to replace his work?

19    Q.    Correct.

20    A.    But for my defense?  I don't understand.

21    Q.    Did you ever hire or consult with outside

22    counsel on anything related to David Bennett prior

23    to the filing of this lawsuit in January of 2004?

24    A.    Related to David Bennett's termination?

Page 114

1    A.    To Mr. Wilk?

2    Q.    Yes.

3    A.    I never saw this fax before.  I have not

4    seen this fax.

5    Q.    Do you know whether or not that was the

6    hotel at which Mr. Bennett incurred the $65 dinner,

7    one-half of which was for a bottle of wine?

8    A.    I don't know unless I see his entire

9    expense report because at the time, if I remember,

10   we didn't require the detail of what food or what

11   beverage was purchased.  All we required was the

12   folio from the Marriott in which the items would be

13   listed but not specifically identify the types of

14   meals.

15   Q.    I believe you testified this morning that

16   you asked Mr. Wilk to look into Mr. Bennett's

17   expenses?

18   A.    As I think about it some more, I don't

19   recall at all asking Mr. Wilk to look into the

20   expenses.

21   Q.    Didn't you say that this morning?

22   A.    I may have, but I don't think I did ask him

23   to do that.  I don't recall that I did that for

24   sure.  I thought I said Wilk looked at it, maybe at

1    my suggestion or Tim's suggestion.  I don't remember

2    if it was mine, but, apparently, he did look into

3    it, no matter who suggested it.

4        Q.    Exhibit Number 10 is an e-mail from you to

5    Cathy Ferrante dated April 20, 2001 and from

6    Mr. Feagans to Mr. Bennett of the same date,

7    April 20, 2001.

8                MR. MICHAELES:  Is that a business

9    record?

10       A.    It's not complete.  There is a first e-mail

11   from Bennett to Feagans which is not attached.

12               MS. COMISKY:  I'll give the witness

13   the full document, SGC00167 and SGC00168.

14       A.    The document identified as 00167 and 00168

15   is the complete e-mail.

16       Q.    Exhibit Number 11 is another incomplete

17   e-mail.  I copied them the way I received them and

18   it doesn't look like it's complete, but it is part

19   of a series of e-mails between you and Cathy

20   Ferrante dated April 27, 2001 and from Mr. Bennett

21   to Mr. Feagans April 26, 2001.

22       A.    They're e-mails.  The last one I sent, but,

23   again, there's, obviously, something on the next

24   page.

Page 116

1    Q.   So it's not complete?

2    A.   In fact, the bottom of that is the middle

3  paragraph on Exhibit Number 10.

4    Q.   So if we put exhibits 10 and 11 together,

5  does that make it complete?

6    A.   If you put 10 and 11 with the additional

7  page, it will make a complete string of e-mails.

8    Q.   Would that be a business record?

9    A.   Yes.

10    Q.   Exhibit Number 12 is an e-mail from you to

11  Mr. Bennett dated April 30, 2001 and from him to Tim

12  Feagans dated April 27, 2001.  Business record?

13        MS. COMISKY:  Yes.

14    Q.   Let me show you what has been marked as

15  Exhibit Number 13.  We talked this morning a little

16  bit about Mr. Borst's termination?

17    A.   Uh-huh.

18    Q.   This Exhibit 13 is an e-mail from Mr. Borst

19  to you dated May 2, 2001?

20    A.   Yes.

21    Q.   I assume he had not been terminated as of

22  the date of this e-mail?

23    A.   As of the time of that e-mail --

24    Q.   He was not terminated?

Page 139

1    meeting, but I'm not positive.

2        Q.    Exhibit Number 42 are two e-mails from you

3    dated October 25, 2002 to David Bennett and an

4    e-mail from him to you of the same date?

5        A.    Yes.

6        Q.    Business record?

7        A.    Yes.

8        Q.    Exhibit 43 is an e-mail from you dated

9    October 28, 2002 to Benoit Bazin.  Business record?

10            MS. COMISKY:  Yes.

11       Q.    The first line of that e-mail says "No, not

12   yet.  I have an issue with one of the IP lawyers

13   which will be resolved on Thursday."  Does that

14   refer to Mr. Bennett?

15       A.    That's who I was referring to.  I never let

16   Benoit know who was involved.

17       Q.    When you say "it will be resolved," what

18   did you mean by that?

19       A.    That was the date of the interview with

20   Dave Bennett, and it would be resolved one way or

21   the other.

22       Q.    Do you mean either --

23       A.    He'd be cleared or he'd be terminated.

24            (Discussion off the record.)

Page 172

1   Wheatfield or whatever location it was, and I was

2   the one who questioned it initially and prompted Tim

3   to follow up with David.

4       Q.    Thank you.  Mr. Michaeles also showed you a

5   document, and I think this is Exhibit 40 because it

6   was 36 and 40 together.  We've identified this as a

7   business record, but I'm going to turn your

8   attention specifically to the top e-mail on the

9   first page of this document sent to you from Benoit

10  Bazin on October 20, 2002.  The first bullet talks

11  about a transition process for David Bennett.  What

12  was that all about?

13      A.    This was in the time frame after my

14  decision to relocate the department and the

15  follow-up reaction by the business unit, including

16  Benoit Bazin.  During that process I think the

17  business people as well as the R&D people recognized

18  the importance of Dave Bennett's expertise and

19  knowledge that he had from being with the company

20  for at that time nearly 15 years and that they

21  recognized that they were a little bit vulnerable if

22  David were to leave through retirement or otherwise,

23  and they wanted to start to think about hiring a

24  lawyer to work with David, whether that was going to

Page 173

1    be for one year, five years, we didn't know what

2    David's plans were, so that we could educate another

3    lawyer to take over for David whenever he did leave.

4        Q.    Thank you.  I would like to show you a

5    document that was marked as Exhibit 35 at David

6    Bennett's deposition.  It's a provision of the

7    Massachusetts General Laws on criminal harassment.

8    Can you identify this particular section?

9        A.    Yes.  This is a section of the

10   Massachusetts law that deals with criminal

11   harassment, and this is the section that concerned

12   me with respect to David Bennett's activities.

13       Q.    Section 43A?

14       A.    Yes.

15       Q.    Chapter 265?

16       A.    Yes.

17       Q.    I would like to show you what was marked as

18   Mesher 3.  It was identified as a business record.

19   I believe you testified about the circumstances

20   which led you to write this e-mail.  Is there

21   anything else you would like to add?

22       A.    I just identified it.

23       Q.    You testified about the circumstances that

24   led you to write that e-mail?

MARRIOTT NIAG FALLS

#0770 P.001/003

6740 Oakas Drive
Niagara Falls, Ontario  L2G 3W5
Phone: (905) 357-7300
Fax: (905) 357-0490

**Niagara Falls
Marriott Fallsview**

# Fax

| | | | |
|---|---|---|---|
| To: Mr. Bob Wilk | | From: Chie @ Marriott FV | |
| Fax: (508) 795-5344 | | Pages: 3 (incl. cover) | |
| Phone: (508) 795-5781 | | Date: Apr. 5 a | |
| Re: Bennett Folio | | CC: | |

**COMMENTS:**

Mr. Wilk

   I hope this copy of the bill proves to be helpful. If you have any further questions please feel free to contact me tommorow after 3pm.

   Have a good Afternoon
   Chie

EXHIBIT 9
WIT: Mesher
DATE: 8/4/05
JEAN P. ZBINDEN

Marriott Guest Services

SGC 01001

NIAGARA FALLS
MARRIOTT
FALLSVIEW
6740 OAKES DRIVE
NIAGARA FALLS, CANADA

TBL# 2129                    ROOM
1#GUESTS  PM RMSV    SVR
1 CALAMARI           12.10
1 VEAL    PARM       39.60
1 1/2 KDNZ MERLOT    25.00
       SUBTOTAL      76.70
       15.00%
       Gratuity      11.50

       GST            5.37

       SUBTOTAL      93.57
       LQTX           2.50
       PST1           4.14
CAN  TOTL          100.21
WE ARE PLEASED TO ACCEPT PAYMENT
IN U.S. DENOMINATIONS VIA CASH,
THE TRAVELLERS CHEQUES
THANK YOU FOR DINING WITH US
PLEASE COME
AGAIN

TIP: _____

TOTAL: _____

PRINT NAME: D. BENNETT

ROOM #: _____

SIGNATURE: _____

RM SERVE CSHR
0061 20:07 MAR 13'01      W/S#06 P1

NIAGARA FALLS
MARRIOTT
FALLSVIEW
6740 OAKES DRIVE
NIAGARA FALLS, CANADA

TBL# 2129                    ROOM
1#GUESTS  PM RMSV    SVR
       CK PAID          88.20

       GST            5.37

       SUBTOTAL      93.57
       LQTX           2.50
       PST1           4.14
CAN  TOTL          100.21
       ROOM CHG     100.21
       ROOM #  2129
              BENNETT/DAVE -VS
WE ARE PLEASED TO ACCEPT PAYMENT
IN U.S. DENOMINATIONS VIA CASH,
TRAVELLERS CHEQUES
THANK YOU FOR DINING WITH US.
PLEASE COME
AGAIN
RM SERVE CSHR
0067 20:47 MAR 13'01      W/S#06 P1

# Marriott FALLSVIEW

NIAGARA FALLS MARRIOTT
HOTEL · RESORTS · SUITES

GS R124524976

6740 Oakes Drive, Niagara Falls, Ontario, Canada L2G 3W6 (905) 357-7300 Fax (905) 357-0490

## GUEST FOLIO

| 2129 | BENNETT/DAVE | 119.95 | DUPLICATE | 14:51 | ACCT# |
|------|--------------|--------|-----------|-------|-------|
| ROOM | NAME | RATE | DEPART | TIME | 8588 |

| NOOG | | 13/03/01 | |
|------|--|----------|--|
| TYPE | | ARRIVE | TIME |

| ROOM | 6600 WALMORE RD | |
|------|------------------|--|
| CLERK | NF    NY | |
| 14304 | | VSXXXXXXXXXXXXX6949 |
| CLERK | ADDRESS | PAYMENT |

| DATE | REFERENCE | CHARGES | CREDITS | BALANCE |
|------|-----------|---------|---------|---------|
| 13/03 | LD PHONE 3457-6 5 | 7.36 | | |
| 13/03 | GST TAX 3457-6 5 | .52 | | |
| 13/03 | RM SERV 21292129 | 100.21 | | |
| 13/03 | VAL PARK | 13.00 | | |
| 13/03 | GST TAX | .91 | | |
| 13/03 | ROOM | 119.95 | | |
| 13/03 | PST TAX 2129, 1 | 6.00 | | |
| 13/03 | GST TAX 2129, 1 | 8.40 | | |
| 14/03 | ROOM 2129, 1 | 119.95 | | |
| 14/03 | PST TAX 2129, 1 | 6.00 | | |
| 14/03 | GST TAX 2129, 1 | 8.40 | | |
| 14/03 | VAL PARK | 13.00 | | |
| 14/03 | GST TAX | .91 | | |
| 15/03 | TERRAPIN 302129 | 26.00 | | |
| 15/03 | CCARD-VS | | 430.61 | |
| | | | | .00 |

# Marriott FALLSVIEW

NIAGARA FALLS MARRIOTT
HOTEL · RESORTS · SUITES

6740 Oakes Drive, Niagara Falls, Ontario, Canada L2G 3W6
(905) 357-7300 Fax (905) 357-0490

This statement is your only record. You have agreed to pay in cash or by credit card or by approved charge. If payment is to be made by credit card, you authorize us to charge your credit card for all amounts billed to the account. You agree to be personally liable for payment of the account should the person, company or association indicated fail to pay. Above will be charged to the account indicated. You will remit all bank charges. Authorization above does not waive any rights to collect the full amount if company does not pay. If the account is to be charged to a company or association, and it fails to pay, the guest remains liable. All charges are payable upon check-out unless other arrangements have been made. Room rate shown is per day and does not include applicable taxes.

Signature X

For Reservations At Any Marriott Hotel Call 1-800-228-9290

# NIAGARA FALLS **Marriott**
## FALLSVIEW

GST# R124524976

6740 Oakes Drive, Niagara Falls, Ontario, Canada L2G 3W6 (905) 357-7300 Fax (905) 357-0490

## GUEST FOLIO

| | | | | | | |
|---|---|---|---|---|---|---|
| 2129 | BENNETT/DAVE | | 119.95 | 15/03/01 | 08:13 | 8588 |
| ROOM | NAME | | RATE | DEPART | TIME | ACCT# |
| NQQG | | | | 13/03/01 | 19:18 | |
| TYPE | | | | ARRIVE | TIME | |
| 5 | 6600 WALMORE RD | | PASSPORT: | | | |
| | NF | NY | VSXXXXXXXXXXXX6949 | | | /0403 |
| ROOM 14304 | | | PAYMENT | | | MR#: |
| CLERK | ADDRESS | | | | | |

| DATE | REFERENCE | | CHARGES | CREDITS | BALANCE DUE |
|---|---|---|---|---|---|
| 13/03 | LD PHONE | 3457-6 5 | 7.36 | | |
| 13/03 | GST TAX | 3457-6 5 | .52 | G | |
| 13/03 | RM SERV | 21292129 | 100.21 | | |
| 13/03 | VAL.PARK | | 13.00 | | |
| 13/03 | GST TAX | | .91 | B | |
| 13/03 | ROOM | 2129 | 119.95 | | |
| 13/03 | PST TAX | 2129, 1 | 6.00 | A | |
| 13/03 | GST TAX | 2129, 1 | 8.40 | B | |
| 14/03 | ROOM | 2129, 1 | 119.95 | | |
| 14/03 | PST TAX | 2129, 1 | 6.00 | A | |
| 14/03 | GST TAX | 2129, 1 | 8.40 | B | |
| 14/03 | VAL.PARK | | 13.00 | | |
| 14/03 | GST TAX | | .91 | B | |
| 15/03 | TERRAPIN | 302129 | 26.00 | | |
| 15/03 | CGARD-VS | | | 430.61 | |
| | SETTLED TO: | VISA | | XXXXXXXXXXXX6949 | |
| | | | | | .00 |

GST R# 893936179

| DESCRIPTION | TAXED AMOUNT | TAX |
|---|---|---|
| TOTAL GST TAX (BCE) | | $18.62 |
| TOTAL PST TAX (AD) | | $12.00 |
| F  PST7% | $.00 | $.00 |
| G  7% GST TAX | $.00 | .52 |

| NET CHARGES | TAX | CREDITS | FOLIO |
|---|---|---|---|
| $399.47 | $31.14 | $430.61 | $.00 |

G #01 GK

This statement is your only receipt. You have agreed to pay in cash or by
for all amounts charged to you. The amount shown in the credit card column
charged to the credit card number set forth above. (The credit card comp
does not make payment on this account, you will owe us such amount. If
check-out, you will owe us interest from the check-out date on any und
maximum allowed by law, plus the reasonable cost of collection, includin

Signature X _____

For Reservations At Any Marriott Hotel Call 1-800-228-9290

## NIAGARA FALLS **Marriott**
### FALLSVIEW

**Always Leave Keys With Attendant**

NO 12219

# PARKING
## GUEST RECEIPT

Cars parked at Owner's Risk! (see back for details)

Name: _____

For your convenience please call Ex. 4242 ten minutes
in advance to have your vehicle waiting.
Winter months additional twenty minutes in advance.

NIAGARA FALLS **Marriott**
FALLSVIEW

BUY FUEL

Post-It® Fax Note   7671   Date 4/5   # of pages ►

To  Tim        From  A

Co./Dept.      Co.

Phone #        Phone #

Fax #          Fax #

**Mesher, John R.**

| | |
|---|---|
| **From:** | Mesher, John R. |
| **Sent:** | Friday, April 20, 2001 11:06 AM |
| **To:** | Ferrante, Cathy |
| **Subject:** | FW: Expense Reports |

FYI. This relates to a $65 dinner that Dave Bennett incurred during a recent trip to Wheatfield, NY. We reimbursed Dave, but Tim noted that he thought the expense was on the high side. The saga never ends. Please put this in David's personnel file. .

---Original Message---
From: Feagans, Tim L.
Sent: Friday, April 20, 2001 10:31 AM
To: Mesher, John R.
Subject: FW: Expense Reports

For your information.

---Original Message---
From: Feagans, Tim L.
Sent: Friday, April 20, 2001 10:30 AM
To: Bennett, David X.
Subject: RE: Expense Reports

The Travel and Entertainment Policy requires me as the approving manager to review all expense reports to ensure expenses are ordinary and necessary, neither lavish or extravagant and supported by proper documentation as defined in the Policy. And Section 9.1 of the Policy directs me to verify the reasonableness of reported meals. So, I have not only the right -- but the obligation -- to question any expense submitted for reimbursement. You should not feel defensive or regard my efforts to counsel you in this regard as distasteful. It has nothing to do with your tenure with the Company, your position or your professional status. No one in the organization is (or should be) accorded any special treatment. Managers regularly communicate with their direct reports (at all levels of the organization) regarding the Policy. You should also understand there have been numerous instances where the Company has disciplined or terminated not only individual employees for failing to abide by the Policy but also supervisors for failing to enforce it.

In discharging my responsibility for approving expense reports, I not only look to the standards and practices outlined in the Policy but also to the prevailing practice followed by others within the Department and the Company generally. It has nothing to do with my own spending habits or frugality. And your suggestion in this respect is inappropriate.

I could have rejected the expense. Instead I elected to approve it (this one time) and counsel you on what the Company considers to be reasonable. It was nothing more than an effort to set expectations so as to prevent misunderstandings in the future. If it would help you to have some numerical limit for dinner meals, I would suggest you use $25 as a guide. This should not be viewed as a per diem but rather a guideline as to what the upper end of reasonable is.

Finally, it appears from your hotel receipt that you used your VISA card to charge your bill. Employees travelling on Company business are required to use the Card. I have brought this to your attention before on several occasions. Again, just to be clear and prevent any further misunderstanding, you should understand that I will no longer approve any expenses charged to your personal credit card unless I am able to confirm with the merchant that it does not accept American Express.

David, it appears your frustration in looking at this issue stems from a perception that I am being overly rigid in reviewing and approving expense reports. You should understand that I am merely following the Policy and common practice within the Company. You may want to consider speaking with Cathy Ferrante or Bob Wilk to gain some insight as to how we as a Company look at these issues.

I hope this helps.

---Original Message---
From: Bennett, David X.
Sent: Thursday, April 12, 2001 7:03 AM
To: Feagans, Tim L.
Subject: Expense Reports

Tim:

EXHIBIT  10
WIT: Mesher
DATE: 8/4/05
JEAN P. ZBINDEN

SGC 00167

In your E-Mail of yesterday, you said:
"I did not want you to think in approving the report however that I am willing to reimburse meal expenses of this magnitude in the future".  (I feel sure you intended to say "approve reimbursement").

At a threshhold level I feel that this is a matter that would have better been handled in a man-to-man conversation but now the matter has been elevated to this level, perhaps it would be better to secure a little clarification.

I have never claimed expenses that I did not consider reasonable and prudent given the circumstances at the time and I take steps to minimize expenses where this can be done without inconvenience to others. I even elect to drive to Hartford rather than take the shorter route to Boston when I fly to Buffalo because the airfare is somewhat cheaper. I find it distasteful at this stage in my career to have my judgment on what is reasonable and prudent challenged for the first time on the basis of a single meal bill. I intend to continue to use my own judgment as I have in the past and any excess over the Feaganesque frugality standard (let's call it the "FF Standard"), I shall gladly pay out of my own pocket. In this way I hope to avoid unnecessary delys in having my expenses (incurred, let us remember, while on company business) reimbursed. To facilitate this exercise it would greatly assist me if you would place a dollar figure on the FF Standard for lunches and dinners. I will report only that amount, assuming I reach it of course, though the bill submitted in support will not exactly correspond.

I hope this arrangement will save us a reiteration of this correspndence in the future.

David.X.Bennett@saint-gobain.com

2

SGC 00168

**Mesher, John R.**

EXHIBIT _12_
WIT: _Mesher_
DATE: _8/4/05_
JEAN P. ZBINDEN

| | |
|---|---|
| **From:** | Mesher, John R. |
| **Sent:** | Monday, April 30, 2001 3:54 PM |
| **To:** | Bennett, David X. |
| **Cc:** | Feagans, Tim L. |
| **Subject:** | RE: Policy |

David: This summarizes our telephone conversation earlier today:

1. I (not Tim) give final approval to the T&E expense reports for the Law Department. As you know, I am also responsible for Corporate Security, and I want those in my Department to be above reproach when it comes to T&E.

2. I am the one who initially questioned the $65 dinner expense that has prompted this and prior e-mails.

3. Although I approved the expense report, I asked Tim to follow-up with you to let you know that I believed the amount was on the high side.

4. You requested a dollar limit as to what would be considered to be reasonable for dinners.

5. $25 was suggested by Tim as a guide as to what is reasonable. (This, of course, must be viewed in context. We would certainly anticipate, and approve, higher costs in certain cities, such as NYC or LA, and somewhat lower costs in other cities.)

6. To the extent possible, I expect travelers to submit receipts even if the expense is less than $25 (see Section 6.5 of the Policy).

7. You should try to resolve your dispute with American Express as soon as possible (involve Mark Williams to the extent necessary), so that you can resume using the Amex card for business travel.

8. I would hope that this now concludes this issue. All of us have more productive demands on our time.

-----Original Message-----
From: Bennett, David X.
Sent: Friday, April 27, 2001 2:13 PM
To: Feagans, Tim L.
Cc: Mesher, John R.
Subject: Policy

Tim:
In your memo of April 20th you referred to the "Travel and Entertainment Policy" and said that "(T)here have been numerous instances where the Company has disciplined or terminated not only individual employees for failing to abide by the Policy but also supervisors for failing to enforce it."

I assure you, you have nothing to fear. You will not be disciplined or terminated on this basis. The instances of which I am aware that fall in this general category are confined to situations involving false claims or padded Expense Reports and/or management connivance in such activity. I am sure you will agree that there is no reason to suspect that such a situation applies here since the occasion for your remark was a single fully documented hotel meal item for US$65.00. I wonder why you felt it necessary to raise the matter.

However I am intent on not transgressing one jot or tittle of the Policy, even erring on the side of caution in accepting, at your suggestion, that it would be extravagent to bill more than $25.00 for any meal taken while travelling on business. I register no judgment on the appropriateness of your decision in all situations. It is after all spelled out in paragraph 9.1 of the "Business Travel and Entertainment Policy" that "Approving managers are responsible for verifying the reasonableness of reported meal costs". If that is the limit of "reasonableness" that you choose to enforce in the Department, so be it, assuming of course that it is applied non-discriminately.

The same paragraph goes on to say that "..receipts are required for meal expenses in excess of $25.00". May I therefore assume that no receipts are required under the Policy for meals below $25.00?

1

SGC 00032

David.X.Bennett@saint-gobain.com

SGC 00033