# EXHIBIT 2

Page 1

Volume I
Pages 1 - 82

IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DAVID BENNETT,          District Court
     Plaintiff,         Civil Action No. 04-CV-40014-FDS

vs.

SAINT-GOBAIN CORPORATION,
et al,
     Defendants.

* * * * * *

DEPOSITION of TIMOTHY L. FEAGANS, called as a witness by counsel for the Plaintiff, pursuant to the applicable provisions of the Massachusetts Rules of Federal Procedure, before Rachel Marie Grady, CSR No. 146900-S, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, taken at the offices of WOLFSON, KEENAN, COTTON & MEAGHER, 390 Main Street, Worcester, Massachusetts, on Wednesday, August 3, 2005, commencing at 3:34 P.M.

*************************

FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303  *  (617) 536-2727


TOLL FREE: (888) 244-8858
FAX:   (508) 752-4611

*************************

DUPLICATE

Page 15

1       THE WITNESS. Okay. Thank you.

2       Q. And your present title is?

3       A. Deputy General Counsel.

4       Q. In general, can you tell me what your
5  duties are?

6       A. My present duties?

7       Q. Yes.

8       A. Well, from a practicing law standpoint, I'm
9  responsible for the legal services that are provided
10 to what we call the "HPM Group," the High Performance
11 Materials Group, which is one of five Saint-Gobain
12 sectors. I'm responsible for the provision of labor
13 work to their activities in North America, both from a
14 general business law standpoint and then the
15 intellectual property law standpoint. My management
16 responsibilities include managing the General Law and
17 IP law staff in Worcester.

18      Q. In terms of your management, did you hire
19 either Tom Field or Joe Sullivan?

20      A. Yes, I did. I did hire those two.

21      Q. Was there anyone else involved in the
22 hiring process?

23      A. Yes.

24      Q. Who?

1  A.  Pretty much everybody that was in the
2  Worcester group at the time when we were recruiting
3  for those two positions.  Certainly, Mary Porter was
4  involved.  Volker Ulbrich was involved before he left.
5  Mike Crosby was involved.  Those would have been the
6  three individuals from the IP side.
7       And Frank Anthony was involved as well.
8  And then John Mesher became involved.  In addition to
9  that, we had quite a few people from the business
10 unit, particularly in the R&D Group in Northborough,
11 participate in interviews and reviewing resumes as
12 well.
13      Q.  Were the interviews by the members of the
14 IP Department, with these two lawyers, to see if there
15 was good chemistry, or did they --
16      A.  It was more than that.
17      Q.  Would they give feedback as to whether they
18 thought they were good --
19      A.  Yes.  Their responsibility was to interview
20 them and to make sure there was not only good
21 chemistry but also that they felt that they were
22 qualified, that they had the right experience and the
23 right scientific backgrounds that we were looking for,
24 in terms of filling those two positions.

1  Q. Since being with Saint-Gobain, have you
2  hired anyone else, other than Joe Sullivan or Tom
3  Field?
4  A. Are you referring to since Joe and Tom or
5  at any time?
6  Q. At any time.
7  A. Yes. I hired Joan Frank shortly after I
8  got to Saint-Gobain. I think that was in 1996, if I
9  recall. And I also participated in interviewing Frank
10 Anthony. I did not hire him. He was hired by John
11 Mesher, but John asked me to meet with him and to give
12 my feedback on Frank.
13 Q. Is that the end of it? No other hirees?
14 A. I hired Mike Crosby as well.
15 Q. Have you terminated anyone?
16 A. No.
17 Q. Do you sign off on performance evaluations
18 of the Law Department?
19 A. Yes.
20 Q. Does anyone sign off with you?
21 A. The procedure at Saint-Gobain is that it
22 has to be signed by my managers. So John would sign
23 any performance reviews that I signed, in the first
24 instance.

Page 22

1   depends on what the economy is doing and what the
2   inflationary issues are and what have you.  It is
3   typically in that range.
4       Q.  Did you also tell him that he was not
5   getting his bonus?
6       A.  Yes.  That's correct.  That was a part of
7   it.
8       Q.  Do you recall what the amount of the bonus
9   would have been?
10      A.  I don't recall, no.
11      Q.  Before making the decision that he wouldn't
12  get a bonus or raise, did you discuss that with
13  anybody else?
14      A.  Yes.  I discussed it with Cathy Ferrante,
15  who was managing Human Resources for our group at that
16  particular point in time, and I also discussed it with
17  John Mesher.
18      Q.  There was a complaint by Mary Porter that
19  was dated June 6, 2001.  Do you recall that?
20      A.  A complaint about --
21      Q.  It was called, I think, a "grievance."
22      A.  A grievance against me that --
23      Q.  Yes.
24      A.  -- was made in June of 2001; is that what

Page 37

1  A.  Yes.

2  Q.  Who?

3  A.  David Bennett.

4  Q.  When is the first time you communicated
5  with Mr. Wilk about David Bennett?

6  A.  I don't recall when it was.

7  Q.  Do you remember what it was about?

8  A.  David had submitted an expense report which
9  I felt had an excessive amount claimed for, I believe,
10 a meal or something, in connection with a recent trip
11 that he had taken.  And I conferred with Bob Wilk to
12 get his advice as to how to handle it.

13 Q.  Do you remember what the amount of the meal
14 was?

15 A.  I believe it was $65 U.S.  I think it was
16 $100 Canadian.

17 Q.  Did you have any conversation with
18 Mr. Bennett about whether or not that was excessive or
19 why he incurred that expense?

20 A.  Yes.

21 Q.  Was that conversation with Mr. Bennett
22 before or after you contacted Mr. Wilk?

23 A.  I don't recall.

24 Q.  Did you ask Mr. Wilk to do anything with

1   regard to those dinner expenses?

2   A. No. At the time that that issue came up,
3   there was a great deal of scrutiny being placed upon
4   managers who were approving expense reports. We were
5   encouraged to speak with Bob Wilk if we had any
6   questions regarding the application of the policy to
7   any specific issue, so I spoke to Bob in that context.
8   I did not ask him to undertake any further study. As
9   I learned later, he did contact the establishment that
10  had issued the receipt to get additional information
11  about what the nature of the expense was.

12      I did not ask him to do that, but he
13  provided me with that information subsequent.

14  Q. Let me show you what appears to be a fax to
15  Mr. Wilk from the Niagara Falls Marriott. It appears
16  to have attached to it three pages of guest receipts.
17  Could you take a look at that, please?

18  A. Okay.

19  Q. Is that the meal issue for which you
20  contacted Mr. Wilk?

21  A. I believe it is, yes.

22      MR. MICHAELES: This is a document
23  which you produced in response to my document request.
24  Do you want to stipulate that it's in the ordinary

Page 39

1 | course of business?
2 | MS. COMISKY: Oh, yes.
3 | MR. MICHAELES: I'm sorry?
4 | MS. COMISKY: Yes.
5 | MR. MICHAELES: Do you want to go
6 | through the three things to stipulate it's a business
7 | record?
8 | MS. COMISKY: It's a business
9 | record.
10 | MR. MICHAELES: We'll mark that as
11 | Exhibit 1.
12 | (Exhibit No. 1 marked for
13 | identification.)
14 | Q. What was the outcome, if anything, about
15 | that Marriott dinner of 65 U.S. and $100 Canadian?
16 | A. The outcome was an exchange of E-mails
17 | between myself and David about what the company's
18 | expectations were with respect to what we considered
19 | to be reasonable and ordinary business expenses.
20 | Q. Was there a limit or a dollar amount which
21 | employees should not exceed?
22 | A. No. There isn't a limit in the policy, if
23 | you will.
24 | Q. Were any other members of the Law

1   Department questioned about travel or dinner expenses?

2       A.   By who?

3       Q.   By you.

4       A.   By me?

5       Q.   Yes.

6       A.   Did I question other members of my group
7   about travel and entertainment?  Is that the question?

8       Q.   That is.

9       A.   Yes.

10      Q.   Let me put a time frame on that.  From,
11  say, 2001 forward.

12      A.   Yes.

13      Q.   Who else?

14      A.   All of them and frequently.

15      Q.   Did you ever invite Mr. Wilk to look into
16  any of the others?

17      A.   I don't recall whether there was ever that
18  need.  I don't recall.  I believe there may have been
19  one or two instances where I asked him for advice
20  about other expenses.

21      Q.   Other than this Niagara Falls Marriott
22  situation, did you ask Mr. Wilk to look into any other
23  David Bennett matter?

24           MS. COMISKY:  Objection.  You can

1   answer.

2       A.  No.

3       Q.  Are you aware of whether or not Mr. Bennett
4   was investigated by the company for anything other
5   than the Marriott dinner expense and the Diana Henchey
6   writings?

7       MS. COMISKY:  I'm going to object.
8   He did not testify that he was investigated by the
9   company about that expense.

10      A.  There was not an investigation.

11      Q.  What would you characterize that as?

12      A.  It was part of a required consultation I
13  felt I had to have, as the approving manager, to seek
14  advice from Bob Wilk, who was responsible for
15  communicating with business units and managers on the
16  travel and entertainment policy.

17      Q.  Do you recall whether, while you were the
18  head of the Legal Department -- other than the
19  situation on Exhibit 1 and other than the Diana
20  Henchey memos -- did Mr. Bennett do anything else
21  which was inconsistent with the company policies or
22  procedures?

23      MS. COMISKY:  I have a separate
24  objection to that.  There's no foundation that he