# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

DAVID BENNETT,                                  )
                                                )
         Plaintiff,                             )
                                                )
                                                )    Civil Action No.
         v.                                     )    04-40014-FDS
                                                )
SAINT-GOBAIN CORPORATION,                       )
JOHN R. MESHER, and TIMOTHY L.                  )
FEAGANS,                                        )
                                                )
         Defendants.                            )
_____)

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SAYLOR, J.

    This is an action for age discrimination and unlawful retaliation.  Plaintiff David Bennett

contends that he was unlawfully discharged by defendant Saint-Gobain Corporation because of his

age and in retaliation for filing a grievance in which he accused his supervisor, defendant Timothy

Feagans, of age discrimination.  He also contends that defendants Feagans and John R. Mesher

tortiously interfered with his contractual relations with Saint-Gobain.  Pending before the Court is

defendants' motion for summary judgment.  For the reasons below, the motion will be granted.

## I.    Facts

    The following facts are set forth in the light most favorable to the plaintiff.

### A.    Bennett's Employment with Saint-Gobain

    Saint-Gobain Corporation manufactures abrasives, glass, ceramic, and high-performance

plastic products.  Its headquarters is in Valley Forge, Pennsylvania, and it has manufacturing and

1

administrative operations in Worcester, Massachusetts.  Although most of the company's legal department is located at its headquarters, it has a law department in Worcester where most of its intellectual property lawyers are located.

David Bennett is an attorney who has worked for Saint-Gobain or its predecessor since 1989.  He is, at least originally, British.  As of 1999, he was a senior patent attorney in the law department in Worcester.  At that time, he began reporting to Saint-Gobain's Deputy General Counsel, defendant Timothy Feagans.  Feagans reports to the company's Vice President and General Counsel, defendant John Mesher.  Feagans works in Worcester and Mesher in Valley Forge.

Feagans and Mesher apparently found managing Bennett difficult.  They considered his performance as an attorney to be very good, but reported that he constantly challenged their authority, was disrespectful, and, at times, insubordinate.  They warned Bennett about his conduct a number of times, both formally and informally, during the period from 2000 until just before his termination in 2002.[1]  On several occasions, Mesher or Feagans reported Bennett's conduct to human resources, including to the company's Vice President of Human Resources, Dennis Baker.[2]

### B.    The Internal Age Discrimination Grievance

---

[1] For example, Bennett's performance evaluation for 2000, completed by Feagans and approved by Mesher, stated that "[m]any of David's communications with me (and [Mesher]) over the past year were negative, hostile and disrespectful . . .[that] nothing warrants this kind of behavior," and that he should begin immediately "communicat[ing] more constructively with Law Department management."  Mesher also sent Bennett a letter on November 20, 2001, stating that a recent incident in which he criticized Mesher to other employees "will weigh heavily in my vision of the future structure and direction of the Department and will, at the very least, have a negative impact on your overall performance evaluation."

[2] For example, in April 2001, Mesher forwarded one of Bennett's e-mails to Baker and Cathy Ferrante, a human resources manager, indicating that the e-mail "is another example of [the] type of arrogance . . . that has come from David Bennett over at least the last two years . . . I want you to be aware of what Tim [Feagans] has to deal with on a constant basis with the IP lawyers."

In June 2001, Bennett (who was then 63) and four other Worcester-based law department employees—Otto Lies (who was 64), Mary Porter (who was 47), Volker Ulbrich (who was 59), and Frank Anthony (who was 55)—filed an internal grievance against their supervisor, Feagans (who was 41). Each complainant was an attorney, except for Lies (a Trademark Manager, who performed work similar to that of a paralegal). The record is not clear, but it appears that the only Worcester-based attorney who did not support the grievance (and apparently was not aware of it) was Mike Crosby (who was 32).

Although the grievance complained about Feagans's management generally, it alleged specifically that he treated his employees differently on the basis of age. It stated that Feagans was creating "a hostile work environment" by subjecting the "older members of the group" to "abusive and disrespectful mis-management," and that he was trying to get the older members to quit.[3] The complainants also submitted statements by Bennett, Lies, and Porter that provided specific examples of alleged mismanagement and differential treatment.[4] Bennett's statement indicated that the older members of the group had received unfounded criticism and that younger members were not similarly targeted.

The complainants met with Baker and Mesher in early June and again in mid-July. Baker

---

[3] Though not expressly defined, the document suggests that "older members" referred to Bennett, Ulbrich, Lies, and Anthony. Porter and Crosby were apparently considered the younger members of the group.

[4] According to the complainants, Feagans treated the older workers unfavorably by (1) undermining Lies's work in front of clients; (2) creating unwarranted negative performance reviews of Bennett, Lies, Ulbrich, and Anthony; (3) unfairly disciplining Lies; (4) stating that certain people had provided negative feedback about Lies but refusing, when asked, to provide specific information about the feedback; and (5) conducting a 45-minute meeting with Porter and Bennett, at which he addressed both of them but kept his back turned toward Bennett while looking only at Porter. According to Lies, Feagans told him that the others were "bitchers and whiners," "vindictive," "negative," and "challeng[ed] every action and policy." According to Porter, Feagans "repeatedly complained to [her] in meetings and on the phone about how he disliked working with Otto, Volker, David," and other employees.

treated their grievance as a complaint of age discrimination and conducted an investigation; among other things, he interviewed several managers, including Feagans and Robert Wilk, who managed security for the company. Baker concluded that the complaint of age discrimination was unfounded and documented his findings in a confidential memorandum to Mesher.[5]

### C.    Changes to the Worcester Law Department

Shortly after the filing of the grievance, Mesher began making preparations to restructure the law department by outsourcing the trademark prosecution work and closing down the Worcester office entirely.[6] Mesher made the decision, with some input from Baker. There is no evidence that Feagans had any involvement in the decision, although he learned of it prior to its announcement to the staff. The record does not disclose precisely when the decision occurred, but it appears that it was made some time after the filing of the grievance in June or (at the latest) by mid-November 2001.[7]

The trademark-outsourcing decision involved the elimination of two positions: the Trademark Manager position (held by Lies) and an IP assistant. Lies learned of the decision in December 2001, and his position was eliminated effective in February 2002.

---

[5] During the same approximate time period, Bennett contends that he was unfairly treated with regard to his travel expenses. In April 2001, Bennett submitted a $65 dinner receipt for reimbursement. Feagans expressed the view to Bennett that the expense was on the high side and suggested guidelines for future travel expenditures. In August 2001, Mesher and Feagans received an e-mail from Cathy Ferrante notifying them that American Express was demanding that the company guarantee Bennett's company credit card. In his response to Ferrante, Mesher noted that he wanted "Bob Wilk to monitor [Bennett's] monthly statement to make sure it is only used for company business."

[6] According to Mesher, he decided to outsource the trademark function to reduce fixed costs and to expand the expertise available to the company beyond that possessed by Lies, who was not a lawyer.

[7] The company contends that the outsourcing decision was made in November 2001. However, Jean-Francois Phelizon, the CEO of Saint-Gobain, stated in a September 26, 2002 e-mail that the decision to close the Worcester office had been made at least a year earlier (i.e., September 2001).

The closure of the Worcester office was announced in September 2002.  The company offered the law department employees in Worcester two options:  they could relocate to Valley Forge or they could resign and accept one of two severance packages.[8]  A number of business unit managers in Worcester (who were clients of the Worcester law department, and who were not consulted by Mesher in advance of the decision) vigorously protested when they learned the office was closing.  Their opposition led to the revocation of the decision.[9]  On October 4, Mesher sent an e-mail to the employees of the Worcester law department stating that the closing decision was suspended and instructing them to return the severance packages to the human resources department.[10]

Bennett forwarded Mesher's October 4 e-mail to a number of employees (although not to Mesher or Feagans) with a comment appended:  "For any help you were able to provide in securing this result, a sincere Thank You."  One recipient, Benoit Bazin, a high-level manager, forwarded Bennett's "thank you" e-mail to Feagans on October 8 with the following message:

> Another example of inappropriate behavior.  I know that you fully share this point of view.  In addition, Dave Bennett should cc you on all his email, which is not always the case.  If you want me to tell him formally that his mail below is inappropriate, I can do it.  But I do not want to give him too much importance (since this is exactly what he is looking for).  I agree with you that we should work asap on a transition for David Bennett.

---

[8] All of the members of the Worcester law department received the same letter and were given the same options.  One of the packages provided for enhanced severance benefits in exchange for the signing of a release; the other apparently provided ordinary severance benefits but did not require a release.  The letter provided forty-five days for consideration of the offer, after which time it would be withdrawn.

[9] Phelizon acknowledged in an e-mail that the business unit managers were not in agreement with Mesher's decision and stated that the decision should be put on hold until a consensus was reached.

[10] Initially, Bennett was considering relocating and even traveled to Valley Forge to investigate housing options and the Saint-Gobain facility.  On October 25, 2002, Bennett told Mesher he was considering accepting the severance offer.  Mesher responded that the offer had been withdrawn on October 4.

Feagans then forwarded Bazin's message, and the content of the "thank you" e-mail, to Mesher.[11]

### D.    Bennett's Termination from Employment

On October 31, just weeks after the closure decision was revoked, Bennett's employment was terminated.  The company contends that this was because they discovered that Bennett was harassing another employee.

### 1.    Investigation into Complaints by Diana Henchey

In May 2002, Diana Henchey, a customer service employee, complained to Sonya Simonian, a human resources manager, that she was receiving poems anonymously at work.  One had been left on the windshield of her car in October 2001 and two had been sent in a manila, inter-office mail envelope on May 28, 2002.  At the time, Henchey suspected a co-worker named Alan Feltham.[12]

On September 27, 2002, Henchey received another poem through inter-office mail.  She complained to Simonian, stating she felt like she was being stalked.  The poems were not explicitly sexual, but strongly suggested that the writer had a romantic interest in Henchey.  The poems were typewritten; the envelopes in which the last three were delivered were addressed by hand in capital, block lettering.  They only included Henchey's name and mail stop number (e.g.,

---

[11] The parties dispute the meaning of the last sentence of Bazin's message.  Bennett argues that a "transition" for Bennett means that Feagans had decided by October 8 to end Bennett's employment.  Defendants argue that it reflects the manager's concern that the company prepare for Bennett's eventual, voluntary retirement (Bennett was 64) by hiring a new attorney in the meantime.  Although the Court for present purposes must resolve the dispute in plaintiff's favor, because Bennett has not established that Feagans was involved in the termination decision, the issue is not material.

[12] Simonian asked Henchey if she suspected anyone.  Henchey responded that Feltham made her feel uncomfortable, and she thought that the printing on the envelopes looked somewhat like his.  Simonian then interviewed Feltham, who denied sending the envelope to Henchey.  Apparently, Simonian did not take further action at that time.

"DIANA D. HENCHEY" and "SWR 419-201").

Simonian asked her if she suspected anyone.  Henchey described an individual she saw in the hallways at work and at the YMCA, who she believed worked in the law department.  She stated that the way he looked at her made her feel uncomfortable.  She also stated that she had had several casual conversations with him and that he spoke with a foreign accent.  She pointed out that several words in the poem were spelled in British English, including "meager," spelled m-e-a-g-r-e.  Simonian concluded she was describing Bennett.[13]

Simonian relayed the complaint to Cathy Ferrante, the human resources manager for the law department.  Ferrante notified Wilk of the complaint.  Wilk then retained Jean Joanne Berrie, an independent forensic document examiner, and Joe Jackson, an outside security consultant.[14]  It was at this time—around October 16—that Mesher first learned of the harassment investigation and the hiring of the document examiner.

Berrie was provided with photocopies of the poems and envelopes as well as handwriting exemplars of eight employees, including Bennett.  On October 22, she concluded it was "highly probable" Bennett was the writer of the handwriting on the envelope, "very probable" neither Feltham nor Henchey was the writer, and "not possible" any of the others was the writer.  She qualified her findings as subject to an examination of the original documents when they became available.[15]

---

[13] She stated that she no longer suspected Feltham because she did not think he would send another poem after Simonian had already talked to him.

[14] Jackson searched Bennett's office without his knowledge and found numerous handwritten poems, but not the same ones that had been sent to Henchey.

[15] At some point thereafter, the company provided Berrie with the Bennett handwriting exemplars in original form.  On November 11, 2002, Berrie amended her report to account for the receipt of original exemplars,

Wilk informed Mesher of these conclusions.  Mesher arranged for Wilk and Jackson to interview Bennett on October 31.  He also called Feagans to ensure Bennett would be available, although he did not tell Feagans what the meeting concerned.  No one notified Bennett in advance that the meeting was going to occur.

### 2.    Events of October 31

On October 31, Wilk and Jackson confronted Bennett and accused him of writing harassing poems to Henchey.  Bennett responded that he did not write poetry.  Wilk showed him the poems; Bennett denied writing them.  Bennett told Wilk that he could freely search his office.  Wilk did so, and discovered a number of handwritten poems.  Bennett admitted that he was the author of some of them, but stated that they were written to his wife.[16]  Wilk asked him to spell the word "meager," which Bennett spelled m-e-a-g-r-e.  Wilk then met with Mesher, told him what he learned, and gave his opinion that Bennett sent the poems.

Both Mesher and Ferrante then met with Bennett.  Mesher showed Bennett the envelopes and poems and asked whether he had written them.  Bennett said that he did not.  Mesher then told him that his employment was being terminated for the sexual harassment of Henchey.[17]  According to Bennett, he was not given the opportunity to review any documentation supporting the charge, or to refute it.

---

and concluded that the questioned documents "were written" by Bennett.  Her opinion as to the other subjects remained the same.  Her November opinion continued to be qualified, however, in that she still had not obtained a number of original documents.

[16] Wilk found a poem that described Feagans as "dim Tim" and Mesher as "weak-kneed."  Bennett admitted writing the poem, but explained that it was written for an employee who had retired.

[17] Mesher also said that Wilk wanted him to "press charges" and that Bennett "could get up to two years in prison."

Mesher testified that he did not make the decision to terminate Bennett until after Wilk

reported to him the results of the investigation that day.[18]  There is no evidence that Feagans had

any input into the termination decision.  At the time of Bennett's termination, he was 64 years old.


### 3.    Subsequent Events

Saint-Gobain did not provide Bennett with any written reasons for his termination.  A

completed company form, titled "employee change notice" and dated November 7, 2002, gave the

"reason for termination" as follows:

> Gross misconduct, including (i) a pattern of harassment of a female employee
> through anonymous, unwanted written communications, using interoffice mail and
> other means of delivery, which has caused the employee to be alarmed and
> distressed, (ii) gross insubordination (e.g., a poem highly critical of his immediate
> and ultimate supervisors), and (iii) a pattern of rude and unprofessional behavior
> directed at the General Counsel's office and other members of the Delegation staff.

Mesher testified that the latter two bases—insubordination and rude and unprofessional

behavior—would not have alone resulted in his termination.  According to Mesher, the

"compelling" reason, or the "triggering event" was his belief that Bennett had harassed Henchey.

By March 2003, the company hired two new IP lawyers in Worcester who were 29 and 45

years old, respectively.  These attorneys, and one other who was 34 years old, ultimately assumed

Bennett's duties.[19]  Apparently, the law departments in Worcester and Valley Forge were never

consolidated.

---

[18] Bennett challenges this, pointing to an e-mail by Mesher to Benoit Bazin on October 28, 2002, stating
that Mesher has "an issue with one of the IP lawyers that will be resolved on Thursday [October 31]."

[19] These employees apparently replaced Ulbrich as well, who had voluntarily retired.  Ulbrich negotiated a
severance package that was the same in substance as that offered in September 2002 to each law department
employee in Worcester.

Bennett contends he did not even know Henchey's name until the events of October 31 and did not send the poems. In his opposition to the motion, Bennett submitted the report of Nancy McCann, a certified document and handwriting examiner.[20] The report challenges Berrie's conclusion that Bennett was the writer of the questioned documents.[21]

## II.    Procedural History

Bennett filed a seventeen-count complaint on January 28, 2004, alleging claims of (1) age discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 (against all defendants); (2) age discrimination and retaliation under Mass. Gen. Laws ch. 151B (against Saint-Gobain); (3) aiding and abetting age discrimination and retaliation under Mass. Gen. Laws ch. 151B (against Mesher and Feagans); (4) breach of contract (against Saint-Gobain); (5) breach of implied contract (against Saint-Gobain); (6) promissory estoppel (against Saint-Gobain); and (7) interference with contractual relations (against Mesher and Feagans). On February 1, 2005, the Court granted defendants' motion to dismiss certain claims for failure to state a claim upon which relief can be granted, leaving the federal and state claims of age discrimination and retaliation against Saint-Gobain (Counts 1-4); the state claims of aiding

---

[20] The parties do not challenge the admissibility of the reports of each other's handwriting examiners.

[21] McCann examined the same documents on which Berrie relied to issue her October 22 and November 11 reports. (Apparently, Berrie issued a new report in 2005 that was based on additional Bennett handwriting exemplars; McCann received and considered these documents as well). McCann concluded it was not possible with any degree of certainty for Berrie to have identified Bennett as the writer of the questioned documents, or to exclude either Henchey or Feltham, without having the opportunity to review an adequate number of writings of each, preferably in equal quantities. She noted, and defendants do not dispute, that the quantity of Bennett exemplars provided to Berrie far exceeded the quantity of exemplars for the other subjects. In McCann's opinion, there were similarities between the Bennett, Henchey, and Feltham exemplars and the questioned documents. She conceded that the similarities with the Bennett exemplars were substantially greater, but she attributed this, at least in part, to the greater number of exemplars submitted for Bennett. She also stated that the questioned documents contained relatively common forms of capital, block-style handprinting, and were of limited quantity, which, in her opinion, made "it extremely difficult to opine, with any degree of certainty, as to the authorship of those limited envelope entries."

and abetting discrimination and retaliation against Mesher and Feagans (Counts 10, 11, 15, and

16); and the state claims of intentional interference against Mesher and Feagans (Counts 12 and

17).

In November 2005, Bennett moved for partial summary judgment, and defendants cross-

moved for summary judgment as to the remaining claims. On February 28, 2006, the Court held a

hearing on the motions; it denied Bennett's motion from the bench for reasons announced in open

court, and took defendants' motion under advisement.

**III.    Analysis**

Summary judgment may be entered if the record shows that "there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

R. Civ. P. 56(c). The evidence must be viewed in the light most favorable to the non-moving

party. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991).

**A.    Admissibility of Certain Evidence**

Generally speaking, evidence must be admissible at trial in order to be considered on

summary judgment. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990).[22] As an

initial matter, two issues of admissibility must be addressed.

First, plaintiff seeks to rely upon statements purportedly made by Feagans regarding his

desire to get rid of the older members of the IP group. According to plaintiff, Mary Porter stated

that Feagans told her, in substance,

> he would do absolutely nothing for David [Bennett] and Volker [Ulbrich], he was
> finished with them and he wanted rid of them. As far as he was concerned, he

---

[22] A significant exception is affidavits, which are generally not admissible at trial but may be considered
at the summary judgment stage. *See* Fed. R. Civ. P. 56(e).

wanted them to quit and he would do nothing to keep them, nor to address their
concerns about working conditions in our department.  He threatened he would do
everything in his power to make them leave.

She also stated that another employee, Joan Frank, told her that Feagans said "he wanted to hire

someone younger than her . . . but he was stuck with her."  Bennett contends that he confronted

Feagans about these comments, and that he denied making them.

Bennett argues that the statements are admissible against Feagans and Saint-Gobain as

statements of a party-opponent under Fed. R. Evid. 801(d)(2)(A) and (D).  However, the

threshold issue is foundation:  they have been submitted only in the form of unsworn memoranda

by Porter and Bennett, who do not even profess in those memoranda to have personal knowledge.

The statements are therefore not admissible.  *See* Fed. R. Civ. P. 56(e); *Cloutier v. Costco

Wholesale Corp.*, 390 F.3d 126, 137 (1st Cir. 2004).

Second, plaintiff seeks to offer evidence from the record of the proceedings before the

Massachusetts Division of Employment and Training ("DET").  Following his termination,

Bennett applied for unemployment benefits with the DET.  After his initial application was denied,

he appealed.  Because Saint-Gobain failed to respond to the initial application, it was precluded

from participating in the appeal hearing as a party, and was not allowed to cross-examine Bennett,

present any testimony, or make a closing argument.  After the hearing, DET awarded Bennett

unemployment benefits.  Essentially, Bennett now asks the Court to consider factual findings

made by the DET hearing examiner that he did not harass Henchey.

The Court sees little, if any, relevance in the hearing examiner's factual findings.  The

examiner's conclusions as to facts that are to be determined by a jury are simply not relevant.

Furthermore, the key inquiry in this case is not whether Bennett sent the poems, but whether

12

Mesher *believed* that he did—indeed, as to that issue, the DET examiner accepted the company's representation that Bennett was fired because it determined he harassed Henchey.  And even if the findings are relevant, they are hearsay.  The exception for public records and reports does not apply where "the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8).  Under DET procedures, the company was precluded from participating in the hearing, substantially undermining the trustworthiness of the findings.  *See Donald v. Rast*, 927 F.2d 379, 381 (8th Cir. 1991) (administrative law judge's findings excluded due to *ex parte* nature of administrative proceedings).  The statements are therefore inadmissible and may not be considered on summary judgment.

While the Court does not decide the issue, it also notes that a state bar to the admissibility of certain information in the DET record in subsequent court proceedings may operate as to the state-law claims.[23]

## B.    Age Discrimination

Counts 1 and 3 assert age discrimination claims against Saint-Gobain under federal and

---

[23] Under Massachusetts law, "information secured pursuant to [the chapter concerning unemployment insurance benefits] is confidential and for the exclusive use and information of the [DET] in the discharge of its duties.  Such information is not . . . admissible in any action or proceeding," with certain exceptions not relevant here.  Mass. Gen. Laws ch. 151A, § 46; *see Tuper v. N. Adams Ambulance Serv., Inc.*, 428 Mass. 132, 137 (1998). A state claim in federal court by virtue of the court's exercise of supplemental jurisdiction is generally governed by federal evidentiary law.  Fed. R. Evid. 101; *Downeast Ventures, Ltd. v. Washington County*, No. CV-05-87-B-W, 2006 WL 2602120, at *2 (D. Me. Sept. 7, 2006); *Vanderbilt v. Town of Chilmark*, 174 F.R.D. 225, 226-27 (D. Mass. 1997).  Although not free from doubt, where a state evidentiary rule would apply to a state law cause of action over which a federal court is exercising supplemental jurisdiction, and that rule is bound up with state substantive law, the state evidentiary rule should be applied to give effect to state substantive policy.  *See Downeast Ventures*, 2006 WL 2602120, at *2 n.3 (citing *Conway v. Chem. Leaman Tank Lines, Inc.*, 540 F.2d 837, 838 (5th Cir. 1976)); *cf. Daigle v. Maine Med. Ctr., Inc.*, 14 F.3d 684, 689-90 (1st Cir. 1994) (applying state rule making certain findings of medical malpractice screening panel admissible in subsequent court proceedings) (diversity jurisdiction).  Given the purposes of the unemployment insurance scheme to "afford relief to those who are unemployed through no fault of their own," and in light of the informality and requirement of swift adjudication of those proceedings, the bar to admissibility of DET findings and conclusions in most subsequent proceedings may be understood as a substantive rule to effectuate the purposes of the scheme.  *See Tuper*, 428 Mass. at 136 (citation omitted).

state law.  Counts 10 and 15 assert claims against Feagans and Mesher, respectively, for aiding

and abetting age discrimination under state law.

It is unlawful under both federal and Massachusetts law for an employer to discharge an

individual age 40 or older because of his age.  29 U.S.C. §§ 623(a)(1), 631(a); Mass. Gen. Laws

ch. 151B, §§ 1(8), 4(1B).  To prevail on an age discrimination claim, a plaintiff must prove four

elements:  (1) membership in a protected class; (2) harm; (3) discriminatory animus; and (4)

causation.  *Lewis v. City of Boston*, 321 F.3d 207, 213 (1st Cir. 2003); *Lipchitz v. Raytheon Co.*,

434 Mass. 493, 502 (2001).  As to the fourth element, the evidence must be sufficient to show

that discriminatory animus was the determinative cause.  *Lewis*, 321 F.3d at 213; *Knight v. Avon

Prod.*, 438 Mass. 413, 425-26 (2003).

Where no direct evidence of discriminatory animus and causation is presented, a plaintiff

may establish those elements circumstantially, using a three-stage burden-shifting method of

proof.  *Lewis*, 321 F.3d at 213-14; *see also Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 39-

40 (2005); *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).[24]  First, the

plaintiff must establish a *prima facie* case by a preponderance of the evidence.  Here, the *prima

facie* case consists of the following four elements:  (1) that plaintiff is a member of the protected

class; (2) that he performed his job at an acceptable level; (3) that he was fired; and (4) that he

---

[24]A possible alternative framework for considering discrimination claims is the "mixed-motive" analysis
established by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).  Mixed-motive analysis
may be applied where there is evidence that an employer considered both a proscribed factor and one or more
legitimate factors in making an adverse employment decision.  *Price Waterhouse*, 490 U.S. at 241-42; *see also
Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 105 n.3 (1st Cir. 2005).  In a mixed-motive case, the defendant may
assert the limited affirmative defense that it would have taken the same employment action absent the proscribed
factor.  42 U.S.C. § 2000e-5(g)(2)(B); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 95 (2003).  This limited
defense does not relieve defendant of liability, but limits the remedies available to the plaintiff.  *Desert Palace*, 539
U.S. at 95.  Because Bennett has not asserted a mixed-motive theory in this case, the Court will not apply that
analysis here.

was replaced by a younger person. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *Joyal v. Hasbro, Inc.*, 380 F.3d 14, 16 (1st Cir. 2004); *Knight*, 438 Mass. at 420-21.

The employer may rebut the presumption of discrimination created by the *prima facie* case by articulating a legitimate, non-discriminatory reason for the termination and producing some credible evidence to support that reason. *Reeves*, 530 U.S. at 142; *Sullivan*, 444 Mass. at 50. Finally, the plaintiff may submit evidence to show that the defendant's articulated reason is a pretext to hide discrimination. *Reeves*, 530 U.S. at 144; *Sullivan*, 444 Mass. at 54-55. If the plaintiff proffers sufficient evidence at the final stage, the jury may infer that the defendant's termination decision was made because of discrimination in violation of law. *Lewis*, 321 F.3d at 214; *Lipchitz*, 434 Mass. at 501.

The parties agree that Bennett has met the *prima facie* case: he is in the age-protected group; he was terminated from employment; he was otherwise performing his job acceptably; and he was replaced by younger employees. The parties also agree that defendants have articulated a legitimate, non-discriminatory reason for his discharge: his harassment of another employee. The fundamental issue with respect to the age discrimination claims, then, is whether Bennett has set forth sufficient evidence that the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143 (citation omitted); *Sullivan*, 444 Mass. at 54-55.

Bennett argues that he has set forth sufficient evidence of pretext because (1) the stated reason for his termination—harassment of a co-worker—is false; (2) he was treated differently from others who were similarly situated; and (3) by March 2003, the oldest members of the Worcester law department were no longer employed by the company. The Court will first

15

address Bennett's evidence under both ADEA and chapter 151B.

### 1.        ADEA Claim against Saint-Gobain

#### a.        Evidence That the Reason for His Termination Was False

Bennett first contends that the stated reason for his termination (harassment of a female

co-worker) is false, and therefore pretextual.  In certain circumstances, evidence that an

employer's reason for its termination decision is false may allow a jury to "infer from the falsity of

the explanation that the employer is dissembling to cover up a discriminatory purpose."  *Reeves*,

530 U.S. at 147.[25]  "Proof that the defendant's explanation is unworthy of credence is . . .

circumstantial evidence that is probative of intentional discrimination" and "may be quite

persuasive."  *Id.*

However, "[t]he question to be resolved is whether the defendant's explanation of its

conduct, together with any other evidence, could reasonably be seen by a jury not *only to be false

but to suggest an age-driven animus*."  *Ronda-Perez*, 404 F.3d at 44 (emphasis added).  Where,

as here, the employer's reason for termination is based on the results of an investigation into

alleged misconduct by the plaintiff, the inquiry is not whether the plaintiff's version of events is

true, but whether the decision-maker reasonably believed that the plaintiff had engaged in

misconduct.  *See id.* at 45.  Here, Bennett has not proffered sufficient evidence from which a jury

could find Mesher advanced a false reason.

It is undisputed that Mesher knew the following at the point he decided to terminate

---

[25] Bennett, in substance, argues that he is entitled to a jury trial because he has set forth both a *prima facie* case and sufficient evidence from which a jury could infer that the justification for the adverse action was not true. However, the First Circuit has rejected the argument that such evidence is sufficient to prevent summary judgment. *See Ronda-Perez v. Banco Bilbao Vizcaya Argentaria–P.R.*, 404 F.3d 42, 45 (1st Cir. 2005); *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 6 (1st Cir. 2000).

Bennett: that (1) Henchey identified Bennett as a suspect; (2) Bennett initially denied to Wilk that he wrote poetry, but later admitted to writing certain poems that were found in his office; (3) one of the poems Henchey received contained words spelled in British English; (4) Bennett is British; (5) when asked to spell a word in a poem Henchey received—the word "meager"—he spelled it in British English; and (6) a handwriting expert had issued an opinion (albeit subject to further examination of original documents) that it was "highly probable" that Bennett's handwriting matched that on the envelopes Henchey received. With that quantity of evidence pointing to Bennett, Mesher's belief that he had sent the poems to Henchey was hardly unreasonable. *See Ruiz v. Posadas de San Juan Assoc.*, 124 F.3d 243, 248 (1st Cir. 1997) (to refute the employer's legitimate, non-discriminatory reason, the plaintiff's "evidence must be of such strength and quality as to permit a reasonable finding that the . . . [termination] was *obviously or manifestly unsupported*.") (alteration in the original) (citation omitted).

Bennett denies sending the poems to Henchey, and cites the conclusions of his own document examiner in support.[26] However, that is not sufficient, under the circumstances, to create a genuine issue of material fact. *See Ronda-Perez*, 404 F.3d at 45 ("Plaintiff's plea that his denials establish triable issues of fact foreclosing summary judgment would, if accepted, spell the end of summary judgment."). Furthermore, Mesher's failure to credit Bennett's denial or to provide him with an opportunity to refute the charges does not suggest age animus. *See Sullivan*, 444 Mass. at 56 ("[O]ur task is not to evaluate the soundness of [the employer's] decision making, but to ensure it does not mask discriminatory animus.") (citing *Mesnick*, 950 F.2d at

---

[26] McCann (Bennett's expert) concluded that Berrie (Saint-Gobain's expert) could not have made her conclusions based on such a small quantity of questioned writing and exemplars. Even assuming that to be true, it is not significant in the absence of evidence that Mesher knew or should have known that Berrie's conclusions were suspect.

825).[27]

**b.     Evidence of Differential Treatment on the Basis of Age**

Bennett next argues that he was treated differently from others who were similarly situated. Evidence that similarly situated employees are treated differently in substantial respects may be strong evidence of discrimination. *See Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129 (1997). For comparisons to be valid, the employees must be similar in terms of performance, qualifications, conduct, and any other relevant characteristics or circumstances. *Id.* at 130; *see also Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 21 (1st Cir. 1999).

As evidence that he was treated differently on the basis of age, Bennett argues that (1) when another company employee, Keoni Dennison, was accused of making unwelcome phone calls to a female employee, Dennison was allowed an opportunity to rebut the accusations; (2) his was the only office searched in connection with Henchey's complaint; (3) Ulbrich was allowed to accept the severance package that had previously been revoked and denied to Bennett; and (4) he was the only IP lawyer reporting to Feagans whose travel expenses were questioned by management.

Bennett's evidence falls substantially short of establishing differential treatment. First, he fails to allege, much less provide admissible evidence, that Dennison was substantially younger than he. Second, his was the only office searched because he was the only real suspect; and if

---

[27] The fact that Bennett was initially given only one reason for his termination (harassment) but that the written employee change notice, dated one week later, included two additional reasons (gross insubordination and a pattern of rude behavior) is not sufficient, under the circumstances, to support a finding of pretext. *See Joyal*, 380 F.3d at 19 (where an employee was terminated for, among other things, attempted misuse of company property, the fact that the attempted misuse was perhaps a less serious reason than the others cited and may not have led to the termination standing alone did not suggest that the reason was false).

there were other suspects, Bennett has not provided evidence as to their ages.[28]  Third, Ulbrich is only three or four years younger than Bennett, which is not a meaningful distinction in this context.  *See Knight*, 438 Mass. at 424-25.  Fourth, Bennett has not provided evidence that substantially younger lawyers incurred similar (or greater) travel expenses and were not subjected to the same scrutiny.

### c.     Changing Demographics of the Worcester Law Department

Finally, Bennett argues that the changing demographics of the law department in Worcester are sufficient to raise an inference of age animus.  He points to the fact that the company had eliminated the oldest members of the IP group (Bennett, Ulbrich, and Lies) by March 2003.  It is undisputed, however, that Ulbrich voluntarily retired.  Although the average age of the Worcester law department fell from 52 in 1999 to 48 in March 2003, the employee population at issue is relatively small, and there is no evidence that the decrease is statistically significant.  *See, e.g., LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993); *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 32 (1st Cir. 2003).

Bennett also urges the Court to draw the inference that Mesher's decision to close the Worcester law department was a ruse to eliminate its older members, who (he argues) because of their age, were less likely to be willing to relocate.[29]  This is not a reasonable inference from the record; an employee's willingness to relocate depends on many factors, including such things as

---

[28] Bennett was the only person identified by Henchey in September 2002 as a suspect.  Even if the company's decision to treat Bennett as the lead suspect was mistaken, it was hardly unreasonable.  *See Ronda-Perez*, 404 F.3d at 47 (mere inaccuracies or irregularities in investigation into misconduct not suggestive of deceit to cover unlawful purposes).

[29] The Court notes that it is undisputed that both Bennett and Ulbrich were seriously considering relocating, although neither of them affirmatively stated that they would do so.

the employee's family situation, alternative employment possibilities, and any financial incentives tied to the relocation. Here, at most, the evidence supports an inference that Mesher hoped that few, if any, of the IP lawyers would accept relocation.[30] The IP lawyers ranged in age at that time from 34 to 64, although most of them were over 40. Nevertheless, the changing demographics of the law department as a whole are insufficient evidence to support an inference that Mesher was biased against older workers.[31]

Accordingly, Bennett has not put forth sufficient evidence that the reason given for the decision to terminate him was a pretext, and therefore the ADEA claim must fail.

## 2.    **Chapter 151B Claim against All Defendants**

Massachusetts courts construe state age discrimination law the same as federal age discrimination law in most respects. *See Sullivan*, 444 Mass. at 40 n.11. The Court analyzes the state age discrimination claim separately to highlight a potential difference and to address the matter of the individually named defendants.

---

[30] The evidence supporting this inference is as follows: on September 26, the company's CEO stated to certain managers that "the goal of the operation [i.e., the closure] is simply to eliminate unnecessary positions (except Feagans)" and that Mesher "thinks that we don't need as many patent lawyers;" and on October 2, Mesher told the managers his decision "has been a long time coming" and remarked that the Worcester law department "does not foster good morale or efficiency" and "has been extremely difficult to manage . . . [t]his has been particularly true with respect to the patent lawyers ever since the Norton acquisition [in the early 1990's]. They have never wanted to be a part of the 'team' and have actively attempted to undermine virtually all decisions relating to the Worcester office." He also stated that several of the lawyers may move to Valley Forge, including Feagans, and that several of the IP lawyers were in fruitful discussions to join a private law firm, which he noted "would be a good solution to preserve knowledge base and build continuity."

[31] Unrebutted evidence that supports defendants' case may also be considered under federal law. *Reeves*, 530 U.S. at 148-49. Accordingly, the Court notes that Mesher approved a raise for Bennett in April 2002; signed off on a positive performance evaluation of him in February 2002; hired two paralegals in their late 50s in the period from 2000 to 2002; and hired three lawyers who were in their late 40s or early 50s between 1998 and 2002.

### a.    Potential Difference Between State and Federal Law

The analysis of age discrimination claims under Massachusetts law is "in one relevant respect perhaps . . . friendlier to plaintiffs." *Joyal*, 380 F.3d at 17.  In 2001, the Supreme Judicial Court held in *Lipchitz v. Raytheon* that a plaintiff "may be able—automatically and regardless of circumstances—to avoid a directed verdict and reach a jury if he or she proves that at least one of the reasons given by the defendant was pretextual." *Id.*; *Lipchitz*, 434 Mass. at 498-99.  In other words, *Lipchitz* could be construed to support the proposition that a plaintiff who meets the *prima facie* case and also sets forth sufficient evidence from which the jury could conclude that at least one of the defendant's reasons was false is entitled as a matter of law to a jury trial. *Lipchitz*, 434 Mass. at 498-99.[32]

Even under this more generous rule, Bennett's claim under Chapter 151B is unsupported by the evidence.  As described above, Bennett has not put forth evidence sufficient to cast doubt on the reasonableness of Mesher's belief that he harassed a female employee.[33]  Accordingly, the claim for age discrimination under Chapter 151B must fail.

---

[32] The First Circuit has noted that such a rule would be "oddly mechanical," and may lead to counterintuitive results when taken to its extreme. *Joyal*, 380 F.3d at 17 (assuming, without deciding, that under Massachusetts law, "any deliberately false reason would get [a plaintiff] to a jury").  Even under a more generous rule, the focus under state law is still on the truth or falsity of the *reason* for the termination.  "'[I]f the reason given by the employer is the real reason for its action,' it does not matter if 'the employer's action was arbitrary or unwise.'" *Joyal*, 380 F.3d at 19 (quoting *Wheelock Coll. v. MCAD*, 371 Mass. 130, 138-39 (1976)).

[33] The SJC decided a recent discrimination case on essentially this ground.  *Sullivan v. Liberty Mut. Ins.*, 444 Mass. 34 (2005).  In *Sullivan*, plaintiff was an in-house attorney whose manager selected her for layoff after comparing her performance evaluations, areas of expertise, and other characteristics to her co-workers. *Id.* at 51-52.  There was no direct evidence of discriminatory animus on the part of the decision-maker.  The primary reason for her layoff was her manager's negative impression of her abilities and complaints that he had received from her clients. *Id.* at 56-57.  Plaintiff challenged the factual underpinning of that belief by arguing she was a competent attorney and that a negative impression of her was unwarranted. *Id.*  Summary judgment for the employer was upheld, however, because plaintiff failed to challenge whether her manager truly believed that she had mishandled her cases. *Id.*

21

### b.    Aiding and Abetting

Because the company is not liable for age discrimination under state law, there can be no claim against Mesher, the decision-maker, for aiding or abetting discrimination.  *See Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 122 (2000) (aiding and abetting claim entirely derivative of discrimination claim; where new trial was required for discrimination claim, it was required for aiding and abetting claim).  The same is true for the claim against Feagans, which is based on the same events.[34]

### C.    Unlawful Retaliation

Counts 2 and 4 assert claims against Saint-Gobain for unlawful retaliation under federal and state law.  Counts 11 and 16 assert claims against Feagans and Mesher, respectively, for aiding and abetting retaliation under state law.

### 1.    Retaliation under Federal and State Law

The anti-retaliation provision of the ADEA states as follows:

> [i]t shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d).  Similarly, Mass. Gen. Laws ch. 151B provides that it is an unlawful practice "[f]or any person [or] employer . . . to discharge, expel or otherwise discriminate against any

---

[34] In any event, it is undisputed that Feagans did not know about the investigation into Bennett's conduct or the decision to fire him until after he was terminated.  Bennett argues that the Court should infer that he had a role in Mesher's termination decision by virtue of (1) his position as Bennett's manager; (2) his reporting relationship to Mesher; (3) his communications with Mesher in 2000 and 2001 about Bennett's disrespectful conduct; and (4) the fact that Bazin "agreed" with Feagans that a "transition" for Bennett should be completed.  At best, the evidence suggests that Feagans found Bennett difficult to manage and decided he should be separated from the company.  But there is no evidence that Feagans attempted to, or did, influence Mesher's termination decision in any improper way.

person because he has opposed any practices forbidden under [Chapter 151B]," § 4(4), or "[f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by [Chapter 151B]," § 4(4A).

A plaintiff must establish three elements to prove a *prima facie* case of retaliation under either statute: that (1) he engaged in protected conduct; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Ramirez Rodriguez v. Boehringer Ingelheim Pharm., Inc.*, 425 F.3d 67, 84 (1st Cir. 2005);[35] *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 662 (1996).

Under both statutes, once the plaintiff has established this *prima facie* showing, the defendant must articulate a legitimate, non-retaliatory reason for its action in order to avoid summary judgment. *Ramirez Rodriguez*, 425 F.3d at 84; *Mole v. Univ. of Mass.*, 442 Mass. 582, 591 (2004). If the defendant meets this burden, the plaintiff must show the reason was a pretext for the defendant's retaliatory animus. *Ramirez Rodriguez*, 425 F.3d at 84-85; *Mole*, 442 Mass. at 591; *see also Abramian*, 432 Mass. at 121(plaintiff must show that the employer's "desire to retaliate against [him] was a determinative factor in its decision.") (alteration in original) (citation omitted).

There is no doubt that Bennett's June 2001 grievance constituted protected activity under state and federal law. *Cf. White v. N.H. Dep't of Corr.*, 221 F.3d 254, 262 (1st Cir. 2000) (internal complaint protected activity under Title VII); *Valerio v. Putnam Assoc., Inc.*, 173 F.3d 35, 41 (1st Cir. 1999) (internal complaint protected activity under the FLSA). And, there is no

---

[35] *Cf. Burlington N. & Santa Fe Ry. Co. v. White*, No. 05-259, 2006 WL 1698953, at *10 (June 22, 2006) (Title VII) (plaintiff must show he suffered a materially adverse action in that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"; adverse action need not be employment related) (citations omitted) (internal quotation marks omitted).

doubt he suffered a materially adverse employment action. The question, then, is whether the circumstances suggest that his protected activity was causally related to his termination for purposes of establishing a *prima facie* case.

Plaintiff has not submitted evidence sufficient to support such a finding. First, defendants have offered evidence of insubordination and other problems concerning Bennett that substantially predate the filing of his grievance. Second, after the filing of the grievance in June 2001, there was a delay of sixteen months before Bennett's employment was terminated in October 2002. Such a delay undermines a finding of causal connection. *Cf., e.g., Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110-11 (1st Cir. 1988) (long period of delay between initial EEOC complaint and ultimate discharge negates inference of retaliation); *see also Mesnick*, 950 F.2d at 828. Third, the unrebutted evidence shows that Bennett's employment not only remained intact during this period, but he was also given a positive performance evaluation and received a pay raise. Finally, Bennett's discharge came only after he was suspected of sexually harassing a female co-worker. This series of events simply cannot support a finding that Bennett's grievance and ultimate termination were casually connected.[36]

Even assuming, for the sake of argument, that Bennett has established a *prima facie* case of retaliation, he has failed to provide sufficient evidence that the company's articulated reason was a pretext for retaliation. As discussed above, Bennett has failed to demonstrate that the

---

[36] The First Circuit considered a retaliation claim under the ADEA in a case with similar facts. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816 (1st Cir. 1991). In *Mesnick*, the Court focused on "the very chronology of the case" in finding an "absence of a causal connection between the statutorily protected conduct and the adverse employment action, not the converse." *Id.* at 828. Specifically, the Court emphasized the "long gestation period" between the plaintiff's filing of a discrimination complaint and his ultimate termination, evidence offered by the defendant of insubordination that predated the filing of the complaint, and the fact that the plaintiff was only fired after "committing a particularly provocative act." *Id.*

stated reason for his termination was pretextual, and there is no evidence suggesting retaliatory animus. The retaliation claim must therefore fail.

### 2.    Aiding and Abetting

Bennett has asserted claims under state law against Feagans and Mesher for aiding and abetting the alleged unlawful retaliation of Saint-Gobain. *See generally* Mass. Gen. Laws ch. 151B, § 4(5); *see also Beaupre v. Cliff Smith & Assoc.*, 50 Mass. App. Ct. 480, 494-95 (2000). Again, because the Court has concluded that there was no unlawful retaliation, the claim of aiding and abetting must necessarily fail. *See Abramian*, 432 Mass. at 122.

### D.    Intentional Interference with Contract

Finally, Counts 12 and 17 asserts claims of intentional interference with contractual relations against Feagans and Mesher. Under Massachusetts law, a plaintiff must prove four elements to succeed on an intentional interference with contractual relations claim: that (1) the plaintiff had a contract with a third party; (2) the defendant induced a breach of that contract knowingly; (3) the interference was improper in motive or means; and (4) the plaintiff was harmed thereby. *Wright v. Shriners Hosp.*, 412 Mass. 469, 476 (1992). Where a plaintiff claims that his supervisor interfered with his at-will employment relationship, he must additionally prove actual malice on the part of the supervisor. *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 76-77 (1st Cir. 2001) (explaining that a supervisor has a conditional privilege for employment decisions in the scope of his supervisory duties).

As already noted, Bennett has not put forth evidence that Feagans contributed in any way to the decision to terminate him. Accordingly, the claim against Feagans must fail. With respect to Mesher, Bennett has failed to put forth evidence that malice or ill-will – rather than a

25

reasonable belief that Bennett sent the poems to Henchey – led to the termination decision. In addition, it is undisputed that after the filing of the grievance, Mesher signed a positive performance evaluation and approved a raise for Bennett, both of which are clearly inconsistent with the claim that he was motivated by malice. Thus, there is insufficient evidence to support a claim of intentional interference against Mesher.

## IV.    Conclusion

For the foregoing reasons, defendants' Motion for Summary Judgment as to all remaining counts of the complaint is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: September 29, 2006